**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIK LUNA, LAURA PALYA, NOELLE HOFFMAN, ANNIE CALLANTA, RACHEL FOLEY, KATHLEEN CAHILL, ERIN ROTTENBERG, MELISSA MOSHER, and JENNIFER STRAIT, individually, and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No. 18-cv-05165 Honorable Harry D. Leinenweber Magistrate Judge Michael T. Mason |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| 4C KINZIE INVESTOR LLC d/b/a Highline Bar & Lounge, et al., | ) ) ) | |
| Defendants. | ) ) | |

## <u>AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT</u>

Thomas A. Zimmerman, Jr.
Sharon A. Harris
Matthew C. De Re
Nickolas J. Hagman
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
Firm I.D. No. 34418

*Counsel for Plaintiffs, the putative
Collective Groups, and the putative Classes*

## TABLE OF CONTENTS

THE DEFENDANTS ................................................................................................. 2

THE PLAINTIFFS ................................................................................................... 19

JURISDICTION AND VENUE ............................................................................... 21

FACTUAL ALLEGATIONS ................................................................................... 21

FACTS RELEVANT TO PLAINTIFF ERIK LUNA ............................................ 37

FACTS RELEVANT TO PLAINTIFF LAURA PALYA ...................................... 40

FACTS RELEVANT TO PLAINTIFF NOELLE HOFFMAN ............................. 41

FACTS RELEVANT TO PLAINTIFF ANNIE CALLANTA ............................... 43

FACTS RELEVANT TO PLAINTIFF RACHEL FOLEY ................................... 44

FACTS RELEVANT TO PLAINTIFF KATHLEEN CAHILL ........................... 46

FACTS RELEVANT TO PLAINTIFF ERIN ROTTENBERG ............................ 48

FACTS RELEVANT TO PLAINTIFF MELISSA MOSHER .............................. 49

FACTS RELEVANT TO PLAINTIFF JENNIFER STRAIT ............................... 51

COLLECTIVE ACTION ALLEGATIONS ........................................................... 53

CLASS ACTION ALLEGATIONS ........................................................................ 56

COUNT I .................................................................................................................. 61

COUNT II ................................................................................................................. 63

COUNT III ............................................................................................................... 66

COUNT IV ................................................................................................................ 69

COUNT V ................................................................................................................. 70

COUNT VI ................................................................................................................ 75

COUNT VII .............................................................................................................. 82

JURY DEMAND ...................................................................................................... 86

Representative Plaintiffs Erik Luna ("Luna"), Laura Palya ("Palya"), Noelle Hoffman ("Hoffman"), Annie Callanta ("Callanta"), Rachel Foley ("Foley"), Kathleen Cahill ("Cahill"), Erin Rottenberg ("Rottenberg"), Melissa Mosher ("Mosher"), and Jennifer Strait ("Strait") (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel, bring this action against Defendants 4C Kinzie Investor LLC d/b/a Highline Bar & Lounge, 1001 W. Lake Opco, LLC d/b/a Federales, 4C 1001 W. Lake Opco, LLC, 4C 15 E. Illinois Operations, LLC d/b/a Fremont Bar, Four Corners Tavern Fund Management, LLC, 1500 N. Wells Opco, LLC d/b/a 80 Proof f/k/a SteakBar, 4C 1500 N. Wells Opco, LLC, Talbott Associates, L.P. d/b/a 20 East, 4C Wrigley, LLC d/b/a Brickhouse Tavern, Keystone Holdings Corp., 4C Riverside, LLC d/b/a Porter Kitchen & Deck, Cheval Porter Manager, LLC, Wells Holdings, LLC d/b/a Benchmark Bar and Grill, Wells Holdings Manager, LLC, West Loop Tap, L.L.C. d/b/a Westend Bar & Grill f/k/a Brownstone Tavern & Grill (Madison and Ada), Shef at Oak, Inc. d/b/a Kirkwood Bar & Grill f/k/a Brownstone Tavern & Grill (Sheffield and Oakdale), River North Tap, Inc. d/b/a Sidebar Grille, Rocco's, LLC d/b/a Ranalli's, Clark Street Restaurant Partners, LLC f/k/a 2450 N. Clark, Inc. d/b/a Gaslight, Asclose, Inc. d/b/a Schoolyard Tavern & Grill, The Chase Tavern, Inc. d/b/a Trellis Wine Bar, Saloon Holdings, LLC d/b/a The Crossing Tavern, Saloon Holdings Manager, LLC, Hardtales, Inc. d/b/a Brownstone Tavern & Grill (Lincoln and Irving Park), a voluntary unincorporated association known as Four Corners, Four Corners Tavern Fund I, LLC, Four Corners Tavern Group Fund Investor, LLC, Four Corners Tavern Partners, LLC, Four Corners Tavern Group Inc., Four Corners Holdings, LLC, Four Corners Capital Advisors, LLC, Four Corners Shuttle, LLC, 4C Cheval LLC, 1001 W. Lake, LLC, Matthew Menna, and Andrew Gloor (collectively, "Defendants"), as follows:

**THE DEFENDANTS**

1.      Defendant 4C Kinzie Investor LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.    4C Kinzie Investor LLC does business as Highline Bar & Lounge, located at 169 West Kinzie Street, Chicago, Illinois 60654.  4C Kinzie Investor LLC employs, and controls the payment of wages to, bartenders and waiters who serve food and drinks (collectively, "Servers") to Highline Bar & Lounge's customers.  As such, 4C Kinzie Investor LLC is an "employer" of the Servers at Highline Bar & Lounge as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C Kinzie Investor LLC and those Servers as defined by 26 U.S.C. § 3121(b).

2.      Defendant 1001 W. Lake Opco, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. 1001 W. Lake Opco, LLC does business as Federales, located at 180 North Morgan Street, Chicago, Illinois 60607. 1001 W. Lake Opco, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Federales's customers.  As such, 1001 W. Lake Opco, LLC is an "employer" of the Servers at Federales as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 1001 W. Lake Opco, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

3.      Defendant 4C 1001 W. Lake Opco, LLC is a Delaware limited liability company with its principal place of business located at 1330 West Fulton Street, Chicago, Illinois 60607. 4C 1001 W. Lake Opco, LLC is the manager of Defendant 1001 W. Lake Opco, LLC. Through 1001 W. Lake Opco, LLC, 4C 1001 W. Lake Opco, LLC employs, and controls the payment of

2

wages to, Servers who serve food and drinks to Federales's customers. As such, 4C 1001 W. Lake Opco, LLC is an "employer" of the Servers at Federales as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C 1001 W. Lake Opco, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

4.      Defendant 4C 15 E. Illinois Operations, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. 4C 15 E. Illinois Operations, LLC does business as Fremont Bar, located at 15 West Illinois Street, Chicago, Illinois 60654. 4C 15 E. Illinois Operations, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Fremont Bar's customers. As such, 4C 15 E. Illinois Operations, LLC is an "employer" of the Servers at Fremont Bar as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C 15 E. Illinois Operations, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

5.      Defendant Four Corners Tavern Fund Management, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Four Corners Tavern Fund Management, LLC is the manager of Defendant 4C 15 E. Illinois Operations, LLC. Through 4C 15 E. Illinois Operations, LLC, Four Corners Tavern Fund Management, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Fremont Bar's customers. As such, Four Corners Tavern Fund Management, LLC is an "employer" of the Servers at Fremont Bar as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an

"employment" relationship between Four Corners Tavern Fund Management, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

6.       Defendant 1500 N. Wells Opco, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.  1500 N. Wells Opco, LLC does business as 80 Proof, located at 1500 North Wells Street Chicago, IL 60610. 1500 N. Wells Opco, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to 80 Proof's customers.  As such, 1500 N. Wells Opco, LLC is an "employer" of the Servers at 80 Proof as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 1500 N. Wells Opco, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

7.       Defendant 4C 1500 N. Wells Opco, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.  4C 1500 N. Wells Opco, LLC is the manager of Defendant 1500 N. Wells Opco, LLC. Through 1500 N. Wells Opco, LLC, 4C 1500 N. Wells Opco, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to 80 Proof's customers.  As such, 4C 1500 N. Wells Opco, LLC is an "employer" of the Servers at 80 Proof as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C 1500 N. Wells Opco, LLC and those Servers as defined by 26 U.S.C. § 3121(b).  Prior to being known as 80 Proof, this bar and restaurant was known as SteakBar.

8.       Defendant Talbott Associates, L.P. is an Illinois limited partnership with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.

4

Talbott Associates, L.P. does business as 20 East, located at 20 East Delaware Place, Chicago, Illinois 60611. Talbott Associates, L.P. employs, and controls the payment of wages to, Servers who serve food and drinks to 20 East's customers.  As such, Talbott Associates, L.P. is an "employer" of the Servers at 20 East as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Talbott Associates, L.P. and those Servers as defined by 26 U.S.C. § 3121(b).

9.      Defendant 4C Wrigley, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.  4C Wrigley, LLC does business as Brickhouse Tavern, located at 3647 North Clark Street, Chicago, Illinois 60613. 4C Wrigley, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Brickhouse Tavern's customers.  As such, 4C Wrigley, LLC is an "employer" of the Servers at Brickhouse Tavern as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C Wrigley, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

10.     Defendant Keystone Holdings Corp. is an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Keystone Holdings Corp. is the manager of Defendant 4C Wrigley, LLC.  Through 4C Wrigley, LLC, Keystone Holdings Corp. employs, and controls the payment of wages to, Servers who serve food and drinks to Brickhouse Tavern's customers.  As such, Keystone Holdings Corp. is an "employer" of the Servers at Brickhouse Tavern as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Keystone Holdings Corp. and those Servers as defined by 26 U.S.C. § 3121(b).

11.     Defendant 4C Riverside, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.   4C Riverside, LLC does business as Porter Kitchen & Deck, located at 150 North Riverside Plaza, Chicago, Illinois 60606. 4C Riverside, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Porter Kitchen & Deck's customers.  As such, 4C Riverside, LLC is an "employer" of the Servers at Porter Kitchen & Deck as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C Riverside, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

12.     Defendant Cheval Porter Manager, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.  Cheval Porter Manager, LLC is the manager of Defendant 4C Riverside, LLC.  Through 4C Riverside, LLC, Cheval Porter Manager, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Porter Kitchen & Deck's customers.  As such, Cheval Porter Manager, LLC is an "employer" of the Servers at Porter Kitchen & Deck as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Cheval Porter Manager, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

13.     Defendant Wells Holdings, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Wells Holdings, LLC does business as Benchmark Bar and Grill, located at 1510 North Wells Street, Chicago, Illinois 60610. Wells Holdings, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Benchmark Bar and Grill's customers.  As such, Wells

Holdings, LLC is an "employer" of the Servers at Benchmark Bar and Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Wells Holdings, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

14. Defendant Wells Holding Manager, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Wells Holding Manager, LLC is the manager of Defendant Wells Holdings, LLC. Through Wells Holdings, LLC, Wells Holding Manager, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Benchmark Bar and Grill's customers. As such, Wells Holding Manager, LLC is an "employer" of the Servers at Benchmark Bar and Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Wells Holding Manager, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

15. Defendant West Loop Tap, L.L.C. is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. West Loop Tap, L.L.C. does business as Westend Bar & Grill, located at 1326 West Madison Street Chicago, Illinois 60607. West Loop Tap, L.L.C. employs, and controls the payment of wages to, Servers who serve food and drinks to Westend Bar & Grill's customers. As such, West Loop Tap, L.L.C. is an "employer" of the Servers at Westend Bar & Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between West Loop Tap, L.L.C. and those Servers as defined by 26 U.S.C. § 3121(b). Prior to being known as Westend Bar & Grill, this bar and restaurant was known as Brownstone Tavern & Grill (Madison and Ada).

7

16.     Defendant Shef at Oak, Inc. is an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Shef at Oak, Inc. does business as Kirkwood Bar & Grill, located at 2934 North Sheffield Avenue, Chicago, Illinois 60657. Shef at Oak, Inc. employs, and controls the payment of wages to, Servers who serve food and drinks to Kirkwood Bar & Grill's customers. As such, Shef at Oak, Inc. is an "employer" of the Servers at Kirkwood Bar & Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Shef at Oak, Inc and those Servers as defined by 26 U.S.C. § 3121(b). Prior to being known as Kirkwood Bar & Grill, this bar and restaurant was known as Brownstone Tavern & Grill (Sheffield and Oakdale).

17.     Defendant River North Tap, Inc. is an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. River North Tap, Inc. does business as Sidebar Grille, located at 221 North LaSalle Street, Chicago, Illinois 60601. River North Tap, Inc. employs, and controls the payment of wages to, Servers who serve food and drinks to Sidebar Grille's customers. As such, River North Tap, Inc. is an "employer" of the Servers at Sidebar Grille as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between River North Tap, Inc. and those Servers as defined by 26 U.S.C. § 3121(b).

18.     Defendant Rocco's, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Rocco's, LLC does business as Ranalli's, located at 1925 North Lincoln Avenue, Chicago, Illinois, 60614. Rocco's, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Ranalli's's customers. As such, Rocco's, LLC is an "employer" of the Servers at

Ranalli's as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Rocco's, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

19.     Defendant Clark Street Restaurant Partners, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.  Clark Street Restaurant Partners, LLC does business as Gaslight, located at 2450 North Clark Street, Chicago, Illinois 60614. Clark Street Restaurant Partners, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Gaslight's customers. As such, Clark Street Restaurant Partners, LLC is an "employer" of the Servers at Gaslight as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Clark Street Restaurant Partners, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

20.     Until approximately June 13, 2018, 2450 N. Clark, Inc. was an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.  2450 N. Clark, Inc. did business as Gaslight, located at 2450 North Clark Street, Chicago, Illinois 60614.  2450 N. Clark, Inc. employed, and controlled the payment of wages to, Servers who served food and drinks to Gaslight's customers.  As such, 2450 N. Clark, Inc. was an "employer" of the Servers at Gaslight as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 2450 N. Clark, Inc. and those Servers as defined by 26 U.S.C. § 3121(b).  On or about June 13, 2018, 2450 N. Clark, Inc. was merged into, and consolidated with, Defendant Clark Street Restaurant Partners, LLC.  On information and belief, this merger and consolidation was

cosmetic only, did not affect Gaslight's operations, and transferred any and all ongoing liabilities from 2450 N. Clark, Inc. to Clark Street Restaurant Partners, LLC.

21.     Defendant Asclose, Inc. is an Illinois corporation with its principal place of business located at 1259 West Foster Avenue, #1, Chicago, Illinois 60640.  Until approximately June 2018, Asclose, Inc. did business as Schoolyard Tavern & Grill, located at 3258 North Southport Avenue, Chicago, Illinois 60657.  However, in approximately June 2018, Asclose, Inc. was sold to a new owner (or owners).[1] On information and belief, that sale did not affect any of Asclose, Inc.'s ongoing liabilities.  Prior to that sale, Asclose, Inc.'s principal place of business was located at 1040 West Randolph Street, Chicago, Illinois 60607.  Until approximately June 2018, Asclose, Inc. employed, and controlled the payment of wages to, Servers who served food and drinks to Schoolyard Tavern & Grill's customers.  As such, Asclose, Inc. was an "employer" of the Servers at Schoolyard Tavern & Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was an "employment" relationship between Asclose, Inc. and those Servers as defined by 26 U.S.C. § 3121(b).

22.     Defendant The Chase Tavern, Inc. is an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. From approximately November 2013 through June 2015, The Chase Tavern, Inc. did business as Trellis Wine Bar, located at 2426 North Racine Avenue, Chicago, Illinois 60614.  During that time, The Chase Tavern, Inc. employed, and controlled the payment of wages to, Servers who served food and drinks to Trellis Wine Bar's customers.  As such, The Chase Tavern, Inc. was an "employer" of the Servers at Trellis Wine Bar as that term is defined by 29 U.S.C. § 203(d), 820 ILCS

---

[1] http://www.chicagotribune.com/business/ct-biz-schoolyard-tavern-links-four-corners-20180611-story.html

105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was an "employment" relationship between The Chase Tavern, Inc. and those Servers as defined by 26 U.S.C. § 3121(b).

23.     Defendant Saloon Holdings, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.  Until approximately 2017, Saloon Holdings, LLC did business as The Crossing Tavern, located at 2548 North Southport Avenue, Chicago, Illinois 60614.  During that time, Saloon Holdings, LLC employed, and controlled the payment of wages to, Servers who served food and drinks to The Crossing Tavern's customers.  As such, Saloon Holdings, LLC was an "employer" of the Servers at The Crossing Tavern as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was an "employment" relationship between Saloon Holdings, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

24.     Defendant Saloon Holdings Manager, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607.  Saloon Holdings Manager, LLC is the manager of Defendant Saloon Holdings, LLC.  Through Saloon Holdings, LLC, Saloon Holdings Manager, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to The Crossing Tavern's customers.  As such, Saloon Holdings Manager, LLC is an "employer" of the Servers at The Crossing Tavern as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Saloon Holdings Manager, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

25.     Defendant Hardtales, Inc. is an Illinois corporation with its principal place of business located at 4711 W. Golf Road, Suite 1125, Skokie, Illinois 60076.  Until approximately 2016, an unknown entity did business as Brownstone Tavern & Grill (Lincoln and Irving Park),

located at 3937 North Lincoln Avenue, Chicago, Illinois 60613. However, in approximately 2016, Brownstone Tavern & Grill (Lincoln and Irving Park) was sold to Hardtales, Inc. On information and belief, that sale did not affect the Brownstone Tavern & Grill (Lincoln and Irving Park)'s operations, and any and all ongoing liabilities of the unknown entity as pertaining to the Brownstone Tavern & Grill (Lincoln and Irving Park) were transferred to Hardtales, Inc. Prior to that sale, that unknown entity employed, and controlled the payment of wages to, Servers who served food and drinks to Brownstone Tavern & Grill (Lincoln and Irving Park)'s customers. As such, that unknown entity was an "employer" of the Servers at Brownstone Tavern & Grill (Lincoln and Irving Park) as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was an "employment" relationship between that unknown entity and those Servers as defined by 26 U.S.C. § 3121(b).

26.     Each of the foregoing bars and restaurants, and the entities (and parent entities) that own and manage them, are part of a collection of bars and restaurants located in Chicago, Illinois operating under the common "Four Corners" enterprise.[2] As such, Defendant Four Corners is a voluntary unincorporated association of entities operating the foregoing bars and restaurants located in Chicago, Illinois. Like the constituent entities within the Four Corners enterprise, Defendant Four Corners employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Defendant Four Corners was, and is, an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was, and is, an

---

[2] See www.4cbars.com ("Four Corners is one of Chicago's leading hospitality groups that owns and operates … our current portfolio of 15 venues in Chicago.")

"employment" relationship between Defendant Four Corners and those Servers as defined by 26 U.S.C. § 3121(b).

27. In addition to the foregoing bars and restaurants, and the entities (and parent entities) that own and manage them, several other entities operate within the Four Corners enterprise.

28. Defendant Four Corners Tavern Fund I, LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Defendant Four Corners Tavern Fund Management, LLC is the manager of Four Corners Tavern Fund I, LLC, and Four Corners Tavern Fund I, LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, Four Corners Tavern Fund I, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Four Corners Tavern Fund I, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Tavern Fund I, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

29. Defendant Four Corners Tavern Group Fund Investor, LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Four Corners Tavern Group Fund Investor, LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, Four Corners Tavern Group Fund Investor, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Four Corners Tavern Group Fund Investor, LLC is an "employer" of the Servers at the bars and

restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Tavern Group Fund Investor, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

30.     Defendant Four Corners Tavern Partners, LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607.  Four Corners Tavern Partners, LLC is a part of the Four Corners enterprise.  Through its participation in the Four Corners enterprise, Four Corners Tavern Partners, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise.  As such, Four Corners Tavern Partners, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Tavern Partners, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

31.     Defendant Four Corners Tavern Group Inc. is an Illinois corporation with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607.  Four Corners Tavern Group Inc. is the operating company for Four Corners Tavern Fund I, LLC, and is a part of the Four Corners enterprise.  Through its participation in the Four Corners enterprise, Four Corners Tavern Group Inc. employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise.  As such, Four Corners Tavern Group Inc. is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS

14

105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Tavern Group Inc. and those Servers as defined by 26 U.S.C. § 3121(b).

32.     Four Corners Holdings, LLC is an Illinois limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607.  Four Corners Holdings, LLC is a part of the Four Corners enterprise.  Through its participation in the Four Corners enterprise, Four Corners Holdings, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise.  As such, Four Corners Holdings, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Holdings, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

33.     Four Corners Capital Advisors, LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607.  Four Corners Capital Advisors, LLC is a part of the Four Corners enterprise.  Through its participation in the Four Corners enterprise, Four Corners Capital Advisors, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise.  As such, Four Corners Capital Advisors, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Capital Advisors, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

34.     Four Corners Shuttle, LLC is an Illinois limited liability company with its principle place of business at 3258 North Southport Avenue, Chicago, Illinois 60657. Four Corners Shuttle, LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, Four Corners Shuttle, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Four Corners Shuttle, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Shuttle, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

35.     4C Cheval LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. 4C Cheval LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, 4C Cheval LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, 4C Cheval LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C Cheval LLC and those Servers as defined by 26 U.S.C. § 3121(b).

36.     1001 W. Lake, LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Defendant Four Corners Tavern Fund I, LLC is the manager of 1001 W. Lake, LLC, and 1001 W. Lake, LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise,

16

1001 W. Lake, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, 1001 W. Lake, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 1001 W. Lake, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

37.     Matthew Menna is a real person, and a manager of Defendants 4C Kinzie Investor LLC, 4C 1001 W. Lake Opco, LLC, Four Corners Tavern Fund Management, LLC, Wells Holdings Manager, LLC, West Loop Tap, L.L.C., Rocco's, LLC, Clark Street Restaurant Partners, LLC, Four Corners Tavern Group Fund Investor, LLC, Four Corners Tavern Partners, LLC, Four Corners Holdings, LLC, Four Corners Capital Advisors, LLC, Four Corners Shuttle, LLC, Saloon Holdings Manager, LLC, and 4C Cheval LLC. Matthew Menna is also a partner in Defendant Talbott Associates, L.P., the President of Defendants Keystone Holdings Corp., 2450 N. Clark, Inc., The Chase Tavern, Inc., and Four Corners Tavern Group Inc., and the Secretary of Defendant River North Tap, Inc. Until its sale in approximately June 2018, Matthew Menna was also the President of Defendant Asclose, Inc. On information and belief, Matthew Menna is also a manager of Defendants 4C 1500 N. Wells Opco, LLC and Cheval Porter Manager, LLC, and is, or was, a manger, officer, or member of the unknown entity that did business as Brownstone Tavern & Grill (Lincoln and Irving Park), as well as the voluntary unincorporated association known as Four Corners.

38.     Andrew Gloor is a real person, and a manager of Defendants 4C Kinzie Investor LLC, 4C 1001 W. Lake Opco, LLC, Four Corners Tavern Fund Management, LLC, Wells Holdings Manager, LLC, West Loop Tap, L.L.C., Rocco's, LLC, Clark Street Restaurant

Partners, LLC, Four Corners Tavern Group Fund Investor, LLC, Four Corners Tavern Partners, LLC, Four Corners Holdings, LLC, Four Corners Capital Advisors, LLC, Four Corners Shuttle, LLC, Saloon Holdings Manager, LLC, and 4C Cheval LLC. Andrew Gloor is also a partner in Defendant Talbott Associates, L.P., the President of Defendants Shef at Oak, Inc. and River North Tap, Inc., and the Secretary of Defendants Keystone Holdings Corp., Shef at Oak, Inc., The Chase Tavern, Inc., and Four Corners Tavern Group Inc. Until its sale in approximately June 2018, Andrew Gloor was also the Secretary of Defendant Asclose, Inc. On information and belief, Andrew Gloor is also a manager of Defendants 4C 1500 N. Wells Opco, LLC and Cheval Porter Manager, LLC, and is, or was, a manger, officer, or member of the unknown entity that did business as Brownstone Tavern & Grill (Lincoln and Irving Park).

39. As managers and/or officers of the business entities which comprise the Four Corners enterprise, Matthew Menna and Andrew Gloor exercise significant control, oversight, and authority relative to the entities within the Four Corners enterprise, and the Four Corners enterprise itself. On information and belief, at each of the bars and restaurants within the Four Corners enterprise, Matthew Menna and Andrew Gloor, on behalf of the Four Corners enterprise, and the constituent entities thereof: (1) have the power to hire and fire Servers; (2) supervise and control the hours of operation and the conditions of employment; (3) create, establish, maintain, and enforce policies related to employee compensation, accounting, and recordkeeping; and (4) are responsible for maintaining records relative to employee compensation, revenue, and accounting. As such, Matthew Menna and Andrew Gloor are each an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an

"employment" relationship between Matthew Menna and Andrew Gloor, and those Servers, as defined by 26 U.S.C. § 3121(b).

40.     Based on the foregoing, all Defendants are part of the Four Corners business "enterprise" as that term is defined by 29 U.S.C. § 203(r)(1), and are jointly and severally liable for the liabilities of the Four Corners enterprise.

41.     Based upon information and belief, the Four Corners business enterprise has many employees who are engaged in commerce, and many employees who regularly and recurrently handle goods that have travelled in interstate commerce.

42.     Based upon information and belief, the Four Corners business enterprise has an annual gross volume of business done in excess of $500,000.

43.     Based on the foregoing, the Four Corners business enterprise is engaged in commerce within the meaning of 29 U.S.C. § 203(s)(1)(A).

## THE PLAINTIFFS

44.     Plaintiff Erik Luna is a resident and citizen of Cook County, Illinois, and worked for the Four Corners business enterprise as a Server from approximately April 2011 until June 2018.  Throughout that period, Luna was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

45.     Plaintiff Laura Palya is a resident and citizen of Cook County, Illinois and worked for the Four Corners business enterprise as a Server from approximately January 2016 until November 2017.  Throughout that period, Palya was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

46.     Plaintiff Noelle Hoffman is a resident and citizen of Cook County, Illinois, and worked for the Four Corners business enterprise as a Server from approximately May 2008 until

July 2009, and from approximately July 2017 until October 2017. Throughout that period, Hoffman was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

47.     Plaintiff Annie Callanta is a resident and citizen of Cook County, Illinois, and worked for the Four Corners business enterprise as a Server from approximately August 2010 until April 5, 2015, and from approximately September 2016 until May 2017. Throughout that period, Callanta was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

48.     Plaintiff Rachel Foley is a resident and citizen of Cook County, Illinois, and worked for the Four Corners business enterprise as a Server from approximately September 2014 until July 2015. Throughout that period, Foley was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

49.     Plaintiff Kathleen Cahill is a resident and citizen of Johnson County, Kansas, and worked for the Four Corners business enterprise as a Server from approximately August 2010 until November 2013. Throughout that period, Cahill was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

50.     Plaintiff Erin Rottenberg is a resident and citizen of Cook County, Illinois, and worked for the Four Corners business enterprise as a Server from approximately May 2016 until June 2016, and from approximately September 2016 until March 2017. Throughout that period, Rottenberg was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

20

51.     Plaintiff Melissa Mosher is a resident and citizen of Cook County, Illinois, and worked for the Four Corners business enterprise as a Server from approximately March 2016 until November 2016.  Throughout that period, Mosher was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

52.     Plaintiff Jennifer Strait is a resident and citizen of Lake County, Indiana, and worked for the Four Corners business enterprise as a Server from approximately October 2017 until March 2018.   Throughout that period, Strait was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

## JURISDICTION AND VENUE

53.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

54.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as Defendants are residents of this District, and the events giving rise to the claims in this case occurred in this District.

## FACTUAL ALLEGATIONS

55.     Defendants operate a collection of bars and restaurants located in Chicago, Illinois operating under the common Four Corners enterprise.[3]

56.     At each bar and restaurant within the Four Corners group, Defendants employ Servers who serve food and drinks to customers.  Defendants' Servers are compensated at an hourly rate of pay, and through tips bestowed upon them by Defendants' customers ("Bestowed

---

[3] *See* www.4cbars.com ("Four Corners is one of Chicago's leading hospitality groups that owns and operates … our current portfolio of 15 venues in Chicago.")

Tips"). The amount of Servers' hourly compensation and tip income is recorded in Defendants' point-of-sale ("POS") system.

57.     To record the number of hours that they work during a given shift, Servers are required to log in and out of Defendants' POS system at the beginning and ends of each shift.

58.     At each bar and restaurant within the Four Corners group, Defendants require Servers, as well as other "Support Staff Employees" such as table bussers, barbacks, and VIP hosts, to participate in a "tip pool." Through these "tip pools," Servers share a portion—approximately 20%—of their Bestowed Tips with other Servers and/or Support Staff Employees.

59.     At the end of each shift, before they leave work, Defendants' Servers calculate what they believe to be the accurate total amount of their Bestowed Tips, and the portion of that amount that is required to be contributed to the "tip pool." Barring infrequent miscalculations that are the expected and inescapable result of natural human error, Servers accurately calculate the amount of their Bestowed Tips, and account for all Bestowed Tips (*e.g.*, cash and credit).

60.     After contributing the requisite portion of their Bestowed Tips to the "tip pool," Servers accurately log and declare the remaining amount of their Bestowed Tips in Defendants' POS system.[4] At the same time, Servers log out of Defendants' POS system to record that their shift has ended.

61.     Servers are given cash in an amount equal to the total amount of their Declared Tips, and are allowed to keep that money.[5] As such, the amount of Servers' Take Home Cash is coextensive with the amount of their Declared Tips.

---

[4] The amount of tips that the Servers declare in Defendants' POS system shall be referred to as "Declared Tips."
[5] The cash that Servers are given and allowed to keep at the ends of their shifts shall be referred to as "Take Home Cash."

62.     Although Servers attempt to accurately calculate the amount of their Bestowed Tips and believe that their calculations are accurate, there are occasions where Servers do not (and cannot) precisely calculate the amount of their Bestowed Tips.  This is due to, *inter alia*, natural and expected miscalculations, the complexities of the "tip pool," the fact that Servers' shifts sometimes end before the entirety of customers' Bestowed Tips are collected, and because Bestowed Tips may be stored in different cash registers or locations.  For example:

    a.    A bartender may work a given shift in conjunction with several other bartenders, and each of those bartenders arrive to work and leave work at different times, usually staggered within one hour of one another.[6]  At the ends of each of those bartenders' respective shifts, it may be difficult (or impossible) to determine the precise amount of Bestowed Tips left by Defendants' customers at a given time.

    b.    A waitress may work a shift from 3:00 p.m. until 6:00 p.m., and wait on a table that is seated at 5:00 p.m. If at the end of that waitress's shift, that table of Defendants' customers has yet to finish their meal and pay their bill, there would be no Bestowed Tips to include in that waitress's post-shift calculation, even though she would be entitled to at least a portion of the Bestowed Tips left by those customers.

    c.    A cash register behind the bar in one of Defendants' bars and restaurants may become "overflowed" with too many $1 bills.  In that case, one of Defendants' managers may remove $20 worth of $1 bills from the register with the intention of replacing that money with a $20 bill.  However, that manager may not do so, and would only later realize—after the bartenders at that bar have already calculated their portion of Bestowed Tips and declared that amount in Defendants' POS system—that the $20 was omitted from that calculation.

63.     The foregoing instances do not arise because Servers purposely underreport the portion of their Bestowed Tips to which they are entitled.  Since Servers do not retain an additional amount of Bestowed Tips (or Take Home Cash) over and above what they declare in Defendants' POS system as Declared Tips—*i.e.*, since the amount of Servers' Take Home Cash is coextensive with the amount of their Declared Tips—a Server's omission of a certain amount of

---

[6] For example, the first bartender on duty may start work at 3:00 p.m. and work until 11:00 p.m., the next bartender may start work at 4:00 p.m. and work until 12:00 a.m., and so on.

Bestowed Tips from his/her end-of-shift calculation does not cause the Server to underreport (as Declared Tips) the amount of tip income he/she actually *received*. Rather, a Server's omission of a certain amount of Bestowed Tips from his/her end-of-shift calculation causes the Server to underreport (as Declared Tips) the amount of Bestowed Tips to which he/she was actually *entitled*.

64.     Servers do not receive any additional payments in connection with their Bestowed Tips other than the Take Home Cash they receive, even if they are entitled to a greater share of the Bestowed Tips left for them by Defendants' customers during a given shift. Even if it is later discovered that a Server did not declare, and collect (in the form of Take Home Cash), the correct portion of his/her Bestowed Tips, the Server will not receive that additional money, even though he/she is entitled to that additional amount of Bestowed Tips.

65.     When a Server declares a certain amount of Declared Tips in Defendants' POS system, the Server is receiving that exact amount in Take Home Cash, and no other amounts.

66.     Periodically—on a daily, weekly, or monthly basis—Defendants' managers reconcile Defendants' receipts, the amount of all Bestowed Tips, the amount of Bestowed Tips each Server was entitled to, the amount of Servers' Declared Tips, the amount of Servers' Take Home Cash, Servers' work schedules, and other similar data to determine whether Servers received additional amounts in Bestowed Tips which were not logged as Declared Tips and thus not given as Take Home Cash.

67.     This reconciliation routinely shows that Servers did not receive the full portion of Bestowed Tips to which they are entitled, and Defendants are aware that those Servers did not collect (in the form of Take Home Cash) the full amount of Bestowed Tips to which they were

entitled ("Bestowed Tips Kept By Defendants"). The Servers' Bestowed Tips Kept By Defendants are in Defendants' possession at the time of this discovery.

68.     Instead of supplementing Servers' Take Home Cash with the additional Bestowed Tips Kept By Defendants to which Servers are entitled, Defendants retain those amounts for their own benefit.

69.     Defendants' Servers' hourly compensation—*i.e.*, compensation that does not derive from tips—is to be paid once every two weeks. However, Defendants usually retain the entirety of Servers' hourly compensation (and only that amount) for tax withholding purposes, and therefore, Servers usually do not receive any additional compensation over and above their Take Home Cash at the end of each pay period.

70.     On the same biweekly basis, Servers receive paystubs ("Paystubs") that are supposed to reflect, *inter alia*, the number of hours Servers worked during the previous pay period, the amount of hourly wage compensation they earned during the previous pay period, and the amount of taxes withheld during the previous pay period. The Paystubs also state Servers' "Cash Tips" during a given pay period.

71.     The value of "Cash Tips" reflected on Servers' Paystubs should reflect the portion of Bestowed Tips that Servers received in the form of Take Home Cash, and the amount of Servers' Declared Tips, as these values should be coextensive.

72.     However, the "Cash Tips" reflected on Servers' Paystubs routinely overstate the actual amount of tip income that Servers were given and allowed to keep. This is because Defendants have a company-wide policy, affecting all bars and restaurants in the Four Corners enterprise, wherein Defendants assume that Servers received tip income—*i.e.*, Take Home

Cash—equal to at least 16% to 20% of Defendants' total sales ("Assumed Tip Income"), regardless of what Servers actually received in the form of Take Home Cash.

73.     Based on that assumption, Defendants' managers are required to modify the amounts of Servers' Declared Tips in Defendants' POS system in the event that a Server's Declared Tips are less than that Server's Assumed Tip Income.   This modified amount of Servers' Declared Tips is then reflected as "Cash Tips" on Servers' Paystubs.

74.     In actuality, Servers only receive, on average, approximately 12% of Defendants' sales in the form of Take Home Cash.

75.     Servers' Paystubs routinely overstate the amount of Servers' tip income, as those Paystubs reflect Servers' Assumed Tip Income—a greater number—instead of the actual amount of Take Home Cash Servers actually receive—a lesser number.   Since the amount of a Server's Declared Tips is not adjusted downward in the event that his/her Declared Tips exceed the amount of his/her Assumed Tip Income, Servers' Paystubs never understate the amount of Servers' tip income.

76.     At the end of each calendar year, Defendants generate Form W-2 wage and tax statements ("W-2s") for their Servers using the information on Servers' Paystubs.   Accordingly, Servers' annual income, as set forth on their W-2s, is based upon the artificially greater amount of "Cash Tips" listed on Servers' Paystubs during the previous calendar year.

### *The Wage and Hour Claims*

77.     Applicable here, the Fair Labor Standards Act ("FLSA")—codified as 29 U.S.C. §§ 201, *et seq.*—the Illinois Minimum Wage Law ("IMWL")—codified as 820 ILCS 105/1, *et seq.*—and the Chicago Minimum Wage Ordinance ("Chicago Ordinance")—codified as Chi.

Mun. Code §§ 1-24-010, *et seq.*—all establish a minimum hourly rate at which employers must compensate employees (*i.e.*, a minimum wage).

78.     From July 24, 2009 through the present, the FLSA provided that employees are to be compensated at an hourly rate of at least $7.25 per hour.  29 U.S.C. § 206(a)(1)(C).  Prior to that, from July 24, 2007 through July 23, 2008, the FLSA provided that employees are to be compensated at an hourly rate of at least $5.85 per hour (29 U.S.C. § 206(a)(1)(A)), and from July 24, 2008 through July 23, 2009, the FLSA provided that employees are to be compensated at an hourly rate of at least $6.55 per hour (29 U.S.C. § 206(a)(1)(B)).

79.     Relative to "tipped employees"—as defined by 29 U.S.C. § 203(t)—the FLSA permits employers to credit the amount of tips employees receive towards employees' hourly rate of pay, so long as employers pay "tipped employees" a cash wage of at least $2.13 per hour.  29 U.S.C. § 203(m)(2); 29 CFR § 531.59(a).

80.     From July 1, 2010 through the present, the IMWL provided that employees are to be compensated at an hourly rate of at least $8.25 per hour.  820 ILCS 105/4(a)(1).  Prior to that: (1) from July 1, 2007 through June 30, 2008, the IMWL provided that employees are to be compensated at an hourly rate of at least $7.50 per hour; (2) from July 1, 2008 through June 30, 2009, the IMWL provided that employees are to be compensated at an hourly rate of at least $7.75 per hour; and (3) from July 1, 2009 through June 30, 2010, the IMWL provided that employees are to be compensated at an hourly rate of at least $8.00 per hour.   820 ILCS 105/4(a)(1).

81.     Relative to employees "engaged in an occupation in which gratuities have customarily and usually constituted and have been recognized as part of the" employees' compensation, the IMWL permits employers to credit the amount of tips employees receive

27

towards employees' hourly rate of pay, so long as the amount credited does not exceed 40% of the prevailing minimum wage rate—*e.g.*, under the current minimum wage of $8.25 per hour, employers must pay tipped employees a cash wage of at least $4.95 per hour.  820 ILCS 105/4(c).

82.    The foregoing provisions of the FLSA and IMWL establish what is commonly referred to as the "tip credit" because those provisions allow employers to credit a certain amount of tips that employees receive towards the FLSA's and IMWL's applicable minimum wage.

83.    Because "whether a tip is to be given, and its amount, are matters determined solely by the customer, who has the right to determine who shall be the recipient of the gratuity," it is well-established that "tips are the property of the employee."  29 CFR § 531.52.  As such, "tip credit provisions of [the FLSA and IMWL] require employers to permit employees to retain all tips received by the employee."  29 CFR § 531.59(b); *see also*, *Williams-Green v. J. Alexander's Restaurants, Inc.*, 277 F.R.D. 374, 378 (N.D. Ill. 2011) ("Tip credits are treated identically under both the [IMWL] and [FLSA].").

84.    Accordingly, "an employer may only take the tip credit under the FLSA and IMWL if each tipped employee retains all of his tips."  *E.g.*, *Starr v. Chicago Cut Steakhouse, LLC*, 75 F.Supp.3d 859, 864-65 (N.D. Ill. 2014) (citing 29 U.S.C. § 203(m)(2) and 820 ILCS 105/4(c)); *Williams-Green*, 277 F.R.D. at 378; 29 CFR § 531.52; 29 CFR § 531.59(b).

85.    "Tip pools" are an exception to the foregoing provisions of the FLSA and IMWL which require employers to allow employees to retain all of their tips.  *Starr*, 75 F.Supp.3d at 865 (citing 29 U.S.C. § 203(m)(2)(A)(ii) and 820 ILCS 105/4(c)); 29 CFR § 531.52; 29 CFR § 531.54.  However, "to be valid under the FLSA and IMWL, the tip pool must only include

28

employees who 'customarily and regularly receive tips,' and the employer 'may not retain any of the employees' tips for any other purpose.'" *Starr*, 75 F.Supp.3d at 865 (quoting 29 CFR § 531.54); 29 U.S.C. § 203(m)(2).

86.     The Chicago Ordinance—which went into effect on July 1, 2015—also establishes a minimum wage for employees.  From July 1, 2015 through June 30, 2016, the Chicago Ordinance provided that employees are to be compensated at an hourly rate of at least $10.00 per hour (Chi. Mun. Code § 1-24-020(a)), from July 1, 2016 through June 30, 2017, the Chicago Ordinance provided that employees are to be compensated at an hourly rate of at least $10.50 per hour (Chi. Mun. Code § 1-24-020(b)), and from July 1, 2017 through June 30, 2018, the Chicago Ordinance provided that employees are to be compensated at an hourly rate of at least $11.00 per hour (Chi. Mun. Code § 1-24-020(c)).  As of July 1, 2018, the Chicago Ordinance requires employees to be compensated at an hourly rate of at least $12.00 per hour. Chi. Mun. Code § 1-24-020(d).

87.     Like the FLSA and IMWL, the Chicago Ordinance establishes a lesser minimum wage relative to employees "engaged in an occupation in which gratuities have customarily and usually constituted part of the" employees' compensation.  Chi. Mun. Code § 1-24-030(a).  From July 1, 2015 through June 30, 2016, the minimum wage for tipped employees under the Chicago Ordinance was $5.45 per hour (Chi. Mun. Code § 1-24-030(a)(1)), from July 1, 2016 through June 30, 2017, the minimum wage for tipped employees under the Chicago Ordinance was $5.95 per hour (Chi. Mun. Code § 1-24-030(a)(2)), and from July 1, 2017 through June 30, 2018, the minimum wage for tipped employees under the Chicago Ordinance was $6.10 per hour (Chi. Mun. Code § 1-24-030(a)(3)).  As of July 1, 2018, the minimum wage for tipped employees under the Chicago Ordinance is $6.25 per hour (Chi. Mun. Code § 1-24-030(a)(3)).

29

88.     To avail itself of the lesser minimum wage for tipped employees—*i.e.*, a tip credit under the Chicago Ordinance—an employer must permit its employees to retain all of their tips. Chi. Mun. Code § 1-24-030(b).  Otherwise, an employer must pay tipped employees the minimum wage applicable to employees who do not customarily receive tips.  Chicago Minimum Wage and Paid Sick Leave Rules, MW 2.04.

89.     Here, at all times relevant, Plaintiffs' and Servers' hourly rate of pay, taken alone, irrespective of tips, was less than the applicable minimum rates established by the FLSA (29 U.S.C. § 206(a)(1)), the IMWL (820 ILCS 105/4(a)(1)), and the section of the Chicago Ordinance pertaining to employees who do not customarily receive tips (Chi. Mun. Code § 1-24-020).

90.     Defendants were required to rely on a "tip credit" to satisfy the minimum wage requirements set forth by the FLSA and the IMWL, and avail themselves of the lesser minimum wage for tipped employees established by the Chicago Ordinance.

91.     However, as discussed above, Servers routinely do not receive the full portion of Bestowed Tips to which they are entitled, even after their contributions to Defendants' "tip pools" are accounted for.  Despite knowing that Servers are entitled to additional tip income that was not included in their Take Home Cash, Defendants do not supplement Servers' Take Home Cash with those additional amounts.  Instead, Defendants retain those additional sums for their own benefit.

92.     Defendants did not retain those additional sums for tax withholding purposes, as those additional amounts were not listed on Plaintiffs' and Servers' Paystubs as being withheld for tax purposes.  In fact, Defendants could not withhold those additional amounts for tax purposes, as Defendants would only be permitted to do so if Plaintiffs and Servers remitted those

amounts back to Defendants *after* Defendants gave those amounts to Plaintiffs and Servers.  26 U.S.C. § 3102(c); 26 U.S.C. § 3402(k).

93.     As explained below, Defendants' common practice of reporting Servers' Assumed Tip Income, instead of the amount of Take Home Cash that Servers actually received, on Servers' Paystubs conceals the fact that Defendants retained the Bestowed Tips Kept By Defendants to which Servers are entitled.

94.     Because Plaintiffs and Servers did not receive the entirety of the tips that were bestowed upon them by Defendants' customers in the form of Take Home Cash, and Defendants retained those additional amounts for their own benefit, Defendants cannot rely on a tip credit relative to Plaintiffs' and Servers' hourly rate of pay.   *E.g.*, 29 CFR § 531.52; 29 CFR § 531.59(b); *Starr*, 75 F.Supp.3d at 864-65; *Williams-Green*, 277 F.R.D. at 378.

95.     Regardless of whether Defendants can rely on a tip credit relative to Plaintiffs' and Servers' hourly rate of pay, Defendants were not permitted to retain any portion of the tips that were bestowed upon Plaintiffs and Servers by Defendants' customers.   *E.g.*, 29 U.S.C. § 203(m)(2)(B); 29 CFR § 531.52; 29 CFR § 531.54; 29 CFR § 531.59; *Starr*, 75 F.Supp.3d at 865; *see also*, 26 U.S.C. § 3102(c); 26 U.S.C. § 3402(k).

96.     In addition, in accordance with the minimum wage and tip credit provisions of the FLSA, IMWL, and Chicago Ordinance, Defendants agreed to compensate Plaintiffs and Servers at an hourly rate that complied with the applicable minimum wage, and to allow Plaintiffs and Servers to retain all tips that were bestowed upon Plaintiffs and Servers by Defendants' customers.

97.     As such, the entirety of the tips that were bestowed upon Plaintiffs and Servers by Defendants' customers were "wages" under the Illinois Wage Payment and Collection Act

("IWPCA")—codified as 820 ILCS 115/1, *et seq.*—the FLSA, the IMWL, and the Chicago Ordinance. 820 ILCS 115/2; 29 U.S.C. § 203(m); 820 ILCS 105/3(b); Chi. Mun. Code § 1-24-010.

98. Since Defendants are not permitted to avail themselves of a tip credit with respect to Plaintiffs and Servers to satisfy Defendants' minimum wage obligations under the FLSA, IMWL, and Chicago Ordinance, and because *all* of the tips that were bestowed upon Plaintiffs and Servers by Defendants' customers also constitute wages owed to Plaintiffs and Servers, Defendants did not pay Plaintiffs and Servers the full amount of all wages to which they were entitled, in violation of the FLSA, IMWL, Chicago Ordinance, and IWPCA. 29 U.S.C. § 206(a)(1); 29 U.S.C. § 203(m); 820 ILCS 105/4(a)(1); 820 ILCS 105/4(c); Chi. Mun. Code § 1-24-020; Chi. Mun. Code § 1-24-030(b); 820 ILCS 115/4.

99. Finally, in addition to altering the amounts of Plaintiffs' and Servers' Declared Tips in Defendants' POS system, Defendants have a company-wide policy, affecting all bars and restaurants in the Four Corners enterprise, wherein Defendants' managers are required to modify Servers' log in and/or log out times stored in Defendants' POS system to reduce the total number of hours that Servers worked.

100. Like the modified amount of Servers' Declared Tips, the modified number of Servers' hours is reflected on Servers' Paystubs, and Servers are only paid for that lesser, modified number of hours.

101. As such, Servers were not compensated for all of the hours that they worked for Defendants' benefit in violation of the FLSA, IMWL, Chicago Ordinance, and IWPCA.

102.     Accordingly, Plaintiffs, individually, and on behalf of other similarly situated individuals, bring claims under the FLSA, IMWL, Chicago Ordinance, and the IWPCA (collectively, the "Wage and Hour Claims") against Defendants.

103.     With respect to Plaintiffs' FLSA claims, Plaintiffs seek to represent the "Collective Groups" of similarly situated employees defined below, pursuant to 29 U.S.C. § 216(b).

104.     With respect to Plaintiffs' IMWL, Chicago Ordinance, and IWPCA claims, Plaintiffs seek to represent the "Wage and Hour Classes" of similarly situated individuals defined below, pursuant to Fed. R. Civ. P. 23.

### The Income Tax Claims

105.     In addition to Plaintiffs' Wage and Hour Claims, Plaintiffs, individually, and on behalf of other similarly situated individuals, bring claims under Section 7434 of the Internal Revenue Code ("IRC Statute")—codified as 26 U.S.C. § 7434—and the Racketeer Influenced and Corrupt Organizations Act ("RICO")—codified as 18 U.S.C. §§ 1961, *et seq.*—as well as for common law civil conspiracy and fraud (collectively, the "Income Tax Claims").

106.     As noted above, Defendants have a company-wide policy whereby Defendants assume that Servers' tip income—*i.e.*, Take Home Cash—is equal to at least 16% to 20% of Defendants' total sales, regardless of what Servers actually received in the form of Take Home Cash.  This company-wide policy effects all Servers at each bar and restaurant within the Four Corners group.

107.     Pursuant to Defendants' company-wide policy, if a Server's Declared Tips during a given shift are less than his/her Assumed Tip Income, Defendants' managers adjust the amount of that Server's Declared Tips upwards to equal his/her Assumed Tip Income.

33

108.    Defendants' common practice of reporting Servers' Assumed Tip Income, instead of the amount of Take Home Cash that Servers actually received, on Servers' Paystubs concealed the fact that Defendants retained the Bestowed Tips Kept By Defendants to which Servers were entitled.  For example, if "Server A" works a shift during which (1) Defendants' total sales are $1,000, (2) he/she calculates and *believes* the portion of Defendants' customers Bestowed Tips to which he/she is entitled is $100, and (3) the portion of Defendants' customers Bestowed Tips to which he/she is *actually* entitled is $120, Server A would log $100 as the amount of his/her Declared Tips in Defendants' POS system, and receive $100 in Take Home Cash.  Since Server A's Declared Tips are $100, which is only 10% of Defendants' total sales, Server A's manager would alter his/her Declared Tips to reflect $160 in tip income (*i.e.*, 16% of Defendants' total sales).  Although Server A is actually entitled to $120 in tip income instead of $100, and thus never collected the additional $20 in the form of Take Home Cash, that additional $20 remains in Defendants' possession.  Because Server A's Declared Tips are adjusted upwards to reflect $160 in tip income on his/her Paystub, Server A is required to pay taxes on $160 of purported income, despite only receiving $100.  Since it appears, for tax and bookkeeping purposes, that Server A's Take Home Cash was $160, Defendants are able to retain the additional $20 that Server A was entitled to, but never received, without paying any tax on that money.  Instead, that tax burden, and then some, is shifted to Server A.

109.    Unlike Servers, Defendants do not report the full amount of tips that Support Staff Employees acquire through Defendants' "tip pools."  As such, Support Staff Employees' taxable income is lower, and Support Staff Employees receive some of their income tax-free.  In turn, Defendants are able to compensate Support Staff Employees at a lower hourly rate without diminishing the amount of after-tax (or untaxed) income Support Staff Employees receive.

34

Instead, that tax burden is shifted to Servers. Essentially, Servers are required to subsidize Support Staff Employees' income. This allows Defendants to covertly depress their labor costs without detection.

110. In addition, by overstating the amount of money that Defendants Servers receive in tip income, Defendants can ensure that they can always avail themselves of a tip credit with respect to the compensation paid to Servers, and never have to pay Servers for any shortfall in their hourly rate of pay. In doing so, Defendants reduce their operating costs, and can therefore retain a greater portion of their gross income for their own benefit.

111. By selecting an unreasonably high percentage of Defendants' sales—16% to 20%—to use for the calculation of Servers' Assumed Tip Income, Defendants diminish the likelihood that the foregoing deceptive practices will be discovered by state or federal authorities—such as the Internal Revenue Service ("IRS"). Pursuant to 26 U.S.C. § 6053(c)(3)(A)(i), tipped employees at "large food or beverage establishments" are presumed to receive 8% of an employer's gross receipts in tips. Similarly, as noted above, on average, Defendants' Servers receive approximately 12% of Defendants' sales in Take Home Cash. These percentages are far exceeded by the 16% to 20% figure used by Defendants, all but insuring that Defendants' malfeasance will not be revealed through an IRS audit or other similar investigation. In fact, according to one of Defendants' managers, Defendants chose to use 16% to 20% of Defendants' sales to calculate Servers' Assumed Tip Income precisely because it would diminish the possibility of an IRS audit.

112. Defendants also benefit from reporting Servers' Assumed Tip Income on Servers' Paystubs and W-2s instead of Servers' actual tip income (*i.e.*, the amount of Take Home Cash Servers receive) because, at the very least, doing so is significantly easier than actually ensuring

that Servers' Declared Tips are accurate.[7]  Since the 16% to 20% figure used by Defendants far exceeds the actual percentage of Defendants' sales Servers are likely to receive in tips from Defendants' customers, Defendants can spend significantly less effort (and resources) reconciling their financial statements and receipts with the amount of Servers' Declared Tips.  Indeed, as noted above, Defendants never have to worry whether a Server is entitled to any additional Bestowed Tips Kept By Defendants because those Bestowed Tips Kept By Defendants will be subsumed within that Servers' Assumed Tip Income, and do not actually need to be given to the Server in order for Defendants' financial statements to balance.

113.    When Defendants modify and adjust Servers' Declared Tips upwards to match the calculated amount of Servers' Assumed Tip Income, Defendants do not do so in order to "correct" the amount of Declared Tips that were underreported by a given Server.  As noted above, Servers make every effort to accurately declare the amount of their Declared Tips in Defendants' POS system, such that there should be no need for Defendants to modify those amounts.  Moreover, assuming *arguendo*, that certain Servers underreport the amount of their Declared Tips, the fact that Defendants modify *all* Servers Declared Tips to match their Assumed Tip Income indicates that Defendants are not doing so for this purpose.

114.    Defendants' use of Assumed Tip Income for tax reporting purposes is not authorized by applicable law.  Although the IRS is permitted to assume that employees, in aggregate, received a percentage of their employer's sales in tip income during proceedings to recover unpaid taxes,[8] an employer may not do so on its own, outside of that context.  *See*, 26 U.S.C. § 3121(q) (stating that tip income is not deemed to have been paid until actually received

---

[7] This is not to say that Servers inaccurately declare the amount of their Declared Tips in Defendants' POS system.

[8] This tip income calculation method is often called the "Aggregate Estimation Method," and will be referred to as such here.

by the employee, unless the IRS determines that tip income has been underreported); *see also*, 29 CFR § 531.54. Even if Defendants were permitted to use the Aggregate Estimation Method outside the context of a proceeding involving the IRS, the fact that Defendants require each Server to input the amount of his/her Declared Tips into Defendants' POS system, and then take the *greater* of that Server's Declared Tips and his Assumed Tip Income for purposes of tax reporting demonstrates a departure from the Aggregate Estimation Method. In addition, when the Aggregate Estimation Method is employed by the IRS, the IRS is required to accurately calculate the percentage of an employer's sales to be used when estimating employees' tip income, which Defendants do not do.

115.    As a result of the foregoing, Plaintiffs' and Servers' Paystubs overstated the amount of taxable income that Plaintiffs and Servers actually received—*i.e.*, the amount of "Cash Tips" stated on Plaintiffs' and Servers' Paystubs was *greater* than the amount of Take Home Cash that Plaintiffs and Servers were actually given and allowed to keep.

116.    Because the amount of "Cash Tips" stated on Plaintiffs' and Servers' Paystubs was used to calculate the amount of Plaintiffs' and Servers' taxable income on their W-2s—instead of the amount of Take Home Cash that Plaintiffs and Servers were actually given and allowed to keep—Plaintiffs and Servers were required to pay income tax on income that they did not actually receive.

117.    With respect to Plaintiffs' Income Tax Claims, Plaintiffs seek to represent the "Tax Fraud Class" of similarly situated individuals defined below, pursuant to Fed. R. Civ. P. 23.

## FACTS RELEVANT TO PLAINTIFF ERIK LUNA

118.    From approximately April 2011 until June 2018, Luna was a bartender at a Four Corners bar known as "Benchmark Bar and Grill" ("Benchmark").

119.    When he worked at Benchmark, Luna was compensated at an hourly rate of pay, and through Bestowed Tips.

120.    To record the number of hours that he worked, Luna would log in and out of Defendants' POS system at the beginning and ends of each of his shifts.

121.    When he worked at Benchmark, Luna participated in a "tip pool" with other Servers and Support Staff Employees.

122.    At the end of each shift, before he left work, Luna would calculate what he believed to be the accurate total amount of his Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool."   In general, Luna accurately calculated the amount of his Bestowed Tips, and accounted for all his Bestowed Tips (*e.g.*, cash and credit).

123.    After contributing the requisite portion of his Bestowed Tips to the "tip pool," Luna accurately logged and declared the remaining amount of his Bestowed Tips in Defendants' POS system.  At the same time, Luna would log out of Defendants' POS system to record that his shift had ended.

124.    Luna was given Take Home Cash in an amount equal to the total amount of his Declared Tips, and was allowed to keep that Take Home Cash.

125.    Although Luna attempted to accurately calculate the amount of his Bestowed Tips and believed that his calculations were accurate, there were occasions where Luna did not precisely calculate the amount of Bestowed Tips to which he was entitled.  As a result, Luna was entitled to additional amounts in Bestowed Tips over and above what he declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

126.    However, Luna did not receive any additional payments in connection with his Bestowed Tips other than the Take Home Cash he received.

127.    Luna usually would not receive a paycheck at the end of each pay period because the entirety of his hourly compensation (and only that amount) was usually withheld for tax purposes.

128.    Luna's Paystubs routinely stated that Luna's "Cash Tips" were greater than the amount of Take Home Cash that he was given (and allowed to keep) and the total amount of his Declared Tips.  This was because, pursuant to the policy articulated above, Defendants would alter the amount of Luna's Declared Tips to reflect 16% to 20% of Defendants' sales.

129.    The amount of "Cash Tips" on Luna's Paystubs was used to calculate Luna's annual income on his W-2s.

130.    Luna's Paystubs also reflected that he was paid for fewer hours than he actually worked, and logged in Defendants' POS system, during particular workweeks.  This was because, pursuant to the policy articulated above, Defendants would alter Luna's log in and log out times to diminish the number of hours that he actually worked.

131.    For example, during the two-week pay period beginning on March 22, 2017 and ending on April 4, 2017, Luna worked five (5) separate shifts as a bartender at Benchmark.  During the first week of that pay period, Luna worked 24 hours and 58 minutes.  *See*, records reflecting the number of hours Luna worked generated by Defendants' POS system, attached hereto as Exhibit 1.  During the second week of that pay period, Luna worked 32 hours and 21 minutes.  *See*, Exhibit 1.  In total, Luna worked 57 hours and 19 minutes during that pay period.  *See*, Exhibit 1.

132.    However, Luna's Paystub for that same pay period states that Luna only worked 53 hours and 13 minutes.  *See*, Luna's Paystub for the pay period beginning on March 22, 2017 and ending on April 4, 2017, attached hereto as Exhibit 2.

39

133.    Based on Luna's hourly rate of $5.95/hour, Luna should have been compensated $341.03 for the pay period beginning on March 22, 2017 and ending on April 4, 2017. However, due to the fact that Defendants diminished the number of hours that Luna recorded in Defendants' POS system, Luna was only compensated $316.60 for that pay period. *See*, Exhibit 2.

## FACTS RELEVANT TO PLAINTIFF LAURA PALYA

134.    From approximately January 2016 until November 2017, Palya was a bartender at Benchmark.

135.    When she worked at Benchmark, Palya was compensated at an hourly rate of pay, and through Bestowed Tips.

136.    To record the number of hours that she worked, Palya would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

137.    When she worked at Benchmark, Palya participated in a "tip pool" with other Servers and Support Staff Employees.

138.    At the end of each shift, before she left work, Palya would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool."  In general, Palya accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

139.    After contributing the requisite portion of her Bestowed Tips to the "tip pool," Palya accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system.  At the same time, Palya would log out of Defendants' POS system to record that her shift had ended.

140.    Palya was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

141.    Although Palya attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Palya did not precisely calculate the amount of Bestowed Tips to which she was entitled.  As a result, Palya was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

142.    However, Palya did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

143.    Palya usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

144.    Palya's Paystubs routinely stated that Palya's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips.  This was because, pursuant to the policy articulated above, Defendants would alter the amount of Palya's Declared Tips to reflect 16% to 20% of Defendants' sales.

145.    The amount of "Cash Tips" on Palya's Paystubs was used to calculate Palya's annual income on her W-2s.

## FACTS RELEVANT TO PLAINTIFF NOELLE HOFFMAN

146.    From approximately May 2008 until July 2009, Hoffman was a server at a Four Corners bar known as "Kirkwood Bar & Grill" ("Kirkwood").  From approximately July 2017 until October 2017, Hoffman was a server at a Four Corners bar known as "Porter Kitchen & Deck" ("Porter").

147.    When she worked at Kirkwood and Porter, Hoffman was compensated at an hourly rate of pay, and through Bestowed Tips.

148.    To record the number of hours that she worked, Hoffman would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

149.    When she worked at Kirkwood and Porter, Hoffman participated in a "tip pool" with other Servers and Support Staff Employees.

150.    At the end of each shift, before she left work, Hoffman would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool."  In general, Hoffman accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

151.    After contributing the requisite portion of her Bestowed Tips to the "tip pool," Hoffman accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system.  At the same time, Hoffman would log out of Defendants' POS system to record that her shift had ended.

152.    Hoffman was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

153.    Although Hoffman attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Hoffman did not precisely calculate the amount of Bestowed Tips to which she was entitled.  As a result, Hoffman was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

154.    However, Hoffman did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

42

155.   Hoffman usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

156.   Hoffman's Paystubs routinely stated that Hoffman's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips.   This was because, pursuant to the policy articulated above, Defendants would alter the amount of Hoffman's Declared Tips to reflect 16% to 20% of Defendants' sales.

157.   The amount of "Cash Tips" on Hoffman's Paystubs was used to calculate Hoffman's annual income on her W-2s.

**FACTS RELEVANT TO PLAINTIFF ANNIE CALLANTA**

158.   From approximately August 2010 until April 5, 2015, and from approximately September 2016 until May 2017, Callanta was a waitress and bartender at Benchmark.

159.   When she worked at Benchmark, Callanta was compensated at an hourly rate of pay, and through Bestowed Tips.

160.   To record the number of hours that she worked, Callanta would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

161.   When she worked at Benchmark, Callanta participated in a "tip pool" with other Servers and Support Staff Employees.

162.   At the end of each shift, before she left work, Callanta would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool."   In general, Callanta accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

163.    After contributing the requisite portion of her Bestowed Tips to the "tip pool," Callanta accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system.  At the same time, Callanta would log out of Defendants' POS system to record that her shift had ended.

164.    Callanta was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

165.    Although Callanta attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Callanta did not precisely calculate the amount of Bestowed Tips to which she was entitled.  As a result, Callanta was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

166.    However, Callanta did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

167.    Callanta usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

168.    Callanta's Paystubs routinely stated that Callanta's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips.  This was because, pursuant to the policy articulated above, Defendants would alter the amount of Callanta's Declared Tips to reflect 16% to 20% of Defendants' sales.

169.    The amount of "Cash Tips" on Callanta's Paystubs was used to calculate Callanta's annual income on her W-2s.

**FACTS RELEVANT TO PLAINTIFF RACHEL FOLEY**

44

170.     From approximately September 2014 until July 2015, Foley was a waitress at Benchmark.

171.     When she worked at Benchmark, Foley was compensated at an hourly rate of pay, and through Bestowed Tips.

172.     To record the number of hours that she worked, Foley would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

173.     When she worked at Benchmark, Foley participated in a "tip pool" with other Servers and Support Staff Employees.

174.     At the end of each shift, before she left work, Foley would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool."  In general, Foley accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

175.     After contributing the requisite portion of her Bestowed Tips to the "tip pool," Foley accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system.  At the same time, Foley would log out of Defendants' POS system to record that her shift had ended.

176.     Foley was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

177.     Although Foley attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Foley did not precisely calculate the amount of Bestowed Tips to which she was entitled.  As a result, Foley was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

45

178.    However, Foley did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

179.    Foley usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

180.    Foley's Paystubs routinely stated that Foley's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips.  This was because, pursuant to the policy articulated above, Defendants would alter the amount of Foley's Declared Tips to reflect 16% to 20% of Defendants' sales.

181.    The amount of "Cash Tips" on Foley's Paystubs was used to calculate Foley's annual income on her W-2s.

### FACTS RELEVANT TO PLAINTIFF KATHLEEN CAHILL

182.    From approximately August 2010 until November 2013, Cahill was a bartender at Benchmark.

183.    When she worked at Benchmark, Cahill was compensated at an hourly rate of pay, and through Bestowed Tips.

184.    To record the number of hours that she worked, Cahill would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

185.    When she worked at Benchmark, Cahill participated in a "tip pool" with other Servers and Support Staff Employees.

186.    At the end of each shift, before she left work, Cahill would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount

that was required to be contributed to the "tip pool." In general, Cahill accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

187.    After contributing the requisite portion of her Bestowed Tips to the "tip pool," Cahill accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Cahill would log out of Defendants' POS system to record that her shift had ended.

188.    Cahill was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

189.    Although Cahill attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Cahill did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Cahill was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

190.    However, Cahill did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

191.    Cahill usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

192.    Cahill's Paystubs routinely stated that Cahill's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Cahill's Declared Tips to reflect 16% to 20% of Defendants' sales.

193. The amount of "Cash Tips" on Cahill's Paystubs was used to calculate Cahill's annual income on her W-2s.

## FACTS RELEVANT TO PLAINTIFF ERIN ROTTENBERG

194. From approximately May 2016 until June 2016, Rottenberg was a bartender at a Four Corners bar known as Federales ("Federales"). From approximately September 2016 until March 2017, Rottenberg was a waitress at a Four Corners bar known as Westend Bar & Grill ("Westend").

195. When she worked at Federales and Westend, Rottenberg was compensated at an hourly rate of pay, and through Bestowed Tips.

196. To record the number of hours that she worked, Rottenberg would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

197. When she worked at Federales and Westend, Rottenberg participated in a "tip pool" with other Servers and Support Staff Employees.

198. At the end of each shift, before she left work, Rottenberg would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool." In general, Rottenberg accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

199. After contributing the requisite portion of her Bestowed Tips to the "tip pool," Rottenberg accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Rottenberg would log out of Defendants' POS system to record that her shift had ended.

200. Rottenberg was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

201.    Although Rottenberg attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Rottenberg did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Rottenberg was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

202.    However, Rottenberg did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

203.    Rottenberg usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

204.    Rottenberg's Paystubs routinely stated that Rottenberg's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips.  This was because, pursuant to the policy articulated above, Defendants would alter the amount of Rottenberg's Declared Tips to reflect 16% to 20% of Defendants' sales.

205.    The amount of "Cash Tips" on Rottenberg's Paystubs was used to calculate Rottenberg's annual income on her W-2s.

**FACTS RELEVANT TO PLAINTIFF MELISSA MOSHER**

206.    From approximately March 2016 until May 2016, Mosher was a waitress at Benchmark.  From approximately May 2016 until November 2016, Mosher was a waitress at Federales.

207.    When she worked at Federales and Benchmark, Mosher was compensated at an hourly rate of pay, and through Bestowed Tips.

49

208.    To record the number of hours that she worked, Mosher would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

209.    When she worked at Federales and Benchmark, Mosher participated in a "tip pool" with other Servers and Support Staff Employees.

210.    At the end of each shift, before she left work, Mosher would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool."  In general, Mosher accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

211.    After contributing the requisite portion of her Bestowed Tips to the "tip pool," Mosher accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system.  At the same time, Mosher would log out of Defendants' POS system to record that her shift had ended.

212.    Mosher was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

213.    Although Mosher attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Mosher did not precisely calculate the amount of Bestowed Tips to which she was entitled.  As a result, Mosher was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

214.    However, Mosher did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

215.    Mosher usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

216.    Mosher's Paystubs routinely stated that Mosher's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips.  This was because, pursuant to the policy articulated above, Defendants would alter the amount of Mosher's Declared Tips to reflect 16% to 20% of Defendants' sales.

217.    The amount of "Cash Tips" on Mosher's Paystubs was used to calculate Mosher's annual income on her W-2s.

**FACTS RELEVANT TO PLAINTIFF JENNIFER STRAIT**

218.    From approximately October 2017 until March 2018, Strait was a waitress at Benchmark.

219.    When she worked at Benchmark, Strait was compensated at an hourly rate of pay, and through Bestowed Tips.

220.    To record the number of hours that she worked, Strait would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

221.    When she worked at Benchmark, Strait participated in a "tip pool" with other Servers and Support Staff Employees.

222.    At the end of each shift, before she left work, Strait would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool."  In general, Strait accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

223. After contributing the requisite portion of her Bestowed Tips to the "tip pool," Strait accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Strait would log out of Defendants' POS system to record that her shift had ended.

224. Strait was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

225. Although Strait attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Strait did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Strait was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

226. However, Strait did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

227. Strait usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

228. Strait's Paystubs routinely stated that Strait's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Strait's Declared Tips to reflect 16% to 20% of Defendants' sales.

229. The amount of "Cash Tips" on Strait's Paystubs was used to calculate Strait's annual income on her W-2s.

## COLLECTIVE ACTION ALLEGATIONS

230. Plaintiffs bring their FLSA claims as a Collective Action on behalf of themselves and the Collective Group of similarly situation employees, pursuant to 29 U.S.C. § 216(b).

231. **Tip Credit Collective Group Definition:** Plaintiffs pursue their FLSA claims on behalf of the following "Tip Credit Collective Group:"

> All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute of limitations period, (2) were compensated at an hourly rate of pay, irrespective of tips, that was less than $7.25 per hour, and (3) were entitled to a greater portion of Bestowed Tips from Defendants' customers than what they received in Take Home Cash.

232. Plaintiffs are members of the Tip Credit Collective Group because they were employed by Defendants during the time period relevant to this action, were compensated at an hourly rate of pay that was less than $7.25 per hour, and received Paystubs which stated that they were given a greater amount in "Cash Tips" than they actually received in Take Home Cash.

233. Plaintiffs' FLSA Collective Action consent forms are attached hereto as Exhibit 3.

234. **Altered Hours Collective Group Definition:** In addition to the Tip Credit Collective Group defined above, Luna pursues additional FLSA claims on behalf of the following "Altered Hours Collective Group:"

> All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute of limitations period, and (2) had the number of hours they worked, as stored in Defendants' POS system, reduced by Defendants.

235. Luna is a member of the Altered Hours Collective Group because he was employed by Defendants during the time period relevant to this action, and had the number of hours he worked, as stored in Defendants' POS system, reduced by Defendants.

236.     Although Plaintiffs and the Tip Credit Collective Group members may have had different job titles and/or worked in different locations throughout the time period relevant to this action, this action may be properly maintained as a Collective Action because:

a.     Plaintiffs and Tip Credit Collective Group members performed substantially similar job duties as Servers;

b.     Plaintiffs and Tip Credit Collective Group members were compensated at an hourly rate of pay that was less than $7.25 per hour;

c.     Plaintiffs and Tip Credit Collective Group members calculated what they believed to be the accurate amount of their Declared Tips and Take Home Cash, and accurately logged and declared that calculated amount in Defendants' POS system;

d.     Plaintiffs and Tip Credit Collective Group members were given Take Home Cash in an amount equal to their Declared Tips;

e.     Other than their Take Home Cash, Plaintiffs and Tip Credit Collective Group members were not given any additional amounts to account for the amount of Bestowed Tips to which they were entitled but had not received;

f.     Plaintiffs and Tip Credit Collective Group members were not given and allowed to keep *all* of the Bestowed Tips to which they were entitled; and

g.     Defendants uniformly retained the additional amounts in tips bestowed upon Plaintiffs and Tip Credit Collective Group members by Defendants' customers over and above what Plaintiffs and Tip Credit Collective Group members were given in Take Home Cash.

237.     Although Luna and the Altered Hours Collective Group members may have had different job titles and/or worked in different locations throughout the time period relevant to this action, this action may be properly maintained as a Collective Action because:

a.     Luna and Altered Hours Collective Group members performed substantially similar job duties as Servers;

b.     Luna and Altered Hours Collective Group members recorded the time they began working and the time they left work in Defendants' POS system in the same way; and

       c.     The number of hours that Luna and Altered Hours Collective Group members worked, as stored in Defendants' POS system, was altered by Defendants.

238.    Defendants encouraged, required, and permitted Plaintiffs and members of the Collective Groups to work without being properly compensated.

239.    Defendants knew that Plaintiffs and members of the Collective Groups performed work that required them to be paid at a rate not less than the minimum wage established by the FLSA. Nonetheless, Defendants operated under a uniform scheme to deprive Plaintiffs and members of the Collective Groups the compensation to which they were entitled.

240.    Defendants' conduct, as alleged herein, was willful and has caused significant damage to Plaintiffs and members of the Collective Groups, as they were compensated at a rate that was less than the minimum wage established by the FLSA.

241.    Defendants are liable under the FLSA for failing to properly compensate Plaintiffs and members of the Collective Groups at an hourly rate that satisfied the FLSA's minimum wage provisions, and/or retaining a portion of the tips that were bestowed upon Plaintiffs and members of the Collective Groups by Defendants' customers. Plaintiffs request that the Court authorize notice to the members of the Collective Groups to inform them of the pendency of this action and their right to opt-in to this lawsuit—pursuant to 29 U.S.C. § 216(b)—for the purpose of seeking unpaid compensation and liquidated damages under the FLSA, and the other relief requested herein.

242.    Plaintiffs estimate that the Collective Groups, including both current and former employees over the time period relevant to this action, will include hundreds of members. This is based on the fact that Defendants operated approximately twenty (20) bars and restaurants during the time period applicable to this action, and each bar and restaurant employed about fifty

(50) Servers at any given time. The precise number of members in each Collective Group should be readily available from Defendants' personnel, scheduling, time, and payroll records maintained in accordance with 29 U.S.C. § 211(c). Given the composition and size of the Collective Groups, their members may be informed of the pendency of this action directly via U.S. mail, e-mail, and by posting notice in Defendants' bars and restaurants.

## CLASS ACTION ALLEGATIONS

243.    Plaintiffs bring their IMWL, Chicago Ordinance, and IWPCA claims as a Class Action on behalf of themselves and the Wage and Hour Classes of similarly situated employees, pursuant to Fed. R. Civ. P. 23, as defined below.

244.    **Tip Credit Class Definition:** Plaintiffs pursue their IMWL, Chicago Ordinance, and IWPCA claims on behalf of the following "Tip Credit Class:"

> All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute of limitations period, (2) were compensated at an hourly rate of pay, irrespective of tips, that was less than $7.25 per hour, and (3) were entitled to a greater portion of Bestowed Tips from Defendants' customers than what they received in Take Home Cash.

Excluded from the Tip Credit Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Tip Credit Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person. Plaintiffs hereby reserve the right to amend the above class definition based on discovery and the proofs at trial.

245.    **Altered Hours Class Definition:** In addition to the Tip Credit Class defined above, Luna pursues his IMWL, Chicago Ordinance, and IWPCA claims the requested relief on behalf of the following "Altered Hours Class:"

> All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute

of limitations period, and (2) had the number of hours they worked, as stored in Defendants' POS system, reduced by Defendants.

Excluded from the Altered Hours Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Altered Hours Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person. Plaintiffs hereby reserve the right to amend the above class definition based on discovery and the proofs at trial.

246. *Numerosity*. The Wage and Hour Classes are so numerous that joinder of all members is impracticable. Plaintiffs estimate that the Wage and Hour Classes, including both current and former employees over the time period relevant to this action, will include hundreds of members. This is based on the fact that Defendants operated approximately twenty (20) bars and restaurants during the time period applicable to this action, and each bar and restaurant employed about fifty (50) Servers at any given time. The precise number of members of the Wage and Hour Classes should be readily available from Defendants' personnel, scheduling, time, and payroll records maintained in accordance with 29 U.S.C. § 211(c).

247. *Commonality and Predominance*. There are questions of fact or law common to the Wage and Hour Classes, which predominate over any questions affecting only individual members including, *inter alia*, the following:

    a.    Whether Plaintiffs and members of the Tip Credit Class received additional amounts in Bestowed Tips over and above what they received in Take Home Cash;

    b.    Whether Defendants remitted any additional amounts in Bestowed Tips over and above what Plaintiffs and members of the Tip Credit Class received in Take Home Cash;

    c.    Whether Defendants retained the additional amounts in tips that Defendants' customers bestowed upon Plaintiffs and Tip Credit Class members over and above what Plaintiffs and Tip Credit Class members were given in Take Home Cash;

d.     Whether Defendants were entitled to avail themselves of a tip credit relative to the hourly rate of compensation paid to Plaintiffs and Tip Credit Class members;

e.     Whether Plaintiffs and Tip Credit Class members were compensated at an hourly rate of pay that was less than the minimum rate of established by applicable law;

f.     Whether Defendants modified the number of hours, as stored in Defendants' POS system, that Luna and Altered Hours Class members worked;

g.     Whether Luna and Altered Hours Class members were compensated for all of the hours that they worked;

h.     Whether Plaintiffs and the members of the Wage and Hour Classes have sustained damages and, if so, what is the proper measure of their damages; and

i.     Whether Plaintiffs and the members of the Wage and Hour Classes are entitled to the relief sought, including attorney's fees.

248.   *Adequacy.*  Plaintiffs will fairly and adequately protect the interests of the Wage and Hour Classes. Plaintiffs have retained the undersigned class counsel, who are competent and experienced in the prosecution of complex and class action litigation.  The interests of Plaintiffs are aligned with, and not antagonistic to, those of the Wage and Hour Classes.

249.   *Typicality and Superiority.*  A class action is an appropriate method for the fair and efficient adjudication of this controversy.   The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Wage and Hour Classes.   Plaintiffs' claims, factual settings, and legal theories are typical of the Wage and Hour Classes.  Also, the likelihood that individual members of the Wage and Hour Classes will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially in view of the relatively modest amount of monetary relief at issue for individual members of the Wage and Hour Classes.

250.    In addition to the Wage and Hour Classes, Plaintiffs bring their Income Tax Claims as a Class Action on behalf of themselves and the Tax Fraud Class of similarly situated employees, pursuant to Fed. R. Civ. P. 23, as defined below.

251.    **Tax Fraud Class Definition:** Plaintiffs pursue their Income Tax Claims on behalf of the following "Tax Fraud Class:"

> All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute of limitations period, and (2) received a W-2 from at least one Defendant which (a) stated that they received a greater amount in wage income from Defendants and tips bestowed upon them by Defendants' customers than they actually received in hourly compensation and Take Home Cash, and (b) was filed by said Defendant with the United States government on or after June 13, 2013.

Excluded from the Tax Fraud Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Tax Fraud Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.  Plaintiffs hereby reserve the right to amend the above class definition based on discovery and the proofs at trial.

252.    *Numerosity*.  The Tax Fraud Class is so numerous that joinder of all members is impracticable.  Plaintiffs estimate that the Tax Fraud Class, including both current and former employees over the time period relevant to this action, will include hundreds of members.  This is based on the fact that Defendants operated approximately twenty (20) bars and restaurants during the time period applicable to this action, and each bar and restaurant employed about fifty (50) Servers at any given time.  The precise number of members of the Tax Fraud Class should be readily available from Defendants' personnel, scheduling, time, and payroll records maintained in accordance with 29 U.S.C. § 211(c).

253.    *Commonality and Predominance*.  There are questions of fact or law common to the Tax Fraud Class, which predominate over any questions affecting only individual members including, *inter alia*, the following:

a.      Whether Plaintiffs' and Tax Fraud Class members' Paystubs and W-2s accurately reflected the amount of Take Home Cash that Plaintiffs and Tax Fraud Class members were given by Defendants in connection with the tips that Defendants' customers bestowed upon Plaintiffs and Tax Fraud Class members;

b.      Whether Defendants engaged in fraud by overstating the amount of compensation Defendants paid to Plaintiffs and Tax Fraud Class members on Plaintiffs' and Tax Fraud Class members' Paystubs and W-2s;

c.      Whether Defendants willfully filed fraudulent W-2s with the United States government that overstated the amount of compensation Defendants paid to Plaintiffs and Tax Fraud Class members;

d.      Whether Plaintiffs and the members of the Tax Fraud Class have sustained damages and, if so, what is the proper measure of their damages; and

e.      Whether Plaintiffs and the members of the Tax Fraud Class are entitled to the relief sought, including attorney's fees.

254.    *Adequacy*.  Plaintiffs will fairly and adequately protect the interests of the Tax Fraud Class. Plaintiffs have retained the undersigned class counsel, who are competent and experienced in the prosecution of complex and class action litigation.  The interests of Plaintiffs are aligned with, and not antagonistic to, those of the Tax Fraud Class.

255.    *Typicality and Superiority*.  A class action is an appropriate method for the fair and efficient adjudication of this controversy.   The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Tax Fraud Class.   Plaintiffs' claims, factual settings, and legal theories are typical of the Tax Fraud Class.   Also, the likelihood that individual members of the Tax Fraud Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to

60

conduct such litigation, especially in view of the relatively modest amount of monetary relief at issue for individual members of the Tax Fraud Class.

**COUNT I**
**Violation of the Fair Labor Standards Act**
**(29 U.S.C. §§ 201, *et seq.*)**
**(On Behalf of Plaintiffs and the Collective Groups)**

256.　Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein.

257.　Plaintiffs' and members of the Collective Groups' work activities were for the direct and substantial benefit of Defendants, and engaged them individually in "commerce," as defined by 29 U.S.C. § 203(b).

258.　At all times relevant, Plaintiffs' and Tip Credit Collective Group members' hourly rate of pay, taken alone, was less than the minimum $7.25 per hour rate established by the FLSA. 29 U.S.C. § 206(a)(1)(C).

259.　The Take Home Cash that was given to Plaintiffs and Tip Credit Collective Group members was less than the amount of Bestowed Tips to which Plaintiffs and Tip Credit Collective Group members were entitled.

260.　Plaintiffs and Tip Credit Collective Group members did not receive any additional payments in connection with the tips that were bestowed upon them by Defendants' customers other than the Take Home Cash they were given by Defendants.

261.　Plaintiffs and Tip Credit Collective Group members were not given and allowed to keep *all* of the tips that were bestowed upon them by Defendants' customers.　Instead, Defendants uniformly retained the additional amounts in tips that were bestowed upon Plaintiffs and Tip Credit Collective Group members by Defendants' customers over and above what Plaintiffs and Tip Credit Collective Group members were given in Take Home Cash.

262.    As such, Defendants cannot claim a tip credit with respect to Plaintiffs and Tip Credit Collective Group members (29 U.S.C. § 203(m)(2)), and Plaintiffs and Tip Credit Collective Group members were compensated at a rate less than the minimum wage established by the FLSA (29 U.S.C. § 206(a)(1)(C)).

263.    Moreover, Defendants unlawfully retained a portion of the tips that were bestowed upon Plaintiffs and Tip Credit Collective Group members by Defendants' customers. 29 U.S.C. § 203(m)(2)(B).

264.    Plaintiffs and Tip Credit Collective Group members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the FLSA, as well as the full amount of tips bestowed upon them by Defendants' customers.

265.    Luna and Altered Hours Collective Group members recorded the time they began working and the time they left work in Defendants' POS system.

266.    Defendants altered and diminished the number of hours that Luna and Altered Hours Collective Group members recorded in Defendants' POS system.

267.    As a result, Luna and Altered Hours Collective Group members were not compensated for all of the hours that they worked.

268.    Luna and Altered Hours Collective Group members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the FLSA.

269.    Defendants knew of the FLSA requirements described herein.

270.    Defendants' violations of the FLSA requirements described herein were willful.

271.     Pursuant to 29 U.S.C. § 216(b), Plaintiffs and members of the Collective Groups are entitled to: (1) compensation for all of the hours for which they were undercompensated; and (2) liquidated damages in an amount equal to all such unpaid compensation.

272.     Plaintiffs and members of the Collective Groups are also entitled to reasonable attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

WHEREFORE, Plaintiffs, individually, and on behalf of the Collective Groups, pray for an Order as follows:

A.      Finding that this action satisfies the prerequisites for maintenance as a Collective Action, as set forth by 29 U.S.C. § 216(b), and certifying the Collective Groups defined herein;

B.      Designating Plaintiffs as representatives of the Collective Groups and their undersigned counsel as Collective Group Counsel;

C.      Entering judgment in favor of Plaintiffs and the Collective Groups and against Defendants;

D.      Awarding Plaintiffs and the Collective Groups all unpaid compensation to which they are entitled;

E.      Awarding Plaintiffs and the Collective Groups liquidated damages in an amount equal to the amount of the unpaid compensation to which they are entitled;

F.      Awarding Plaintiffs and the Collective Groups reasonable attorneys' fees and costs; and

G.      Granting all such further and other relief as the Court deems just and appropriate.

## COUNT II
### Violation of the Illinois Minimum Wage Law
### (820 ILCS 105/1, *et seq.*)
### (On Behalf of Plaintiffs and the Wage and Hour Classes)

273.     Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein.

274.    Plaintiffs' and members of the Wage and Hour Classes' work activities were for the direct and substantial benefit of Defendants, and entitled them to wages, as defined by 820 ILCS 105/3(b).

275.    At all times relevant, Plaintiffs' and Tip Credit Class members' hourly rate of pay, taken alone, was less than the minimum $8.25 per hour rate established by the IMWL.  820 ILCS 105/4(a)(1).

276.    The Take Home Cash that was given to Plaintiffs and Tip Credit Class members was less than the amount of Bestowed Tips to which Plaintiffs and Tip Credit Class members were entitled.

277.    Plaintiffs and Tip Credit Class members did not receive any additional payments in connection with the tips that were bestowed upon them by Defendants' customers other than the Take Home Cash they were given by Defendants.

278.    Plaintiffs and Tip Credit Class members were not given and allowed to keep *all* of the tips that were bestowed upon them by Defendants' customers.  Instead, Defendants uniformly retained the additional amounts in tips that were bestowed upon Plaintiffs and Tip Credit Class members by Defendants' customers over and above what Plaintiffs and Tip Credit Class members were given in Take Home Cash.

279.    As such, Defendants cannot claim a tip credit with respect to Plaintiffs and Tip Credit Class members (820 ILCS 105/4(c)), and Plaintiffs and Tip Credit Class members were compensated at a rate less than the minimum wage established by the IMWL (820 ILCS 105/4(a)(1)).

280.    Moreover, Defendants unlawfully retained a portion of the tips that were bestowed upon Plaintiffs and Tip Credit Class members.  820 ILCS 105/3(b).

281.   Plaintiffs and Tip Credit Class members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the IMWL, as well as the full amount of tips bestowed upon them by Defendants' customers.

282.   Luna and Altered Hours Class members recorded the time they began working and the time they left work in Defendants' POS system.

283.   Defendants altered and diminished the number of hours that Luna and Altered Hours Class members recorded in Defendants' POS system.

284.   As a result, Luna and Altered Hours Class members were not compensated for all of the hours that they worked.

285.   Luna and Altered Hours Class members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the IMWL.

286.   Defendants knew of the IMWL requirements described herein.

287.   Defendants' violations of the IMWL requirements described herein were willful.

288.   Pursuant to 820 ILCS 105/12(a), Plaintiffs and members of the Wage and Hour Classes are entitled to: (1) compensation for all of the hours for which they were undercompensated; and (2) damages in an amount equal to 2% of the amount of all such unpaid compensation for each month following the date of payment during which such underpayments remain unpaid.

289.   Plaintiffs and members of the Wage and Hour Classes are also entitled to reasonable attorneys' fees and costs, pursuant to 820 ILCS 105/12(a).

WHEREFORE, Plaintiffs, individually, and on behalf of the Wage and Hour Classes, pray for an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Wage and Hour Classes defined herein;

B.     Designating Plaintiffs as representatives of the Wage and Hour Classes and their undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiffs and the Wage and Hour Classes and against Defendants;

D.     Awarding Plaintiffs and the Wage and Hour Classes all unpaid compensation to which they are entitled;

E.     Awarding Plaintiffs and the Wage and Hour Classes damages in an amount equal to 2% of the amount of all unpaid compensation for each month following the date of payment during which such underpayments remain unpaid;

F.     Awarding Plaintiffs and the Wage and Hour Classes reasonable attorneys' fees and costs; and

G.     Granting all such further and other relief as the Court deems just and appropriate.

### COUNT III
**Violation of the Chicago Minimum Wage Ordinance**
**(Chi. Mun. Code §§ 1-24-010, *et seq*.)**
**(On Behalf of Plaintiffs and the Wage and Hour Classes)**

290.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein.

291.    Plaintiffs' and members of the Wage and Hours Classes' work activities were for the direct and substantial benefit of Defendants, and were performed while physically present within the geographic boundaries of the City of Chicago, Illinois.  As such, Plaintiffs and members of the Wage and Hours Classes are "Covered Employees" as defined by Chi. Mun. Code § 1-24-010.

66

292.     At all times relevant, Plaintiffs' and Tip Credit Class members' hourly rate of pay, taken alone, was less than the prevailing minimum per hour rate established by the Chicago Ordinance relative to employees who do not receive tips.  Chi. Mun. Code § 1-24-020.

293.     The Take Home Cash that was given to Plaintiffs and Tip Credit Class members was less than the amount of Bestowed Tips to which Plaintiffs and Tip Credit Class members were entitled.

294.     Plaintiffs and Tip Credit Class members did not receive any additional payments in connection with the tips that were bestowed upon them by Defendants' customers other than the Take Home Cash they were given by Defendants.

295.     Plaintiffs and Tip Credit Class members were not given and allowed to keep *all* of the tips that were bestowed upon them by Defendants' customers.  Instead, Defendants uniformly retained the additional amounts in tips that were bestowed upon Plaintiffs and Tip Credit Class members by Defendants' customers over and above what Plaintiffs and Tip Credit Class members were given in Take Home Cash.

296.     As such, Defendants cannot avail themselves of the lesser minimum wage for tipped employees under the Chicago Ordinance relative to the hourly rate of compensation paid to Plaintiffs and Tip Credit Class members (Chi. Mun. Code § 1-24-030), and Plaintiffs and Tip Credit Class members were compensated at a rate less than the applicable minimum wage established by the Chicago Ordinance (Chi. Mun. Code § 1-24-020).

297.     Moreover, Defendants unlawfully retained a portion of the tips that Defendants' customers bestowed upon Plaintiffs and Tip Credit Class members.  Chi. Mun. Code § 1-24-010.

298.     Plaintiffs and Tip Credit Class members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of

compensation at a rate not less the minimum wage established by the Chicago Ordinance, as well as the full amount of tips bestowed upon them by Defendants' customers.

299.    Luna and Altered Hours Class members recorded the time they began working and the time they left work in Defendants' POS system.

300.    Defendants altered and diminished the number of hours that Luna and Altered Hours Class members recorded in Defendants' POS system.

301.    As a result, Luna and Altered Hours Class members were not compensated for all of the hours that they worked.

302.    Luna and Altered Hours Class members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the Chicago Ordinance.

303.    Defendants knew of the Chicago Ordinance requirements described herein.

304.    Defendants' violations of the Chicago Ordinance requirements described herein were willful.

305.    Pursuant to Chi. Mun. Code § 1-24-110, Plaintiffs and members of the Wage and Hour Classes are entitled to recover three times the amount of compensation owed to them under the Chicago Ordinance.

306.    Plaintiffs and members of the Wage and Hour Classes are also entitled to reasonable attorneys' fees and costs, pursuant to Chi. Mun. Code § 1-24-110.

WHEREFORE, Plaintiffs, individually, and on behalf of the Wage and Hour Classes, pray for an Order as follows:

    A.    Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Wage and Hour Classes defined herein;

    B.      Designating Plaintiffs as representatives of the Wage and Hour Classes and their undersigned counsel as Class Counsel;

    C.      Entering judgment in favor of Plaintiffs and the Wage and Hour Classes and against Defendants;

    D.      Awarding Plaintiffs and the Wage and Hour Classes an amount equal to three times the amount of all unpaid compensation to which they are entitled;

    E.      Awarding Plaintiffs and the Wage and Hour Classes reasonable attorneys' fees and costs; and

    F.      Granting all such further and other relief as the Court deems just and appropriate.

**COUNT IV**
**Violation of the Illinois Wage Payment and Collection Act**
**(820 ILCS 115/1, *et seq*.)**
**(On Behalf of Plaintiffs and the Wage and Hour Classes)**

307.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein.

308.    Plaintiffs' and members of the Wage and Hour Classes' work activities were for the direct and substantial benefit of Defendants, and entitled them to wages, as defined by 820 ILCS 115/2.

309.    Defendants agreed to compensate Plaintiffs and members of the Wage and Hour Classes at an hourly rate that complied with the applicable minimum wage.

310.    As set forth in Counts I through III, *supra*, Defendants did not compensate Plaintiffs and members of the Wage and Hour Classes at an hourly rate that complied with the applicable minimum wage.

311.    Defendants' violations of the IWPCA requirements described herein were willful.

312.    Pursuant to 820 ILCS 115/14(a), Plaintiffs and members of the Wage and Hour Classes are entitled to: (1) compensation for all of the hours for which they were

undercompensated; and (2) damages in an amount equal to 2% of the amount of all such unpaid compensation for each month following the date of payment during which such underpayments remain unpaid.

313.    Plaintiffs and members of the Wage and Hour Classes are also entitled to reasonable attorneys' fees and costs, pursuant to 820 ILCS 115/14(a).

WHEREFORE, Plaintiffs, individually, and on behalf of the Wage and Hour Classes, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Wage and Hour Classes defined herein;

B.    Designating Plaintiffs as representatives of the Wage and Hour Classes and their undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiffs and the Wage and Hour Classes and against Defendants;

D.    Awarding Plaintiffs and the IWPCA Class all unpaid compensation to which they are entitled;

E.    Awarding Plaintiffs and the Wage and Hour Classes damages in an amount equal to 2% of the amount of all unpaid compensation for each month following the date of payment during which such underpayments remain unpaid;

F.    Awarding Plaintiffs and the Wage and Hour Classes reasonable attorneys' fees and costs; and

G.    Granting all such further and other relief as the Court deems just and appropriate.

**COUNT V**
**Violation of Section 7434 of the Internal Revenue Code**
**(26 U.S.C. § 7434)**
**(On Behalf of Plaintiffs and the Tax Fraud Class)**

314.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein.

70

315.     Pursuant to the IRC Statute, "if any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434(a).

316.     As the employers of Plaintiffs and Tax Fraud Class members, Defendants issued W-2s to Plaintiffs and Tax Fraud Class members on an annual basis.

317.     The particular Defendant that issued a W-2 to Plaintiffs and each of the Tax Fraud Class members depended upon which Defendant was responsible for tax reporting relative to Plaintiffs and each Tax Fraud Class member. The specific entity (or entities) responsible for tax reporting relative to each Plaintiff is the entity (or entities) which operated the location(s) at which each Plaintiff worked.

318.     The W-2s issued to Plaintiffs and Tax Fraud Class members by Defendants are "information returns" as defined by 26 U.S.C. § 7434(f). 26 U.S.C. § 6724(d)(1)(A); 26 CFR § 31.6051-2(a). The W-2s issued to Plaintiffs and Tax Fraud Class members by Defendants are also "payee statements," as defined by 26 U.S.C. § 6724(d)(2).

319.     For purposes of the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members, the hourly compensation that Defendants paid to Plaintiffs and Tax Fraud Class members, as well as the tips that Defendants' customers bestowed upon Plaintiffs and Tax Fraud Class members, constituted "wages." 26 U.S.C. § 3121(a); 26 U.S.C. § 3401(a) & (f).

320.     Defendants calculated the "wages" on Plaintiffs' and Tax Fraud Class members' W-2s using the information on Plaintiffs' and Tax Fraud Class members' Paystubs from the applicable calendar year. Put another way, the "wages" reflected on the W-2s that Defendants issued to Plaintiffs and Tax Fraud Class members were derived by adding the amount of hourly compensation that Plaintiffs and Tax Fraud Class members earned during the prior calendar

71

year—as reflected Plaintiffs' and Tax Fraud Class members' Paystubs—to the amount of "Cash Tips" stated on Plaintiffs' and Tax Fraud Class members' Paystubs from the prior calendar year.

321.    However, the "Cash Tips" stated on Plaintiffs' and Tax Fraud Class members' Paystubs *inaccurately* reflected the amount of Take Home Cash that Plaintiffs and Tax Fraud Class members were given by Defendants in connection with tips bestowed upon Plaintiffs and Tax Fraud Class members by Defendants' customers during their respective shifts.  In actuality, Plaintiffs and Tax Fraud Class members received a *lesser* amount in Take Home Cash in connection with tips bestowed upon them by Defendants' customers than the amount of "Cash Tips" stated on their Paystubs.

322.    As such, the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members *overstated* the amount of "wages" that Plaintiffs and Tax Fraud Class members earned during the prior calendar year.

323.    Defendants filed the W-2s issued that they to Plaintiffs and Tax Fraud Class members with the United States government, as required by 26 CFR § 31.6051-2(a).

324.    Defendants knew the information on the W-2s that they issued to Plaintiffs and Tax Fraud Class members was false because Plaintiffs and Tax Fraud Class members accurately declared the amount of their tip income in Defendants' POS system—as required by 26 U.S.C. § 6053(a) and 26 CFR § 31.6053-1(a)—and Defendants had a duty to keep accurate records relative to the amount of tips declared by Plaintiffs and Tax Fraud Class members in Defendants' POS system—as required by 26 CFR § 31.6001-1(a).

325.    Plaintiffs and Tax Fraud Class members reasonably believed that the information in the W-2s issued by Defendants was accurate, and relied upon that information, because Defendants had a duty to file correct information returns with the United States government—

pursuant to 26 U.S.C. § 6721(a)(2)(B) and 26 CFR 301.6721-1—and to furnish Plaintiffs and Tax Fraud Class members with correct payee statements—pursuant to 26 U.S.C. § 6722(a)(2)(B) and 26 CFR 301.6722-1. Plaintiffs and Tax Fraud Class members also reasonably believed that the information in the W-2s and Paystubs issued by Defendants was accurate, and relied upon that information, because Defendants had a duty to keep accurate records relative to the amount of tips declared by Plaintiffs and Tax Fraud Class members in Defendants' POS system—pursuant to 26 CFR § 31.6001-1(a). Indeed, unlike Defendants, there is no mandatory recordkeeping requirement imposed on Plaintiffs and Tax Fraud Class members. 26 CFR § 31.6001-1(d). Moreover, "the fact that the [W-2s were] filed for public record amounts to…a guarantee" that the W-2s were accurate. *Lehmann v. Arnold*, 137 Ill.App.3d 412, 421 (4th Dist. 1985).

326.    For the same reasons, Defendants knew and intended that Plaintiffs and Tax Fraud Class members would rely on the information in the W-2s and Paystubs issued by Defendants.

327.    Accordingly, in filing the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members—which contained incorrect information as to the amount of "wages" Plaintiffs and Tax Fraud Class members earned—Defendants filed fraudulent information returns with the United States government in violation of 26 U.S.C. § 7434(a).

328.    The particular Defendant that filed a fraudulent W-2 issued to Plaintiffs and each of the Tax Fraud Class members depended upon which Defendant was responsible for tax reporting relative to Plaintiffs and each Tax Fraud Class member. The specific entity (or entities) responsible for filing a W-2 relative to each Plaintiff is the entity (or entities) which operated the location(s) at which each Plaintiff worked.

329.    As set forth above, Defendants' filing of the fraudulent W-2s that they issued to Plaintiffs and Tax Fraud Class members was part of a willful scheme to shift the burden of paying taxes to Plaintiffs and Tax Fraud Class members so that Defendants could covertly retain income without paying taxes, diminish their labor costs, and avoid paying the minimum hourly rate of pay under applicable minimum wage laws..

330.    Because the amount of "wages" stated on the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members *overstated* the amount of "wages" that Plaintiffs and Tax Fraud Class members actually earned during the prior calendar year, Plaintiffs and Tax Fraud Class members were required to pay income tax on income that they did not actually receive.

331.    As a direct and proximate result of the foregoing, Plaintiffs and Tax Fraud Class members were harmed by Defendants' conduct described herein because they were required to pay a greater amount in income tax than they otherwise should have been, had their W-2s been accurate.

332.    Pursuant to 26 U.S.C. § 7434(b), Plaintiffs and Tax Fraud Class members are each entitled to the greater of: (1) statutory damages of $5,000; or (2) the sum of their actual damages, the costs of this action, and reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs, individually, and on behalf of the Tax Fraud Class, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Tax Fraud Class defined herein;

B.    Designating Plaintiffs as representatives of the Tax Fraud Class and their undersigned counsel as Tax Fraud Class Counsel;

C.    Entering judgment in favor of Plaintiffs and the Tax Fraud Class and against Defendants;

74

D.    Awarding Plaintiffs and the Tax Fraud Class the greater of: (1) statutory damages of $5,000; or (2) the sum of their actual damages, the costs of this action, and reasonable attorneys' fees and costs, as provided for by 26 U.S.C. § 7434(b);

E.    Awarding Plaintiffs and the Tax Fraud Class reasonable attorneys' fees and costs; and

F.    Granting all such further and other relief as the Court deems just and appropriate.

## COUNT VI
### Violation of the Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. §§ 1961, *et seq.*)
### (On Behalf of Plaintiffs and the Tax Fraud Class)

333.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein.

334.    Pursuant to the RICO statute, "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor…and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee…" 18 U.S.C. § 1964(c).

335.    At all relevant times, 18 U.S.C. § 1962 stated, in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity…to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce…

(b) It shall be unlawful for any person through a pattern of racketeering activity…to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…

75

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

336.    18 U.S.C. § 1961(5) defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years…after the commission of a prior act of racketeering activity."

337.    Relevant here, 18 U.S.C. § 1961(1) defines "racketeering activity" as "any act which is indictable under" 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud).  18 U.S.C. § 1961(1)(B).

338.    At all relevant times, 18 U.S.C. § 1341 made it unlawful for persons to use the United States mail to defraud persons of money or property.

339.    At all relevant times, 18 U.S.C. § 1343 made it unlawful for persons to use the wires of interstate commerce to defraud persons of money or property.

340.    All Defendants, except for the unincorporated Defendant Four Corners, are "persons," as defined by 18 U.S.C. § 1961(3).  Each of these "persons" participated in the scheme defined herein as part of the "enterprise"—as defined by 18 U.S.C. § 1961(4)—known as Four Corners.

341.    As the employers of Plaintiffs and Tax Fraud Class members, Defendants issued W-2s to Plaintiffs and Tax Fraud Class members on an annual basis.

342.    The particular Defendant that issued a W-2 to Plaintiffs and each of the Tax Fraud Class members depended upon which Defendant was responsible for tax reporting relative to Plaintiffs and each Tax Fraud Class member.  The specific entity (or entities) responsible for tax

reporting relative to each Plaintiff is the entity (or entities) which operated the location(s) at which each Plaintiff worked.

343. The W-2s issued to Plaintiffs and Tax Fraud Class members by Defendants are "information returns" as defined by 26 U.S.C. § 7434(f). 26 U.S.C. § 6724(d)(1)(A); 26 CFR § 31.6051-2(a). The W-2s issued to Plaintiffs and Tax Fraud Class members by Defendants are also "payee statements," as defined by 26 U.S.C. § 6724(d)(2).

344. For purposes of the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members, the hourly compensation that Defendants paid to Plaintiffs and Tax Fraud Class members, as well as the tips that Defendants' customers bestowed upon Plaintiffs and Tax Fraud Class members, constituted "wages." 26 U.S.C. § 3121(a); 26 U.S.C. § 3401(a) & (f).

345. Defendants calculated the "wages" on Plaintiffs' and Tax Fraud Class members' W-2s using the information on Plaintiffs' and Tax Fraud Class members' Paystubs from the applicable calendar year. Put another way, the "wages" reflected on the W-2s that Defendants issued to Plaintiffs and Tax Fraud Class members were derived by adding the amount of hourly compensation that Plaintiffs and Tax Fraud Class members earned during the prior calendar year—as reflected Plaintiffs' and Tax Fraud Class members' Paystubs—to the amount of "Cash Tips" stated on Plaintiffs' and Tax Fraud Class members' Paystubs from the prior calendar year.

346. However, the "Cash Tips" stated on Plaintiffs' and Tax Fraud Class members' Paystubs *inaccurately* reflected the amount of Take Home Cash that Plaintiffs and Tax Fraud Class members were given by Defendants in connection with tips bestowed upon Plaintiffs and Tax Fraud Class members by Defendants' customers during their respective shifts. In actuality, Plaintiffs and Tax Fraud Class members received a *lesser* amount in Take Home Cash in

connection with tips bestowed upon them by Defendants' customers than the amount of "Cash Tips" stated on their Paystubs.

347.    As such, the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members *overstated* the amount of "wages" that Plaintiffs and Tax Fraud Class members earned during the prior calendar year.

348.    Defendants filed the W-2s that they issued to Plaintiffs and Tax Fraud Class members with the United States government, as required by 26 CFR § 31.6051-2(a).  Defendants (1) sent the W-2s issued to Plaintiffs and Tax Fraud Class members to the United States government by using the United States mail, or a private or commercial interstate carrier, and/or (2) electronically transmitted the W-2s that they issued to Plaintiffs and Tax Fraud Class members to the United States government through wire transmissions in interstate commerce.

349.    Defendants knew the information on the W-2s that they issued to Plaintiffs and Tax Fraud Class members was false because Plaintiffs and Tax Fraud Class members accurately declared the amount of their tip income in Defendants' POS system—as required by 26 U.S.C. § 6053(a) and 26 CFR § 31.6053-1(a)—and Defendants had a duty to keep accurate records relative to the amount of tips declared by Plaintiffs and Tax Fraud Class members in Defendants' POS system—as required by 26 CFR § 31.6001-1(a).

350.    Plaintiffs and Tax Fraud Class members reasonably believed that the information in the W-2s issued by Defendants was accurate, and relied upon that information, because Defendants had a duty to file correct information returns with the United States government— pursuant to 26 U.S.C. § 6721(a)(2)(B) and 26 CFR 301.6721-1—and to furnish Plaintiffs and Tax Fraud Class members with correct payee statements—pursuant to 26 U.S.C. § 6722(a)(2)(B) and 26 CFR 301.6722-1.  Plaintiffs and Tax Fraud Class members also reasonably believed that

the information in the W-2s and Paystubs issued by Defendants was accurate, and relied upon that information, because Defendants had a duty to keep accurate records relative to the amount of tips declared by Plaintiffs and Tax Fraud Class members in Defendants' POS system—pursuant to 26 CFR § 31.6001-1(a). Indeed, unlike Defendants, there is no mandatory recordkeeping requirement imposed on Plaintiffs and Tax Fraud Class members. 26 CFR § 31.6001-1(d). Moreover, "the fact that the [W-2s were] filed for public record amounts to…a guarantee" that the W-2s were accurate. *Lehmann*, 137 Ill.App.3d at 421.

351. For the same reasons, Defendants knew and intended that Plaintiffs and Tax Fraud Class members would rely on the information in the W-2s and Paystubs issued by Defendants.

352. Accordingly, in filing the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members—which contained incorrect information as to the amount of "wages" Plaintiffs and Tax Fraud Class members earned—Defendants filed fraudulent information returns with the United States government through the mail or by wire transmission.

353. The particular Defendant that filed a fraudulent W-2 issued to Plaintiffs and each of the Tax Fraud Class members depended upon which Defendant was responsible for tax reporting relative to Plaintiffs and each Tax Fraud Class member. The specific entity (or entities) responsible for filing a W-2 relative to each Plaintiff is the entity (or entities) which operated the location(s) at which each Plaintiff worked.

354. As set forth above, Defendants' filing of the fraudulent W-2s that they issued to Plaintiffs and Tax Fraud Class members was part of a willful scheme to shift the burden of paying taxes to Plaintiffs and Tax Fraud Class members so that Defendants could covertly retain income without paying taxes, diminish their labor costs, and avoid paying the minimum hourly rate of pay under applicable minimum wage laws.

79

355.    Defendants acted in concert with one another in perpetrating the scheme described herein.  Although each Defendant was responsible for its own employee's W-2s, all Defendants were instructed by Four Corner's central management to calculate Servers' Assumed Tip Income in a uniform, agreed-upon fashion, which ensures that the fraudulent scheme is not discovered.  Indeed, as noted above, Defendants report Servers' Assumed Tip Income on their W-2s to avoid the possibility of an IRS audit, and if even one Defendant failed to do so, the actions of all Defendants would likely be discovered.

356.    Moreover, because Defendants Matthew Menna and Andrew Gloor have a financial interest in all of the business entity Defendants, each participant in the scheme described herein acts with a common purpose: enriching Matthew Menna and Andrew Gloor. For the reasons stated above, by participating this this scheme, each bar and restaurant can increase its income, tax-free, resulting in higher profits for Matthew Menna and Andrew Gloor.

357.    Because the amount of "wages" stated on the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members *overstated* the amount of "wages" that Plaintiffs and Tax Fraud Class members actually earned during the prior calendar year, Plaintiffs and Tax Fraud Class members were required to pay income tax on income that they did not actually receive.

358.    In light of the foregoing, Defendants committed mail fraud as defined in 18 U.S.C. § 1341 and/or wire fraud as defined in 18 U.S.C. § 1343 by engaging in a scheme to file fraudulent W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members with the United States government through the mail or by wire transmission in order to covertly retain income without paying taxes, or avoid paying the minimum hourly rate of pay under applicable minimum wage laws.

359.    Defendants plotted and conspired to work together to defraud Plaintiffs and Tax Fraud Class members (and potentially the United States government), and used the money illegally obtained in their scheme to continue their businesses and operations.

360.    Because the amount of "wages" stated on the W-2s issued by Defendants to Plaintiffs and Tax Fraud members *overstated* the amount of "wages" that Plaintiffs and Tax Fraud members actually earned during the prior calendar year, Plaintiffs and Tax Fraud members were required to pay income tax on income that they did not actually receive.

361.    As a direct and proximate result of the foregoing, Plaintiffs and Tax Fraud members were harmed by Defendants' conduct described herein because they were required to pay a greater amount in income tax than they otherwise should have been, had their W-2s been accurate.

362.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and Tax Fraud members are entitled to three times the damages they sustained as a result of Defendants' illegal conduct described herein.

363.    Plaintiffs and Tax Fraud members are also entitled to reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs, individually, and on behalf of the Tax Fraud, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Tax Fraud defined herein;

B.    Designating Plaintiffs as representatives of the Tax Fraud and their undersigned counsel as RICO Class Counsel;

C.    Entering judgment in favor of Plaintiffs and the Tax Fraud and against Defendants;

81

D.      Awarding Plaintiffs and the Tax Fraud an amount equal to three times the damages they sustained as a result of Defendants' illegal conduct;

E.      Awarding Plaintiffs and the Tax Fraud reasonable attorneys' fees and costs; and

F.      Granting all such further and other relief as the Court deems just and appropriate.

<u>**COUNT VII**</u>
**Fraud**
**(On Behalf of Plaintiffs and the Tax Fraud Class)**

364.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein.

365.    Pursuant to the IRC Statute, "if any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434(a).

366.    As the employers of Plaintiffs and Tax Fraud Class members, Defendants issued W-2s to Plaintiffs and Tax Fraud Class members on an annual basis.

367.    The particular Defendant that issued a W-2 to Plaintiffs and each of the Tax Fraud Class members depended upon which Defendant was responsible for tax reporting relative to Plaintiffs and each Tax Fraud Class member. The specific entity (or entities) responsible for tax reporting relative to each Plaintiff is the entity (or entities) which operated the location(s) at which each Plaintiff worked.

368.    The W-2s issued to Plaintiffs and Tax Fraud Class members by Defendants are "information returns" as defined by 26 U.S.C. § 7434(f). 26 U.S.C. § 6724(d)(1)(A); 26 CFR § 31.6051-2(a). The W-2s issued to Plaintiffs and Tax Fraud Class members by Defendants are also "payee statements," as defined by 26 U.S.C. § 6724(d)(2).

82

369.    For purposes of the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members, the hourly compensation that Defendants paid to Plaintiffs and Tax Fraud Class members, as well as the tips that Defendants' customers bestowed upon Plaintiffs and Tax Fraud Class members, constituted "wages."  26 U.S.C. § 3121(a); 26 U.S.C. § 3401(a) & (f).

370.    Defendants calculated the "wages" on Plaintiffs' and Tax Fraud Class members' W-2s using the information on Plaintiffs' and Tax Fraud Class members' Paystubs from the applicable calendar year.   Put another way, the "wages" reflected on the W-2s that Defendants issued to Plaintiffs and Tax Fraud Class members were derived by adding the amount of hourly compensation that Plaintiffs and Tax Fraud Class members earned during the prior calendar year—as reflected Plaintiffs' and Tax Fraud Class members' Paystubs—to the amount of "Cash Tips" stated on Plaintiffs' and Tax Fraud Class members' Paystubs from the prior calendar year.

371.    However, the "Cash Tips" stated on Plaintiffs' and Tax Fraud Class members' Paystubs *inaccurately* reflected the amount of Take Home Cash that Plaintiffs and Tax Fraud Class members were given by Defendants in connection with tips bestowed upon Plaintiffs and Tax Fraud Class members by Defendants' customers during their respective shifts.  In actuality, Plaintiffs and Tax Fraud Class members received a *lesser* amount in Take Home Cash in connection with tips bestowed upon them by Defendants' customers than the amount of "Cash Tips" stated on their Paystubs.

372.    As such, the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members *overstated* the amount of "wages" that Plaintiffs and Tax Fraud Class members earned during the prior calendar year.

373.    Defendants filed the W-2s issued that they to Plaintiffs and Tax Fraud Class members with the United States government, as required by 26 CFR § 31.6051-2(a).

83

374.    Defendants knew the information on the W-2s that they issued to Plaintiffs and Tax Fraud Class members was false because Plaintiffs and Tax Fraud Class members accurately declared the amount of their tip income in Defendants' POS system—as required by 26 U.S.C. § 6053(a) and 26 CFR § 31.6053-1(a)—and Defendants had a duty to keep accurate records relative to the amount of tips declared by Plaintiffs and Tax Fraud Class members in Defendants' POS system—as required by 26 CFR § 31.6001-1(a).

375.    Plaintiffs and Tax Fraud Class members reasonably believed that the information in the W-2s issued by Defendants was accurate, and relied upon that information, because Defendants had a duty to file correct information returns with the United States government— pursuant to 26 U.S.C. § 6721(a)(2)(B) and 26 CFR 301.6721-1—and to furnish Plaintiffs and Tax Fraud Class members with correct payee statements—pursuant to 26 U.S.C. § 6722(a)(2)(B) and 26 CFR 301.6722-1.  Plaintiffs and Tax Fraud Class members also reasonably believed that the information in the W-2s and Paystubs issued by Defendants was accurate, and relied upon that information, because Defendants had a duty to keep accurate records relative to the amount of tips declared by Plaintiffs and Tax Fraud Class members in Defendants' POS system— pursuant to 26 CFR § 31.6001-1(a).   Indeed, unlike Defendants, there is no mandatory recordkeeping requirement imposed on Plaintiffs and Tax Fraud Class members.  26 CFR § 31.6001-1(d).  Moreover, "the fact that the [W-2s were] filed for public record amounts to…a guarantee" that the W-2s were accurate.  *Lehmann v. Arnold*, 137 Ill.App.3d 412, 421 (4th Dist. 1985).

376.    For the same reasons, Defendants knew and intended that Plaintiffs and Tax Fraud Class members would rely on the information in the W-2s and Paystubs issued by Defendants.

84

377.    Accordingly, in filing the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members—which contained incorrect information as to the amount of "wages" Plaintiffs and Tax Fraud Class members earned—Defendants filed fraudulent information returns with the United States government in violation of 26 U.S.C. § 7434(a).

378.    The particular Defendant that filed a fraudulent W-2 issued to Plaintiffs and each of the Tax Fraud Class members depended upon which Defendant was responsible for tax reporting relative to Plaintiffs and each Tax Fraud Class member.  The specific entity (or entities) responsible for filing a W-2 relative to each Plaintiff is the entity (or entities) which operated the location(s) at which each Plaintiff worked.

379.    As set forth above, Defendants' filing of the fraudulent W-2s that they issued to Plaintiffs and Tax Fraud Class members was part of a willful scheme to shift the burden of paying taxes to Plaintiffs and Tax Fraud Class members so that Defendants could covertly retain income without paying taxes, diminish their labor costs, and avoid paying the minimum hourly rate of pay under applicable minimum wage laws..

380.    Because the amount of "wages" stated on the W-2s issued by Defendants to Plaintiffs and Tax Fraud Class members *overstated* the amount of "wages" that Plaintiffs and Tax Fraud Class members actually earned during the prior calendar year, Plaintiffs and Tax Fraud Class members were required to pay income tax on income that they did not actually receive.

381.    As a direct and proximate result of the foregoing, Plaintiffs and Tax Fraud Class members were harmed by Defendants' conduct described herein because they were required to pay a greater amount in income tax than they otherwise should have been, had their W-2s been accurate.

382.    Accordingly, Plaintiffs, individually, and on behalf of the Fraud Class, seek damages arising from Defendants' conduct described herein.

WHEREFORE, Plaintiffs, individually, and on behalf of the Tax Fraud Class, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Tax Fraud Class defined herein;

B.    Designating Plaintiffs as representatives of the Tax Fraud Class and their undersigned counsel as Tax Fraud Class Counsel;

C.    Entering judgment in favor of Plaintiffs and the Tax Fraud Class and against Defendants;

D.    Awarding Plaintiffs and the Tax Fraud Class the greater of: (1) statutory damages of $5,000; or (2) the sum of their actual damages, the costs of this action, and reasonable attorneys' fees and costs, as provided for by 26 U.S.C. § 7434(b);

E.    Awarding Plaintiffs and the Tax Fraud Class reasonable attorneys' fees and costs; and

F.    Granting all such further and other relief as the Court deems just and appropriate.

## **JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

Plaintiffs ERIK LUNA, LAURA PALYA, NOELLE HOFFMAN, ANNIE CALLANTA, RACHEL FOLEY, KATHLEEN CAHILL, ERIN ROTTENBERG, MELISSA MOSHER, and JENNIFER STRAIT, individually, and on behalf of all others similarly situated,

By:    /s/ Thomas A. Zimmerman, Jr.

86

Thomas A. Zimmerman, Jr.
*tom@attorneyzim.com*
Sharon A. Harris
*sharon@attorneyzim.com*
Matthew C. De Re
*matt@attorneyzim.com*
Nickolas J. Hagman
*nick@attorneyzim.com*
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
Firm I.D. No. 34418

Counsel for Plaintiffs, the putative Collective Groups, and the putative Classes

## <u>CERTIFICATE OF SERVICE</u>

 Matthew C. De Re, an attorney, hereby certifies that he caused the above and foregoing *Amended Collective and Class Action Complaint* to be served upon counsel of record in this case via the U.S. District Court CM/ECF System, on this 13th day of June, 2019.


<u>/s/Matthew C. De Re</u>