## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ERIK LUNA, individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 18-cv-05165 |
| v. | ) ) | Judge Harry D. Leinenweber |
| 4C KINZIE INVESTOR LLC, *et al.* | ) ) | |
| Defendants. | ) | |

### ANSWER AND AFFIRMATIVE DEFENSES
### TO THE AMENDED COMPLAINT

For their Answer and Affirmative Defenses to Plaintiffs' Amended Complaint (Dkt. 57) pursuant to Federal Rules of Civil Procedure 8 and 12 and the Court's order of July 25, 2019 (Dkt. 68), Defendants state the following:

### THE DEFENDANTS

1.      Defendant 4C Kinzie Investor LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. 4C Kinzie Investor LLC does business as Highline Bar & Lounge, located at 169 West Kinzie Street, Chicago, Illinois 60654. 4C Kinzie Investor LLC employs, and controls the payment of wages to, bartenders and waiters who serve food and drinks (collectively, "Servers") to Highline Bar & Lounge's customers. As such, 4C Kinzie Investor LLC is an "employer" of the Servers at Highline Bar & Lounge as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C Kinzie Investor LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that 4C Kinzie Investor LLC is an Illinois limited liability company that does business as Highline Bar & Lounge, located at 169 West Kinzie Street,

Chicago, Illinois 60654 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

2.     Defendant 1001 W. Lake Opco, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. 1001 W. Lake Opco, LLC does business as Federales, located at 180 North Morgan Street, Chicago, Illinois 60607. 1001 W. Lake Opco, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Federales's customers. As such, 1001 W. Lake Opco, LLC is an "employer" of the Servers at Federales as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 1001 W. Lake Opco, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

        **ANSWER:** Defendants admit that 1001 W. Lake Opco, LLC is a Delaware limited liability company that does business as Federales, located at 180 North Morgan Street, Chicago, Illinois 60607 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

3.     Defendant 4C 1001 W. Lake Opco, LLC is a Delaware limited liability company with its principal place of business located at 1330 West Fulton Street, Chicago, Illinois 60607. 4C 1001 W. Lake Opco, LLC is the manager of Defendant 1001 W. Lake Opco, LLC. Through 1001 W. Lake Opco, LLC, 4C 1001 W. Lake Opco, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Federales's customers. As such, 4C 1001 W. Lake Opco, LLC is an "employer" of the Servers at Federales as that term is defined by 29

U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C 1001 W. Lake Opco, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendant admits that 4C 1001 W. Lake Opco, LLC is a Delaware limited liability company with its principal place of business located at 1330 West Fulton Street, Chicago, Illinois 60607 and is the manager of Defendant 1001 W. Lake Opco, LLC. Defendants deny the remaining allegations in this paragraph.

4. Defendant 4C 15 E. Illinois Operations, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. 4C 15 E. Illinois Operations, LLC does business as Fremont Bar, located at 15 West Illinois Street, Chicago, Illinois 60654. 4C 15 E. Illinois Operations, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Fremont Bar's customers. As such, 4C 15 E. Illinois Operations, LLC is an "employer" of the Servers at Fremont Bar as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C 15 E. Illinois Operations, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that 4C 15 E. Illinois Operations, LLC is an Illinois limited liability company that does business as Fremont Bar, located at 15 West Illinois Street, Chicago, Illinois 60654 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

5. Defendant Four Corners Tavern Fund Management, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street,

Chicago, Illinois 60607. Four Corners Tavern Fund Management, LLC is the manager of

Defendant 4C 15 E. Illinois Operations, LLC. Through 4C 15 E. Illinois Operations, LLC, Four

Corners Tavern Fund Management, LLC employs, and controls the payment of wages to, Servers

who serve food and drinks to Fremont Bar's customers. As such, Four Corners Tavern Fund

Management, LLC is an "employer" of the Servers at Fremont Bar as that term is defined by 29

U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an

"employment" relationship between Four Corners Tavern Fund Management, LLC and those

Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Four Corners Tavern Fund Management, LLC is a

Delaware limited liability company and the manager of Defendant 4C 15 E. Illinois Operations,

LLC, but deny the remaining allegations in this paragraph.

6.      Defendant 1500 N. Wells Opco, LLC is a Delaware limited liability company

with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois

60607. 1500 N. Wells Opco, LLC does business as 80 Proof, located at 1500 North Wells Street

Chicago, IL 60610. 1500 N. Wells Opco, LLC employs, and controls the payment of wages to,

Servers who serve food and drinks to 80 Proof's customers. As such, 1500 N. Wells Opco, LLC

is an "employer" of the Servers at 80 Proof as that term is defined by 29 U.S.C. § 203(d), 820

ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment"

relationship between 1500 N. Wells Opco, LLC and those Servers as defined by 26 U.S.C. §

3121(b).

**ANSWER:** Defendants admit that 1500 N. Wells Opco, LLC is a Delaware limited

liability company that does business as 80 Proof, located at 1500 North Wells Street Chicago, IL

60610 and that has employees who it pays.  Defendants deny that its principal place of business

is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

7.      Defendant 4C 1500 N. Wells Opco, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. 4C 1500 N. Wells Opco, LLC is the manager of Defendant 1500 N. Wells Opco, LLC. Through 1500 N. Wells Opco, LLC, 4C 1500 N. Wells Opco, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to 80 Proof's customers. As such, 4C 1500 N. Wells Opco, LLC is an "employer" of the Servers at 80 Proof as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C 1500 N. Wells Opco, LLC and those Servers as defined by 26 U.S.C. § 3121(b). Prior to being known as 80 Proof, this bar and restaurant was known as SteakBar.

    **ANSWER:** Defendants admit that 4C 1500 N. Wells Opco, LLC is a Delaware limited liability company and the manager of Defendant 1500 N. Wells Opco, LLC.  Defendants deny the remaining allegations in this paragraph.

8.      Defendant Talbott Associates, L.P. is an Illinois limited partnership with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Talbott Associates, L.P. does business as 20 East, located at 20 East Delaware Place, Chicago, Illinois 60611. Talbott Associates, L.P. employs, and controls the payment of wages to, Servers who serve food and drinks to 20 East's customers. As such, Talbott Associates, L.P. is an "employer" of the Servers at 20 East as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Talbott Associates, L.P. and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Talbott Associates, L.P. is an Illinois limited partnership but deny the remaining allegations in this paragraph.

9.  Defendant 4C Wrigley, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. 4C Wrigley, LLC does business as Brickhouse Tavern, located at 3647 North Clark Street, Chicago, Illinois 60613. 4C Wrigley, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Brickhouse Tavern's customers. As such, 4C Wrigley, LLC is an "employer" of the Servers at Brickhouse Tavern as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C Wrigley, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that 4C Wrigley, LLC is a Delaware limited liability company that does business as Brickhouse Tavern, located at 3647 North Clark Street, Chicago, Illinois 60613 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

10.  Defendant Keystone Holdings Corp. is an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Keystone Holdings Corp. is the manager of Defendant 4C Wrigley, LLC. Through 4C Wrigley, LLC, Keystone Holdings Corp. employs, and controls the payment of wages to, Servers who serve food and drinks to Brickhouse Tavern's customers. As such, Keystone Holdings Corp. is an "employer" of the Servers at Brickhouse Tavern as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment"

relationship between Keystone Holdings Corp. and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Keystone Holdings Corp. is an Illinois corporation and the manager of Defendant 4C Wrigley, LLC. Defendants deny the remaining allegations in this paragraph.

11.     Defendant 4C Riverside, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. 4C Riverside, LLC does business as Porter Kitchen & Deck, located at 150 North Riverside Plaza, Chicago, Illinois 60606. 4C Riverside, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Porter Kitchen & Deck's customers. As such, 4C Riverside, LLC is an "employer" of the Servers at Porter Kitchen & Deck as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C Riverside, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that 4C Riverside, LLC is a Delaware limited liability company that does business as Porter Kitchen & Deck, located at 150 North Riverside Plaza, Chicago, Illinois 60606 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

12.     Defendant Cheval Porter Manager, LLC is a Delaware limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Cheval Porter Manager, LLC is the manager of Defendant 4C Riverside, LLC. Through 4C Riverside, LLC, Cheval Porter Manager, LLC employs, and controls the payment of wages

to, Servers who serve food and drinks to Porter Kitchen & Deck's customers. As such, Cheval Porter Manager, LLC is an "employer" of the Servers at Porter Kitchen & Deck as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Cheval Porter Manager, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Cheval Porter Manager, LLC is a Delaware limited liability company and manager of Defendant 4C Riverside, LLC. Defendants deny the remaining allegations in this paragraph.

13. Defendant Wells Holdings, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Wells Holdings, LLC does business as Benchmark Bar and Grill, located at 1510 North Wells Street, Chicago, Illinois 60610. Wells Holdings, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Benchmark Bar and Grill's customers. As such, Wells Holdings, LLC is an "employer" of the Servers at Benchmark Bar and Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Wells Holdings, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Wells Holdings, LLC is an Illinois limited liability company that does business as Benchmark Bar and Grill, located at 1510 North Wells Street, Chicago, Illinois 60610 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

8

14.     Defendant Wells Holding Manager, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Wells Holding Manager, LLC is the manager of Defendant Wells Holdings, LLC. Through Wells Holdings, LLC, Wells Holding Manager, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Benchmark Bar and Grill's customers. As such, Wells Holding Manager, LLC is an "employer" of the Servers at Benchmark Bar and Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Wells Holding Manager, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Wells Holding Manager, LLC is an Illinois limited liability company and the manager of Defendant Wells Holdings, LLC. Defendants deny the remaining allegations in this paragraph.

15.     Defendant West Loop Tap, L.L.C. is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. West Loop Tap, L.L.C. does business as Westend Bar & Grill, located at 1326 West Madison Street Chicago, Illinois 60607. West Loop Tap, L.L.C. employs, and controls the payment of wages to, Servers who serve food and drinks to Westend Bar & Grill's customers. As such, West Loop Tap, L.L.C. is an "employer" of the Servers at Westend Bar & Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between West Loop Tap, L.L.C. and those Servers as defined by 26 U.S.C. § 3121(b). Prior to being known as Westend Bar & Grill, this bar and restaurant was known as Brownstone Tavern & Grill (Madison and Ada).

**ANSWER:** Defendants admit that West Loop Tap, L.L.C. is an Illinois limited liability company that does business as Westend Bar & Grill, located at 1326 West Madison Street Chicago, Illinois 60607 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

16.     Defendant Shef at Oak, Inc. is an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Shef at Oak, Inc. does business as Kirkwood Bar & Grill, located at 2934 North Sheffield Avenue, Chicago, Illinois 60657. Shef at Oak, Inc. employs, and controls the payment of wages to, Servers who serve food and drinks to Kirkwood Bar & Grill's customers. As such, Shef at Oak, Inc. is an "employer" of the Servers at Kirkwood Bar & Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Shef at Oak, Inc and those Servers as defined by 26 U.S.C. § 3121(b). Prior to being known as Kirkwood Bar & Grill, this bar and restaurant was known as Brownstone Tavern & Grill (Sheffield and Oakdale).

**ANSWER:** Defendants admits that Shef at Oak, Inc. is an Illinois corporation that does business as Kirkwood Bar & Grill, located at 2934 North Sheffield Avenue, Chicago, Illinois 60657 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

17.     Defendant River North Tap, Inc. is an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. River North Tap, Inc. does business as Sidebar Grille, located at 221 North LaSalle Street, Chicago, Illinois 60601.

River North Tap, Inc. employs, and controls the payment of wages to, Servers who serve food and drinks to Sidebar Grille's customers. As such, River North Tap, Inc. is an "employer" of the Servers at Sidebar Grille as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between River North Tap, Inc. and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that River North Tap, Inc. is an Illinois corporation that does business as Sidebar Grille, located at 221 North LaSalle Street, Chicago, Illinois 60601 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

18. Defendant Rocco's, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Rocco's, LLC does business as Ranalli's, located at 1925 North Lincoln Avenue, Chicago, Illinois, 60614. Rocco's, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Ranalli's's customers. As such, Rocco's, LLC is an "employer" of the Servers at Ranalli's as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Rocco's, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Rocco's, LLC is an Illinois limited liability company that does business as Ranalli's, located at 1925 North Lincoln Avenue, Chicago, Illinois, 60614 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

19.     Defendant Clark Street Restaurant Partners, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Clark Street Restaurant Partners, LLC does business as Gaslight, located at 2450 North Clark Street, Chicago, Illinois 60614. Clark Street Restaurant Partners, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to Gaslight's customers. As such, Clark Street Restaurant Partners, LLC is an "employer" of the Servers at Gaslight as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Clark Street Restaurant Partners, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Clark Street Restaurant Partners, LLC is an Illinois limited liability company that does business as Gaslight, located at 2450 North Clark Street, Chicago, Illinois 60614 and that has employees who it pays. Defendants deny that its principal place of business is 1040 West Randolph Street, Chicago, Illinois 60607. The remainder of this paragraph is a legal conclusion to which no response is required.

20.     Until approximately June 13, 2018, 2450 N. Clark, Inc. was an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. 2450 N. Clark, Inc. did business as Gaslight, located at 2450 North Clark Street, Chicago, Illinois 60614. 2450 N. Clark, Inc. employed, and controlled the payment of wages to, Servers who served food and drinks to Gaslight's customers. As such, 2450 N. Clark, Inc. was an "employer" of the Servers at Gaslight as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 2450 N. Clark, Inc. and those Servers as defined by 26 U.S.C. § 3121(b). On or about June 13, 2018, 2450 N. Clark, Inc. was merged into, and consolidated with, Defendant Clark

Street Restaurant Partners, LLC. On information and belief, this merger and consolidation was cosmetic only, did not affect Gaslight's operations, and transferred any and all ongoing liabilities from 2450 N. Clark, Inc. to Clark Street Restaurant Partners, LLC.

**ANSWER:** Defendants admit that 2450 N. Clark, Inc. was an Illinois corporation with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607; did business as Gaslight, located at 2450 North Clark Street, Chicago, Illinois 60614; and merged with Clark Street Restaurant Partners, LLC. Defendants deny the remaining allegations in this paragraph.

21. Defendant Asclose, Inc. is an Illinois corporation with its principal place of business located at 1259 West Foster Avenue, #1, Chicago, Illinois 60640. Until approximately June 2018, Asclose, Inc. did business as Schoolyard Tavern & Grill, located at 3258 North Southport Avenue, Chicago, Illinois 60657. However, in approximately June 2018, Asclose, Inc. was sold to a new owner (or owners). On information and belief, that sale did not affect any of Asclose, Inc.'s ongoing liabilities. Prior to that sale, Asclose, Inc.'s principal place of business was located at 1040 West Randolph Street, Chicago, Illinois 60607. Until approximately June 2018, Asclose, Inc. employed, and controlled the payment of wages to, Servers who served food and drinks to Schoolyard Tavern & Grill's customers. As such, Asclose, Inc. was an "employer" of the Servers at Schoolyard Tavern & Grill as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was an "employment" relationship between Asclose, Inc. and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Asclose, Inc. is an Illinois corporation that did business as Schoolyard Tavern & Grill, located at 3258 North Southport Avenue, Chicago, Illinois 60657; that it was sold in 2018; and that prior to that sale its principal place of business

13

was located at 1040 West Randolph Street, Chicago, Illinois 60607. Defendants deny the
remaining allegations in this paragraph.

22.     Defendant The Chase Tavern, Inc. is an Illinois corporation with its principal
place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. From
approximately November 2013 through June 2015, The Chase Tavern, Inc. did business as
Trellis Wine Bar, located at 2426 North Racine Avenue, Chicago, Illinois 60614. During that
time, The Chase Tavern, Inc. employed, and controlled the payment of wages to, Servers who
served food and drinks to Trellis Wine Bar's customers. As such, The Chase Tavern, Inc. was an
"employer" of the Servers at Trellis Wine Bar as that term is defined by 29 U.S.C. § 203(d), 820
ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was an "employment"
relationship between The Chase Tavern, Inc. and those Servers as defined by 26 U.S.C. §
3121(b).

     **ANSWER:** Defendants admit that The Chase Tavern, Inc. was an Illinois corporation
with its principal place of business at 1040 West Randolph Street, Chicago, Illinois 60607 and
that from approximately November 2013 through June 2015, it did business as Trellis Wine Bar,
located at 2426 North Racine Avenue, Chicago, Illinois 60614. Defendants deny the remaining
allegations in this paragraph.

23.     Defendant Saloon Holdings, LLC is an Illinois limited liability company with its
principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Until
approximately 2017, Saloon Holdings, LLC did business as The Crossing Tavern, located at
2548 North Southport Avenue, Chicago, Illinois 60614. During that time, Saloon Holdings, LLC
employed, and controlled the payment of wages to, Servers who served food and drinks to The
Crossing Tavern's customers. As such, Saloon Holdings, LLC was an "employer" of the Servers

14

at The Crossing Tavern as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was an "employment" relationship between Saloon Holdings, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Saloon Holdings, LLC was an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607 and did business as The Crossing Tavern, located at 2548 North Southport Avenue, Chicago, Illinois 60614 and that had employees who it paid. Defendants deny the remaining allegations in this paragraph.

24. Defendant Saloon Holdings Manager, LLC is an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607. Saloon Holdings Manager, LLC is the manager of Defendant Saloon Holdings, LLC. Through Saloon Holdings, LLC, Saloon Holdings Manager, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to The Crossing Tavern's customers. As such, Saloon Holdings Manager, LLC is an "employer" of the Servers at The Crossing Tavern as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Saloon Holdings Manager, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Saloon Holdings Manager, LLC was an Illinois limited liability company with its principal place of business located at 1040 West Randolph Street, Chicago, Illinois 60607 and was the manager of Defendant Saloon Holdings, LLC. Defendants deny the remaining allegations of this paragraph.

25. Defendant Hardtales, Inc. is an Illinois corporation with its principal place of business located at 4711 W. Golf Road, Suite 1125, Skokie, Illinois 60076. Until approximately

2016, an unknown entity did business as Brownstone Tavern & Grill (Lincoln and Irving Park), located at 3937 North Lincoln Avenue, Chicago, Illinois 60613. However, in approximately 2016, Brownstone Tavern & Grill (Lincoln and Irving Park) was sold to Hardtales, Inc. On information and belief, that sale did not affect the Brownstone Tavern & Grill (Lincoln and Irving Park)'s operations, and any and all ongoing liabilities of the unknown entity as pertaining to the Brownstone Tavern & Grill (Lincoln and Irving Park) were transferred to Hardtales, Inc. Prior to that sale, that unknown entity employed, and controlled the payment of wages to, Servers who served food and drinks to Brownstone Tavern & Grill (Lincoln and Irving Park)'s customers. As such, that unknown entity was an "employer" of the Servers at Brownstone Tavern & Grill (Lincoln and Irving Park) as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was an "employment" relationship between that unknown entity and those Servers as defined by 26 U.S.C. § 3121(b).

ANSWER: Defendants admit that Hardtales, Inc. is an Illinois corporation that does business as Brownstone Tavern & Grill located at 3937 North Lincoln Avenue, Chicago, Illinois 60613.  Defendants deny the remaining allegations in this paragraph.

26.    Each of the foregoing bars and restaurants, and the entities (and parent entities) that own and manage them, are part of a collection of bars and restaurants located in Chicago, Illinois operating under the common "Four Corners" enterprise.  As such, Defendant Four Corners is a voluntary unincorporated association of entities operating the foregoing bars and restaurants located in Chicago, Illinois. Like the constituent entities within the Four Corners enterprise, Defendant Four Corners employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Defendant Four Corners was, and is, an "employer" of the Servers at the bars and

restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there was, and is, an "employment" relationship between Defendant Four Corners and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants deny the allegations of this paragraph.

27. In addition to the foregoing bars and restaurants, and the entities (and parent entities) that own and manage them, several other entities operate within the Four Corners enterprise.

**ANSWER:** Defendants deny the allegations of this paragraph.

28. Defendant Four Corners Tavern Fund I, LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Defendant Four Corners Tavern Fund Management, LLC is the manager of Four Corners Tavern Fund I, LLC, and Four Corners Tavern Fund I, LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, Four Corners Tavern Fund I, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Four Corners Tavern Fund I, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Tavern Fund I, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Four Corners Tavern Fund I, LLC is a Delaware limited liability company and that Four Corners Tavern Fund Management, LLC is the manager

of Four Corners Tavern Fund I, LLC. Defendants deny the remaining allegations in this paragraph.

29.     Defendant Four Corners Tavern Group Fund Investor, LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Four Corners Tavern Group Fund Investor, LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, Four Corners Tavern Group Fund Investor, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Four Corners Tavern Group Fund Investor, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Tavern Group Fund Investor, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Four Corners Tavern Group Fund Investor, LLC is a Delaware limited liability company but deny the remaining allegations in this paragraph.

30.     Defendant Four Corners Tavern Partners, LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Four Corners Tavern Partners, LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, Four Corners Tavern Partners, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Four Corners Tavern Partners, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. §

18

3401(d), and there is an "employment" relationship between Four Corners Tavern Partners, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Four Corners Tavern Partners, LLC is a Delaware limited liability company but deny the remaining allegations in this paragraph.

31.     Defendant Four Corners Tavern Group Inc. is an Illinois corporation with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Four Corners Tavern Group Inc. is the operating company for Four Corners Tavern Fund I, LLC, and is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, Four Corners Tavern Group Inc. employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Four Corners Tavern Group Inc. is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Tavern Group Inc. and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Four Corners Tavern Group Inc. is an Illinois corporation but deny the remaining allegations in this paragraph.

32.     Four Corners Holdings, LLC is an Illinois limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Four Corners Holdings, LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, Four Corners Holdings, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, Four Corners Holdings, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. §

203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an

"employment" relationship between Four Corners Holdings, LLC and those Servers as defined

by 26 U.S.C. § 3121(b).

 **ANSWER:** Defendants admit that Four Corners Holdings, LLC is an Illinois limited

liability company but deny the remaining allegations in this paragraph.

 33. Four Corners Capital Advisors, LLC is a Delaware limited liability company

with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Four

Corners Capital Advisors, LLC is a part of the Four Corners enterprise. Through its participation

in the Four Corners enterprise, Four Corners Capital Advisors, LLC employs, and controls the

payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants

within the Four Corners enterprise. As such, Four Corners Capital Advisors, LLC is an

"employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that

term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. §

3401(d), and there is an "employment" relationship between Four Corners Capital Advisors,

LLC and those Servers as defined by 26 U.S.C. § 3121(b).

 **ANSWER:** Defendants admit that Corners Capital Advisors, LLC is a Delaware limited

liability company but deny the remaining allegations in this paragraph.

 34. Four Corners Shuttle, LLC is an Illinois limited liability company with its

principle place of business at 3258 North Southport Avenue, Chicago, Illinois 60657. Four

Corners Shuttle, LLC is a part of the Four Corners enterprise. Through its participation in the

Four Corners enterprise, Four Corners Shuttle, LLC employs, and controls the payment of wages

to, Servers who serve food and drinks to customers at the bars and restaurants within the Four

Corners enterprise. As such, Four Corners Shuttle, LLC is an "employer" of the Servers at the

bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Four Corners Shuttle, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that Four Corners Shuttle, LLC is an Illinois limited liability company but deny the remaining allegations in this paragraph.

35.    4C Cheval LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. 4C Cheval LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, 4C Cheval LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, 4C Cheval LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 4C Cheval LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that 4C Cheval LLC is a Delaware limited liability company but deny the remaining allegations in this paragraph.

36.    1001 W. Lake, LLC is a Delaware limited liability company with its principle place of business at 1040 West Randolph Street, Chicago, Illinois 60607. Defendant Four Corners Tavern Fund I, LLC is the manager of 1001 W. Lake, LLC, and 1001 W. Lake, LLC is a part of the Four Corners enterprise. Through its participation in the Four Corners enterprise, 1001 W. Lake, LLC employs, and controls the payment of wages to, Servers who serve food and drinks to customers at the bars and restaurants within the Four Corners enterprise. As such, 1001

W. Lake, LLC is an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between 1001 W. Lake, LLC and those Servers as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants admit that 1001 W. Lake, LLC is a Delaware limited liability company and that Defendant Four Corners Tavern Fund I, LLC is the manager of 1001 W. Lake, LLC, but deny the remaining allegations in this paragraph.

37.     Matthew Menna is a real person, and a manager of Defendants 4C Kinzie Investor LLC, 4C 1001 W. Lake Opco, LLC, Four Corners Tavern Fund Management, LLC, Wells Holdings Manager, LLC, West Loop Tap, L.L.C., Rocco's, LLC, Clark Street Restaurant Partners, LLC, Four Corners Tavern Group Fund Investor, LLC, Four Corners Tavern Partners, LLC, Four Corners Holdings, LLC, Four Corners Capital Advisors, LLC, Four Corners Shuttle, LLC, Saloon Holdings Manager, LLC, and 4C Cheval LLC. Matthew Menna is also a partner in Defendant Talbott Associates, L.P., the President of Defendants Keystone Holdings Corp., 2450 N. Clark, Inc., The Chase Tavern, Inc., and Four Corners Tavern Group Inc., and the Secretary of Defendant River North Tap, Inc. Until its sale in approximately June 2018, Matthew Menna was also the President of Defendant Asclose, Inc. On information and belief, Matthew Menna is also a manager of Defendants 4C 1500 N. Wells Opco, LLC and Cheval Porter Manager, LLC, and is, or was, a manger, officer, or member of the unknown entity that did business as Brownstone Tavern & Grill (Lincoln and Irving Park), as well as the voluntary unincorporated association known as Four Corners.

**ANSWER:** Defendants deny that Matthew Menna is a manager of Four Corners Tavern Fund Management, LLC or 4C 1500 N. Wells Opco, LLC or that he was a manager, officer, or

member of the voluntary unincorporated association known as Four Corners or that such a voluntary unincorporated association exists.

38.     Andrew Gloor is a real person, and a manager of Defendants 4C Kinzie Investor LLC, 4C 1001 W. Lake Opco, LLC, Four Corners Tavern Fund Management, LLC, Wells Holdings Manager, LLC, West Loop Tap, L.L.C., Rocco's, LLC, Clark Street Restaurant Partners, LLC, Four Corners Tavern Group Fund Investor, LLC, Four Corners Tavern Partners, LLC, Four Corners Holdings, LLC, Four Corners Capital Advisors, LLC, Four Corners Shuttle, LLC, Saloon Holdings Manager, LLC, and 4C Cheval LLC. Andrew Gloor is also a partner in Defendant Talbott Associates, L.P., the President of Defendants Shef at Oak, Inc. and River North Tap, Inc., and the Secretary of Defendants Keystone Holdings Corp., Shef at Oak, Inc., The Chase Tavern, Inc., and Four Corners Tavern Group Inc. Until its sale in approximately June 2018, Andrew Gloor was also the Secretary of Defendant Asclose, Inc. On information and belief, Andrew Gloor is also a manager of Defendants 4C 1500 N. Wells Opco, LLC and Cheval Porter Manager, LLC, and is, or was, a manger, officer, or member of the unknown entity that did business as Brownstone Tavern & Grill (Lincoln and Irving Park).

**ANSWER:** Defendants deny that Andrew Gloor is a manager of Four Corners Tavern Fund Management, LLC or 4C 1500 N. Wells Opco, LLC or that he was a manager, officer, or member of the voluntary unincorporated association known as Four Corners or that such a voluntary unincorporated association exists.

39.     As managers and/or officers of the business entities which comprise the Four Corners enterprise, Matthew Menna and Andrew Gloor exercise significant control, oversight, and authority relative to the entities within the Four Corners enterprise, and the Four Corners enterprise itself. On information and belief, at each of the bars and restaurants within the Four

Corners enterprise, Matthew Menna and Andrew Gloor, on behalf of the Four Corners enterprise, and the constituent entities thereof: (1) have the power to hire and fire Servers; (2) supervise and control the hours of operation and the conditions of employment; (3) create, establish, maintain, and enforce policies related to employee compensation, accounting, and recordkeeping; and (4) are responsible for maintaining records relative to employee compensation, revenue, and accounting. As such, Matthew Menna and Andrew Gloor are each an "employer" of the Servers at the bars and restaurants within the Four Corners enterprise as that term is defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), 820 ILCS 115/2, and 26 U.S.C. § 3401(d), and there is an "employment" relationship between Matthew Menna and Andrew Gloor, and those Servers, as defined by 26 U.S.C. § 3121(b).

**ANSWER:** Defendants deny the allegations of this paragraph.

40. Based on the foregoing, all Defendants are part of the Four Corners business "enterprise" as that term is defined by 29 U.S.C. § 203(r)(1), and are jointly and severally liable for the liabilities of the Four Corners enterprise.

**ANSWER:** Defendants deny the allegations of this paragraph.

41. Based upon information and belief, the Four Corners business enterprise has many employees who are engaged in commerce, and many employees who regularly and recurrently handle goods that have travelled in interstate commerce.

**ANSWER:** Defendants deny the allegations of this paragraph.

42. Based upon information and belief, the Four Corners business enterprise has an annual gross volume of business done in excess of $500,000.

**ANSWER:** Defendants deny the allegations of this paragraph.

43.     Based on the foregoing, the Four Corners business enterprise is engaged in commerce within the meaning of 29 U.S.C. § 203(s)(1)(A).

**ANSWER:** Defendants deny the allegations of this paragraph.

### THE PLAINTIFFS

44. Plaintiff Erik Luna is a resident and citizen of Cook County, Illinois, and worked for the Four Corners business enterprise as a Server from approximately April 2011 until June 2018. Throughout that period, Luna was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

45.     Plaintiff Laura Palya is a resident and citizen of Cook County, Illinois and worked for the Four Corners business enterprise as a Server from approximately January 2016 until November 2017. Throughout that period, Palya was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

46.     Plaintiff Noelle Hoffman is a resident and citizen of Cook County, Illinois, and worked for the Four Corners business enterprise as a Server from approximately May 2008 until July 2009, and from approximately July 2017 until October 2017. Throughout that period, Hoffman was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

47.     Plaintiff Annie Callanta is a resident and citizen of Cook County, Illinois, and worked for the Four Corners business enterprise as a Server from approximately August 2010 until April 5, 2015, and from approximately September 2016 until May 2017. Throughout that

period, Callanta was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d),

820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

48.     Plaintiff Rachel Foley is a resident and citizen of Cook County, Illinois, and

worked for the Four Corners business enterprise as a Server from approximately September 2014

until July 2015. Throughout that period, Foley was an "employee" as defined by 29 U.S.C. §

203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

49.     Plaintiff Kathleen Cahill is a resident and citizen of Johnson County, Kansas, and

worked for the Four Corners business enterprise as a Server from approximately August 2010

until November 2013. Throughout that period, Cahill was an "employee" as defined by 29

U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. §

3401(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

50.     Plaintiff Erin Rottenberg is a resident and citizen of Cook County, Illinois, and

worked for the Four Corners business enterprise as a Server from approximately May 2016 until

June 2016, and from approximately September 2016 until March 2017. Throughout that period,

Rottenberg was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820

ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

51.      Plaintiff Melissa Mosher is a resident and citizen of Cook County, Illinois, and

worked for the Four Corners business enterprise as a Server from approximately March 2016

until November 2016. Throughout that period, Mosher was an "employee" as defined by 29

U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

52.     Plaintiff Jennifer Strait is a resident and citizen of Lake County, Indiana, and worked for the Four Corners business enterprise as a Server from approximately October 2017 until March 2018. Throughout that period, Strait was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), 820 ILCS 115/2, 26 U.S.C. § 3121(d), and 26 U.S.C. § 3401(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

## JURISDICTION AND VENUE

53.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

**ANSWER:** Defendants admit the allegations of this paragraph.

54.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as Defendants are residents of this District, and the events giving rise to the claims in this case occurred in this District.

**ANSWER:** Defendants admit the allegations of this paragraph.

## FACTUAL ALLEGATIONS

55.     Defendants operate a collection of bars and restaurants located in Chicago, Illinois operating under the common Four Corners enterprise.

**ANSWER:** Defendants admit that certain Defendants operate bars and/or restaurant but deny the existence of a "common Four Corners enterprise" and deny the remaining allegations of this paragraph.

56.     At each bar and restaurant within the Four Corners group, Defendants employ

Servers who serve food and drinks to customers. Defendants' Servers are compensated at an

hourly rate of pay, and through tips bestowed upon them by Defendants' customers ("Bestowed

Tips"). The amount of Servers' hourly compensation and tip income is recorded in Defendants'

point-of-sale ("POS") system.

**ANSWER:** Defendants admit that certain Defendants employ servers and bartenders who

are paid tips and hourly but deny the remaining allegations of this paragraph.

57.     To record the number of hours that they work during a given shift, Servers are

required to log in and out of Defendants' POS system at the beginning and ends of each shift.

**ANSWER:** Defendants admit that servers and bartenders employed by certain of the

Defendants are required to log in and out of a point of sale system when they begin and end their

shift but deny the remaining allegations of this paragraph.

58.     At each bar and restaurant within the Four Corners group, Defendants require

Servers, as well as other "Support Staff Employees" such as table bussers, barbacks, and VIP

hosts, to participate in a "tip pool." Through these "tip pools," Servers share a portion—

approximately 20%—of their Bestowed Tips with other Servers and/or Support Staff Employees.

**ANSWER:** Defendants admit that certain Defendants require bartenders to pool their tips

and some additional staff are paid from that pool but deny the remaining allegations of this

paragraph.

59.     At the end of each shift, before they leave work, Defendants' Servers calculate

what they believe to be the accurate total amount of their Bestowed Tips, and the portion of that

amount that is required to be contributed to the "tip pool." Barring infrequent miscalculations

that are the expected and inescapable result of natural human error, Servers accurately calculate the amount of their Bestowed Tips, and account for all Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants admit that servers and bartenders report their tips. Defendants are without sufficient information to admit or deny the remaining allegations and therefore deny such allegations.

60. After contributing the requisite portion of their Bestowed Tips to the "tip pool," Servers accurately log and declare the remaining amount of their Bestowed Tips in Defendants' POS system. At the same time, Servers log out of Defendants' POS system to record that their shift has ended.

**ANSWER:** Defendants admit that servers and bartenders self-report their tips and eventually log out of the POS system. Defendants are without sufficient information to admit or deny the remaining allegations and therefore deny such allegations.

61. Servers are given cash in an amount equal to the total amount of their Declared Tips, and are allowed to keep that money. As such, the amount of Servers' Take Home Cash is coextensive with the amount of their Declared Tips.

**ANSWER:** Defendants admit that servers and bartenders receive cash based on the tips they report. Defendants are without sufficient information to admit or deny the remaining allegations and therefore deny such allegations.

62. Although Servers attempt to accurately calculate the amount of their Bestowed Tips and believe that their calculations are accurate, there are occasions where Servers do not (and cannot) precisely calculate the amount of their Bestowed Tips. This is due to, *inter alia*, natural and expected miscalculations, the complexities of the "tip pool," the fact that Servers'

shifts sometimes end before the entirety of customers' Bestowed Tips are collected, and because Bestowed Tips may be stored in different cash registers or locations. For example:

    a.    A bartender may work a given shift in conjunction with several other bartenders, and each of those bartenders arrive to work and leave work at different times, usually staggered within one hour of one another. At the ends of each of those bartenders' respective shifts, it may be difficult (or impossible) to determine the precise amount of Bestowed Tips left by Defendants' customers at a given time.

    b.    A waitress may work a shift from 3:00 p.m. until 6:00 p.m., and wait on a table that is seated at 5:00 p.m. If at the end of that waitress's shift, that table of Defendants' customers has yet to finish their meal and pay their bill, there would be no Bestowed Tips to include in that waitress's post-shift calculation, even though she would be entitled to at least a portion of the Bestowed Tips left by those customers.

    c.    A cash register behind the bar in one of Defendants' bars and restaurants may become "overflowed" with too many $1 bills. In that case, one of Defendants' managers may remove $20 worth of $1 bills from the register with the intention of replacing that money with a $20 bill. However, that manager may not do so, and would only later realize—after the bartenders at that bar have already calculated their portion of Bestowed Tips and declared that amount in Defendants' POS system—that the $20 was omitted from that calculation.

    **ANSWER:** Defendants are without sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

30

63.     The foregoing instances do not arise because Servers purposely underreport the portion of their Bestowed Tips to which they are entitled. Since Servers do not retain an additional amount of Bestowed Tips (or Take Home Cash) over and above what they declare in Defendants' POS system as Declared Tips—*i.e.*, since the amount of Servers' Take Home Cash is coextensive with the amount of their Declared Tips—a Server's omission of a certain amount of Bestowed Tips from his/her end-of-shift calculation does not cause the Server to underreport (as Declared Tips) the amount of tip income he/she actually *received.* Rather, a Server's omission of a certain amount of Bestowed Tips from his/her end-of-shift calculation causes the Server to underreport (as Declared Tips) the amount of Bestowed Tips to which he/she was actually *entitled*.

**ANSWER:** Defendants are without sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

64.     Servers do not receive any additional payments in connection with their Bestowed Tips other than the Take Home Cash they receive, even if they are entitled to a greater share of the Bestowed Tips left for them by Defendants' customers during a given shift. Even if it is later discovered that a Server did not declare, and collect (in the form of Take Home Cash), the correct portion of his/her Bestowed Tips, the Server will not receive that additional money, even though he/she is entitled to that additional amount of Bestowed Tips.

**ANSWER:** Defendants deny that Plaintiffs do not receive all the tip income to which they are entitled.  Defendants lack sufficient information to admit or deny the remaining allegations in this paragraph and therefore deny the allegations.

65.      When a Server declares a certain amount of Declared Tips in Defendants' POS system, the Server is receiving that exact amount in Take Home Cash, and no other amounts.

**ANSWER:** Defendants admit that servers and bartenders retain the tips they report.

66.     Periodically—on a daily, weekly, or monthly basis—Defendants' managers reconcile Defendants' receipts, the amount of all Bestowed Tips, the amount of Bestowed Tips each Server was entitled to, the amount of Servers' Declared Tips, the amount of Servers' Take Home Cash, Servers' work schedules, and other similar data to determine whether Servers received additional amounts in Bestowed Tips which were not logged as Declared Tips and thus not given as Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

67.     This reconciliation routinely shows that Servers did not receive the full portion of Bestowed Tips to which they are entitled, and Defendants are aware that those Servers did not collect (in the form of Take Home Cash) the full amount of Bestowed Tips to which they were entitled ("Bestowed Tips Kept By Defendants"). The Servers' Bestowed Tips Kept By Defendants are in Defendants' possession at the time of this discovery.

**ANSWER:** Defendants deny the allegations of this paragraph.

68.     Instead of supplementing Servers' Take Home Cash with the additional Bestowed Tips Kept By Defendants to which Servers are entitled, Defendants retain those amounts for their own benefit.

**ANSWER:** Defendants deny the allegations of this paragraph.

69.     Defendants' Servers' hourly compensation—*i.e.*, compensation that does not derive from tips—is to be paid once every two weeks. However, Defendants usually retain the entirety of Servers' hourly compensation (and only that amount) for tax withholding purposes, and therefore, Servers usually do not receive any additional compensation over and above their Take Home Cash at the end of each pay period.

**ANSWER:** Defendants admit that certain Defendants pay servers and bartenders every two weeks and that certain amounts are withheld from those checks for tax purposes. Defendants deny the remaining allegations of this paragraph.

70.     On the same biweekly basis, Servers receive paystubs ("Paystubs") that are supposed to reflect, *inter alia*, the number of hours Servers worked during the previous pay period, the amount of hourly wage compensation they earned during the previous pay period, and the amount of taxes withheld during the previous pay period. The Paystubs also state Servers' "Cash Tips" during a given pay period.

**ANSWER:** Defendants admit the allegations of this paragraph.

71.     The value of "Cash Tips" reflected on Servers' Paystubs should reflect the portion of Bestowed Tips that Servers received in the form of Take Home Cash, and the amount of Servers' Declared Tips, as these values should be coextensive.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny the allegations.

72.     However, the "Cash Tips" reflected on Servers' Paystubs routinely overstate the actual amount of tip income that Servers were given and allowed to keep. This is because Defendants have a company-wide policy, affecting all bars and restaurants in the Four Corners enterprise, wherein Defendants assume that Servers received tip income—*i.e.*, Take Home Cash—equal to at least 16% to 20% of Defendants' total sales ("Assumed Tip Income"), regardless of what Servers actually received in the form of Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

73.     Based on that assumption, Defendants' managers are required to modify the amounts of Servers' Declared Tips in Defendants' POS system in the event that a Server's

33

Declared Tips are less than that Server's Assumed Tip Income. This modified amount of Servers' Declared Tips is then reflected as "Cash Tips" on Servers' Paystubs.

**ANSWER:** Defendants deny the allegations of this paragraph.

74.     In actuality, Servers only receive, on average, approximately 12% of Defendants' sales in the form of Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

75.     Servers' Paystubs routinely overstate the amount of Servers' tip income, as those Paystubs reflect Servers' Assumed Tip Income—a greater number—instead of the actual amount of Take Home Cash Servers actually receive—a lesser number. Since the amount of a Server's Declared Tips is not adjusted downward in the event that his/her Declared Tips exceed the amount of his/her Assumed Tip Income, Servers' Paystubs never understate the amount of Servers' tip income.

**ANSWER:** Defendants deny the allegations of this paragraph.

76.     At the end of each calendar year, Defendants generate Form W-2 wage and tax statements ("W-2s") for their Servers using the information on Servers' Paystubs. Accordingly, Servers' annual income, as set forth on their W-2s, is based upon the artificially greater amount of "Cash Tips" listed on Servers' Paystubs during the previous calendar year.

**ANSWER:** Defendants admit that certain Defendants generate W-2s for servers and bartenders but deny the remaining allegations of this paragraph.

### *The Wage and Hour Claims*

77.     Applicable here, the Fair Labor Standards Act ("FLSA")—codified as 29 U.S.C. §§ 201, *et seq.*—the Illinois Minimum Wage Law ("IMWL")—codified as 820 ILCS 105/1, *et seq.*—and the Chicago Minimum Wage Ordinance ("Chicago Ordinance")—codified as Chi.

Mun. Code §§ 1-24-010, *et seq.*—all establish a minimum hourly rate at which employers must compensate employees (*i.e.*, a minimum wage).

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

78.     From July 24, 2009 through the present, the FLSA provided that employees are to be compensated at an hourly rate of at least $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). Prior to that, from July 24, 2007 through July 23, 2008, the FLSA provided that employees are to be compensated at an hourly rate of at least $5.85 per hour (29 U.S.C. § 206(a)(1)(A)), and from July 24, 2008 through July 23, 2009, the FLSA provided that employees are to be compensated at an hourly rate of at least $6.55 per hour (29 U.S.C. § 206(a)(1)(B)).

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

79.     Relative to "tipped employees"—as defined by 29 U.S.C. § 203(t)—the FLSA permits employers to credit the amount of tips employees receive towards employees' hourly rate of pay, so long as employers pay "tipped employees" a cash wage of at least $2.13 per hour. 29 U.S.C. § 203(m)(2); 29 CFR § 531.59(a).

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

80.     From July 1, 2010 through the present, the IMWL provided that employees are to be compensated at an hourly rate of at least $8.25 per hour. 820 ILCS 105/4(a)(1). Prior to that: (1) from July 1, 2007 through June 30, 2008, the IMWL provided that employees are to be compensated at an hourly rate of at least $7.50 per hour; (2) from July 1, 2008 through June 30, 2009, the IMWL provided that employees are to be compensated at an hourly rate of at least

$7.75 per hour; and (3) from July 1, 2009 through June 30, 2010, the IMWL provided that employees are to be compensated at an hourly rate of at least $8.00 per hour. 820 ILCS 105/4(a)(1).

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

81.    Relative to employees "engaged in an occupation in which gratuities have customarily and usually constituted and have been recognized as part of the" employees' compensation, the IMWL permits employers to credit the amount of tips employees receive towards employees' hourly rate of pay, so long as the amount credited does not exceed 40% of the prevailing minimum wage rate—*e.g.*, under the current minimum wage of $8.25 per hour, employers must pay tipped employees a cash wage of at least $4.95 per hour. 820 ILCS 105/4(c).

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

82.    The foregoing provisions of the FLSA and IMWL establish what is commonly referred to as the "tip credit" because those provisions allow employers to credit a certain amount of tips that employees receive towards the FLSA's and IMWL's applicable minimum wage.

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

83.     Because "whether a tip is to be given, and its amount, are matters determined solely by the customer, who has the right to determine who shall be the recipient of the gratuity," it is well-established that "tips are the property of the employee." 29 CFR § 531.52. As such, "tip credit provisions of [the FLSA and IMWL] require employers to permit employees to retain all

tips received by the employee." 29 CFR § 531.59(b); *see also*, *Williams-Green v. J. Alexander's Restaurants, Inc.*, 277 F.R.D. 374, 378 (N.D. Ill. 2011) ("Tip credits are treated identically under both the [IMWL] and [FLSA].").

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

84.     Accordingly, "an employer may only take the tip credit under the FLSA and IMWL if each tipped employee retains all of his tips." *E.g.*, *Starr v. Chicago Cut Steakhouse, LLC*, 75 F.Supp.3d 859, 864-65 (N.D. Ill. 2014) (citing 29 U.S.C. § 203(m)(2) and 820 ILCS 105/4(c)); *Williams-Green*, 277 F.R.D. at 378; 29 CFR § 531.52; 29 CFR § 531.59(b).

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

85.     "Tip pools" are an exception to the foregoing provisions of the FLSA and IMWL which require employers to allow employees to retain all of their tips. *Starr*, 75 F.Supp.3d at 865 (citing 29 U.S.C. § 203(m)(2)(A)(ii) and 820 ILCS 105/4(c)); 29 CFR § 531.52; 29 CFR § 531.54. However, "to be valid under the FLSA and IMWL, the tip pool must only include employees who 'customarily and regularly receive tips,' and the employer 'may not retain any of the employees' tips for any other purpose.'" *Starr*, 75 F.Supp.3d at 865 (quoting 29 CFR § 531.54); 29 U.S.C. § 203(m)(2).

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

86.     The Chicago Ordinance—which went into effect on July 1, 2015—also establishes a minimum wage for employees. From July 1, 2015 through June 30, 2016, the Chicago Ordinance provided that employees are to be compensated at an hourly rate of at least

$10.00 per hour (Chi. Mun. Code § 1-24-020(a)), from July 1, 2016 through June 30, 2017, the Chicago Ordinance provided that employees are to be compensated at an hourly rate of at least $10.50 per hour (Chi. Mun. Code § 1-24-020(b)), and from July 1, 2017 through June 30, 2018, the Chicago Ordinance provided that employees are to be compensated at an hourly rate of at least $11.00 per hour (Chi. Mun. Code § 1-24-020(c)). As of July 1, 2018, the Chicago Ordinance requires employees to be compensated at an hourly rate of at least $12.00 per hour. Chi. Mun. Code § 1-24-020(d).

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

87.     Like the FLSA and IMWL, the Chicago Ordinance establishes a lesser minimum wage relative to employees "engaged in an occupation in which gratuities have customarily and usually constituted part of the" employees' compensation. Chi. Mun. Code § 1-24-030(a). From July 1, 2015 through June 30, 2016, the minimum wage for tipped employees under the Chicago Ordinance was $5.45 per hour (Chi. Mun. Code § 1-24-030(a)(1)), from July 1, 2016 through June 30, 2017, the minimum wage for tipped employees under the Chicago Ordinance was $5.95 per hour (Chi. Mun. Code § 1-24-030(a)(2)), and from July 1, 2017 through June 30, 2018, the minimum wage for tipped employees under the Chicago Ordinance was $6.10 per hour (Chi. Mun. Code § 1-24-030(a)(3)). As of July 1, 2018, the minimum wage for tipped employees under the Chicago Ordinance is $6.25 per hour (Chi. Mun. Code § 1-24-030(a)(3)).

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

88.     To avail itself of the lesser minimum wage for tipped employees—*i.e.*, a tip credit under the Chicago Ordinance—an employer must permit its employees to retain all of their

tips. Chi. Mun. Code § 1-24-030(b). Otherwise, an employer must pay tipped employees the minimum wage applicable to employees who do not customarily receive tips. Chicago Minimum Wage and Paid Sick Leave Rules, MW 2.04.

**ANSWER:** This paragraph consists of legal conclusions to which no response is required.

89. Here, at all times relevant, Plaintiffs' and Servers' hourly rate of pay, taken alone, irrespective of tips, was less than the applicable minimum rates established by the FLSA (29 U.S.C. § 206(a)(1)), the IMWL (820 ILCS 105/4(a)(1)), and the section of the Chicago Ordinance pertaining to employees who do not customarily receive tips (Chi. Mun. Code § 1-24-020).

**ANSWER:** Defendants deny the allegations in this paragraph.

90.    Defendants were required to rely on a "tip credit" to satisfy the minimum wage requirements set forth by the FLSA and the IMWL, and avail themselves of the lesser minimum wage for tipped employees established by the Chicago Ordinance.

**ANSWER:** Defendants deny the allegations in this paragraph.

91.    However, as discussed above, Servers routinely do not receive the full portion of Bestowed Tips to which they are entitled, even after their contributions to Defendants' "tip pools" are accounted for. Despite knowing that Servers are entitled to additional tip income that was not included in their Take Home Cash, Defendants do not supplement Servers' Take Home Cash with those additional amounts. Instead, Defendants retain those additional sums for their own benefit.

**ANSWER:** Defendants deny the allegations of this paragraph.

92. Defendants did not retain those additional sums for tax withholding purposes, as those additional amounts were not listed on Plaintiffs' and Servers' Paystubs as being withheld for tax purposes. In fact, Defendants could not withhold those additional amounts for tax purposes, as Defendants would only be permitted to do so if Plaintiffs and Servers remitted those amounts back to Defendants *after* Defendants gave those amounts to Plaintiffs and Servers. 26 U.S.C. § 3102(c); 26 U.S.C. § 3402(k).

**ANSWER:** Defendants deny the allegations of this paragraph.

93. As explained below, Defendants' common practice of reporting Servers' Assumed Tip Income, instead of the amount of Take Home Cash that Servers actually received, on Servers' Paystubs conceals the fact that Defendants retained the Bestowed Tips Kept By Defendants to which Servers are entitled.

**ANSWER:** Defendants deny the allegations of this paragraph.

94. Because Plaintiffs and Servers did not receive the entirety of the tips that were bestowed upon them by Defendants' customers in the form of Take Home Cash, and Defendants retained those additional amounts for their own benefit, Defendants cannot rely on a tip credit relative to Plaintiffs' and Servers' hourly rate of pay. *E.g.*, 29 CFR § 531.52; 29 CFR § 531.59(b); *Starr*, 75 F.Supp.3d at 864-65; *Williams-Green*, 277 F.R.D. at 378.

**ANSWER:** Defendants deny the allegations of this paragraph.

95. Regardless of whether Defendants can rely on a tip credit relative to Plaintiffs' and Servers' hourly rate of pay, Defendants were not permitted to retain any portion of the tips that were bestowed upon Plaintiffs and Servers by Defendants' customers. *E.g.*, 29 U.S.C. § 203(m)(2)(B); 29 CFR § 531.52; 29 CFR § 531.54; 29 CFR § 531.59; *Starr*, 75 F.Supp.3d at 865; *see also*, 26 U.S.C. § 3102(c); 26 U.S.C. § 3402(k).

**ANSWER:** Defendants deny the allegations of this paragraph.

96.     In addition, in accordance with the minimum wage and tip credit provisions of the FLSA, IMWL, and Chicago Ordinance, Defendants agreed to compensate Plaintiffs and Servers at an hourly rate that complied with the applicable minimum wage, and to allow Plaintiffs and Servers to retain all tips that were bestowed upon Plaintiffs and Servers by Defendants' customers.

**ANSWER:** Defendants deny the allegations of this paragraph.

97.     As such, the entirety of the tips that were bestowed upon Plaintiffs and Servers by Defendants' customers were "wages" under the Illinois Wage Payment and Collection Act ("IWPCA")—codified as 820 ILCS 115/1, *et seq.*—the FLSA, the IMWL, and the Chicago Ordinance. 820 ILCS 115/2; 29 U.S.C. § 203(m); 820 ILCS 105/3(b); Chi. Mun. Code § 1-24-010.

**ANSWER:** Defendants deny the allegations of this paragraph.

98.     Since Defendants are not permitted to avail themselves of a tip credit with respect to Plaintiffs and Servers to satisfy Defendants' minimum wage obligations under the FLSA, IMWL, and Chicago Ordinance, and because *all* of the tips that were bestowed upon Plaintiffs and Servers by Defendants' customers also constitute wages owed to Plaintiffs and Servers, Defendants did not pay Plaintiffs and Servers the full amount of all wages to which they were entitled, in violation of the FLSA, IMWL, Chicago Ordinance, and IWPCA. 29 U.S.C. § 206(a)(1); 29 U.S.C. § 203(m); 820 ILCS 105/4(a)(1); 820 ILCS 105/4(c); Chi. Mun. Code § 1-24-020; Chi. Mun. Code § 1-24-030(b); 820 ILCS 115/4.

**ANSWER:** Defendants deny the allegations of this paragraph.

99.     Finally, in addition to altering the amounts of Plaintiffs' and Servers' Declared Tips in Defendants' POS system, Defendants have a company-wide policy, affecting all bars and restaurants in the Four Corners enterprise, wherein Defendants' managers are required to modify Servers' log in and/or log out times stored in Defendants' POS system to reduce the total number of hours that Servers worked.

**ANSWER:** Defendants deny the allegations of this paragraph.

100.    Like the modified amount of Servers' Declared Tips, the modified number of Servers' hours is reflected on Servers' Paystubs, and Servers are only paid for that lesser, modified number of hours.

**ANSWER:** Defendants deny the allegations of this paragraph.

101.    As such, Servers were not compensated for all of the hours that they worked for Defendants' benefit in violation of the FLSA, IMWL, Chicago Ordinance, and IWPCA.

**ANSWER:** Defendants deny the allegations of this paragraph.

102.    Accordingly, Plaintiffs, individually, and on behalf of other similarly situated individuals, bring claims under the FLSA, IMWL, Chicago Ordinance, and the IWPCA (collectively, the "Wage and Hour Claims") against Defendants.

**ANSWER:** Defendants admit that Plaintiffs, individually, and on behalf of other similarly situated individuals, bring claims under the FLSA, IMWL, Chicago Ordinance, and the IWPCA (collectively, the "Wage and Hour Claims") against Defendants.

103.    With respect to Plaintiffs' FLSA claims, Plaintiffs seek to represent the "Collective Groups" of similarly situated employees defined below, pursuant to 29 U.S.C. § 216(b).

**ANSWER:** Defendants deny that this matter qualifies for collective action or any liability under 29 U.S.C. § 216(b).

104.    With respect to Plaintiffs' IMWL, Chicago Ordinance, and IWPCA claims, Plaintiffs seek to represent the "Wage and Hour Classes" of similarly situated individuals defined below, pursuant to Fed. R. Civ. P. 23.

**ANSWER:** Defendants deny that this matter qualifies for class action under Fed. R. Civ. P. 23.

### *The Income Tax Claims*

105.    In addition to Plaintiffs' Wage and Hour Claims, Plaintiffs, individually, and on behalf of other similarly situated individuals, bring claims under Section 7434 of the Internal Revenue Code ("IRC Statute")—codified as 26 U.S.C. § 7434—and the Racketeer Influenced and Corrupt Organizations Act ("RICO")—codified as 18 U.S.C. §§ 1961, *et seq.*—as well as for common law civil conspiracy and fraud (collectively, the "Income Tax Claims").

**ANSWER:** Defendants admit the allegations of this paragraph.

106.    As noted above, Defendants have a company-wide policy whereby Defendants assume that Servers' tip income—*i.e.*, Take Home Cash—is equal to at least 16% to 20% of Defendants' total sales, regardless of what Servers actually received in the form of Take Home Cash. This company-wide policy effects all Servers at each bar and restaurant within the Four Corners group.

**ANSWER:** Defendants deny the allegations of this paragraph.

107.    Pursuant to Defendants' company-wide policy, if a Server's Declared Tips during a given shift are less than his/her Assumed Tip Income, Defendants' managers adjust the amount of that Server's Declared Tips upwards to equal his/her Assumed Tip Income.

**ANSWER:** Defendants deny the allegations of this paragraph.

108.    Defendants' common practice of reporting Servers' Assumed Tip Income, instead of the amount of Take Home Cash that Servers actually received, on Servers' Paystubs concealed the fact that Defendants retained the Bestowed Tips Kept By Defendants to which Servers were entitled. For example, if "Server A" works a shift during which (1) Defendants' total sales are $1,000, (2) he/she calculates and *believes* the portion of Defendants' customers Bestowed Tips to which he/she is entitled is $100, and (3) the portion of Defendants' customers Bestowed Tips to which he/she is *actually* entitled is $120, Server A would log $100 as the amount of his/her Declared Tips in Defendants' POS system, and receive $100 in Take Home Cash. Since Server A's Declared Tips are $100, which is only 10% of Defendants' total sales, Server A's manager would alter his/her Declared Tips to reflect $160 in tip income (*i.e.*, 16% of Defendants' total sales). Although Server A is actually entitled to $120 in tip income instead of $100, and thus never collected the additional $20 in the form of Take Home Cash, that additional $20 remains in Defendants' possession. Because Server A's Declared Tips are adjusted upwards to reflect $160 in tip income on his/her Paystub, Server A is required to pay taxes on $160 of purported income, despite only receiving $100. Since it appears, for tax and bookkeeping purposes, that Server A's Take Home Cash was $160, Defendants are able to retain the additional $20 that Server A was entitled to, but never received, without paying any tax on that money. Instead, that tax burden, and then some, is shifted to Server A.

**ANSWER:** Defendants deny the allegations of this paragraph.

109.    Unlike Servers, Defendants do not report the full amount of tips that Support Staff Employees acquire through Defendants' "tip pools." As such, Support Staff Employees' taxable income is lower, and Support Staff Employees receive some of their income tax-free. In turn,

Defendants are able to compensate Support Staff Employees at a lower hourly rate without diminishing the amount of after-tax (or untaxed) income Support Staff Employees receive. Instead, that tax burden is shifted to Servers. Essentially, Servers are required to subsidize Support Staff Employees' income. This allows Defendants to covertly depress their labor costs without detection.

> **ANSWER:** Defendants deny the allegations of this paragraph.

110. In addition, by overstating the amount of money that Defendants Servers receive in tip income, Defendants can ensure that they can always avail themselves of a tip credit with respect to the compensation paid to Servers, and never have to pay Servers for any shortfall in their hourly rate of pay. In doing so, Defendants reduce their operating costs, and can therefore retain a greater portion of their gross income for their own benefit.

> **ANSWER:** Defendants deny the allegations of this paragraph.

111. By selecting an unreasonably high percentage of Defendants' sales—16% to 20%—to use for the calculation of Servers' Assumed Tip Income, Defendants diminish the likelihood that the foregoing deceptive practices will be discovered by state or federal authorities—such as the Internal Revenue Service ("IRS"). Pursuant to 26 U.S.C. § 6053(c)(3)(A)(i), tipped employees at "large food or beverage establishments" are presumed to receive 8% of an employer's gross receipts in tips. Similarly, as noted above, on average, Defendants' Servers receive approximately 12% of Defendants' sales in Take Home Cash. These percentages are far exceeded by the 16% to 20% figure used by Defendants, all but insuring that Defendants' malfeasance will not be revealed through an IRS audit or other similar investigation. In fact, according to one of Defendants' managers, Defendants chose to use 16% to 20% of

Defendants' sales to calculate Servers' Assumed Tip Income precisely because it would diminish the possibility of an IRS audit.

**ANSWER:** Defendants deny the allegations of this paragraph.

112.   Defendants also benefit from reporting Servers' Assumed Tip Income on Servers' Paystubs and W-2s instead of Servers' actual tip income (*i.e.*, the amount of Take Home Cash Servers receive) because, at the very least, doing so is significantly easier than actually ensuring that Servers' Declared Tips are accurate. Since the 16% to 20% figure used by Defendants far exceeds the actual percentage of Defendants' sales Servers are likely to receive in tips from Defendants' customers, Defendants can spend significantly less effort (and resources) reconciling their financial statements and receipts with the amount of Servers' Declared Tips. Indeed, as noted above, Defendants never have to worry whether a Server is entitled to any additional Bestowed Tips Kept By Defendants because those Bestowed Tips Kept By Defendants will be subsumed within that Servers' Assumed Tip Income, and do not actually need to be given to the Server in order for Defendants' financial statements to balance.

**ANSWER:** Defendants deny the allegations of this paragraph.

113.   When Defendants modify and adjust Servers' Declared Tips upwards to match the calculated amount of Servers' Assumed Tip Income, Defendants do not do so in order to "correct" the amount of Declared Tips that were underreported by a given Server. As noted above, Servers make every effort to accurately declare the amount of their Declared Tips in Defendants' POS system, such that there should be no need for Defendants to modify those amounts. Moreover, assuming *arguendo*, that certain Servers underreport the amount of their Declared Tips, the fact that Defendants modify *all* Servers Declared Tips to match their Assumed Tip Income indicates that Defendants are not doing so for this purpose.

**ANSWER:** Defendants deny the allegations of this paragraph.

114. Defendants' use of Assumed Tip Income for tax reporting purposes is not authorized by applicable law. Although the IRS is permitted to assume that employees, in aggregate, received a percentage of their employer's sales in tip income during proceedings to recover unpaid taxes, an employer may not do so on its own, outside of that context. *See*, 26 U.S.C. § 3121(q) (stating that tip income is not deemed to have been paid until actually received by the employee, unless the IRS determines that tip income has been underreported); *see also*, 29 CFR § 531.54. Even if Defendants were permitted to use the Aggregate Estimation Method outside the context of a proceeding involving the IRS, the fact that Defendants require each Server to input the amount of his/her Declared Tips into Defendants' POS system, and then take the *greater* of that Server's Declared Tips and his Assumed Tip Income for purposes of tax reporting demonstrates a departure from the Aggregate Estimation Method. In addition, when the Aggregate Estimation Method is employed by the IRS, the IRS is required to accurately calculate the percentage of an employer's sales to be used when estimating employees' tip income, which Defendants do not do.

**ANSWER:** Defendants deny the allegations of this paragraph.

115. As a result of the foregoing, Plaintiffs' and Servers' Paystubs overstated the amount of taxable income that Plaintiffs and Servers actually received—*i.e.*, the amount of "Cash Tips" stated on Plaintiffs' and Servers' Paystubs was *greater* than the amount of Take Home Cash that Plaintiffs and Servers were actually given and allowed to keep.

**ANSWER:** Defendants deny the allegations of this paragraph.

116. Because the amount of "Cash Tips" stated on Plaintiffs' and Servers' Paystubs was used to calculate the amount of Plaintiffs' and Servers' taxable income on their W-2s—

instead of the amount of Take Home Cash that Plaintiffs and Servers were actually given and allowed to keep—Plaintiffs and Servers were required to pay income tax on income that they did not actually receive.

**ANSWER:** Defendants deny the allegations of this paragraph.

117.    With respect to Plaintiffs' Income Tax Claims, Plaintiffs seek to represent the "Tax Fraud Class" of similarly situated individuals defined below, pursuant to Fed. R. Civ. P. 23.

**ANSWER:** Defendants deny that this matter qualifies for class action under Fed. R. Civ. P. 23.

### FACTS RELEVANT TO PLAINTIFF ERIK LUNA

118.    From approximately April 2011 until June 2018, Luna was a bartender at a Four Corners bar known as "Benchmark Bar and Grill" ("Benchmark").

**ANSWER:** Defendants admit the allegations of this paragraph.

119.    When he worked at Benchmark, Luna was compensated at an hourly rate of pay, and through Bestowed Tips.

**ANSWER:** Defendants admit that Luna received hourly pay and tips.

120.    To record the number of hours that he worked, Luna would log in and out of Defendants' POS system at the beginning and ends of each of his shifts.

**ANSWER:** Defendants admit that Luna logged into and out of Benchmark's point of sale system but deny the remaining allegations.

121.    When he worked at Benchmark, Luna participated in a "tip pool" with other Servers and Support Staff Employees.

**ANSWER:** Defendants admit that Luna pooled tips with other bartenders but deny the remaining allegations in this paragraph.

122.    At the end of each shift, before he left work, Luna would calculate what he believed to be the accurate total amount of his Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool." In general, Luna accurately calculated the amount of his Bestowed Tips, and accounted for all his Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants lack sufficient information to admit or deny these allegations and therefore deny the allegations.

123.    After contributing the requisite portion of his Bestowed Tips to the "tip pool," Luna accurately logged and declared the remaining amount of his Bestowed Tips in Defendants' POS system. At the same time, Luna would log out of Defendants' POS system to record that his shift had ended.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations of this paragraph and therefore deny the allegations.

124.    Luna was given Take Home Cash in an amount equal to the total amount of his Declared Tips, and was allowed to keep that Take Home Cash.

**ANSWER:** Defendants admit that Luna was given cash for the tips he reported but deny any other allegations in this paragraph.

125.    Although Luna attempted to accurately calculate the amount of his Bestowed Tips and believed that his calculations were accurate, there were occasions where Luna did not precisely calculate the amount of Bestowed Tips to which he was entitled. As a result, Luna was entitled to additional amounts in Bestowed Tips over and above what he declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

**ANSWER:** Defendants deny that Luna was entitled to greater tips than he reported and lack sufficient information to admit or deny the remaining allegations in this paragraph and therefore deny such allegations.

126.     However, Luna did not receive any additional payments in connection with his Bestowed Tips other than the Take Home Cash he received.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

127.     Luna usually would not receive a paycheck at the end of each pay period because the entirety of his hourly compensation (and only that amount) was usually withheld for tax purposes.

**ANSWER:** Defendants admit that certain amounts were withheld from Luna's paychecks for tax purposes but deny the remaining allegations.

128.     Luna's Paystubs routinely stated that Luna's "Cash Tips" were greater than the amount of Take Home Cash that he was given (and allowed to keep) and the total amount of his Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Luna's Declared Tips to reflect 16% to 20% of Defendants' sales.

**ANSWER:** Defendants deny the allegations of this paragraph.

129.     The amount of "Cash Tips" on Luna's Paystubs was used to calculate Luna's annual income on his W-2s.

**ANSWER:** Defendants admit that the tips that Luna received constitute a portion of his annual income reflected on his W-2s but deny the remaining allegations in this paragraph.

130.     Luna's Paystubs also reflected that he was paid for fewer hours than he actually worked, and logged in Defendants' POS system, during particular workweeks. This was because,

pursuant to the policy articulated above, Defendants would alter Luna's log in and log out times to diminish the number of hours that he actually worked.

**ANSWER:** Defendants admit that Luna's log in and log out times were occasionally adjusted as required to accurately reflect the number of hours that Luna worked but deny the remaining allegations of this paragraph.

131. For example, during the two-week pay period beginning on March 22, 2017 and ending on April 4, 2017, Luna worked five (5) separate shifts as a bartender at Benchmark. During the first week of that pay period, Luna worked 24 hours and 58 minutes. *See*, records reflecting the number of hours Luna worked generated by Defendants' POS system, attached hereto as Exhibit 1. During the second week of that pay period, Luna worked 32 hours and 21 minutes. *See*, Exhibit 1. In total, Luna worked 57 hours and 19 minutes during that pay period. *See*, Exhibit 1.

**ANSWER:** Defendants admit that this paragraph accurately states the contents of Exhibit 1.

132. However, Luna's Paystub for that same pay period states that Luna only worked 53 hours and 13 minutes. *See*, Luna's Paystub for the pay period beginning on March 22, 2017 and ending on April 4, 2017, attached hereto as Exhibit 2.

**ANSWER:** Defendants admit that this paragraph accurately states the contents of Exhibit 2.

133. Based on Luna's hourly rate of $5.95/hour, Luna should have been compensated $341.03 for the pay period beginning on March 22, 2017 and ending on April 4, 2017. However, due to the fact that Defendants diminished the number of hours that Luna recorded in

Defendants' POS system, Luna was only compensated $316.60 for that pay period. *See*, Exhibit 2.

**ANSWER:** Defendants admit that Luna's hourly wages were $316.60 during the period specified in this paragraph but deny the remaining allegations of this paragraph.

## FACTS RELEVANT TO PLAINTIFF LAURA PALYA

134. From approximately January 2016 until November 2017, Palya was a bartender at Benchmark.

**ANSWER:** Defendants admit the allegations of this paragraph.

135. When she worked at Benchmark, Palya was compensated at an hourly rate of pay, and through Bestowed Tips.

**ANSWER:** Defendants admit that Palya received hourly pay and tips.

136. To record the number of hours that she worked, Palya would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

**ANSWER:** Defendants admit that Palya logged in and out of the point of sale system but deny the remaining allegations.

137. When she worked at Benchmark, Palya participated in a "tip pool" with other Servers and Support Staff Employees.

**ANSWER:** Defendants admit that Palya pooled tips with other employees.

138. At the end of each shift, before she left work, Palya would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool." In general, Palya accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

139. After contributing the requisite portion of her Bestowed Tips to the "tip pool," Palya accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Palya would log out of Defendants' POS system to record that her shift had ended.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

140. Palya was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

141. Although Palya attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Palya did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Palya was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

**ANSWER:** Defendants deny that Palya was entitled to more tips than she received. Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

142. However, Palya did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

143. Palya usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

**ANSWER:** Defendants admit that amount were withheld from Palya's paychecks for tax purposes but deny the remaining allegations in this paragraph.

144. Palya's Paystubs routinely stated that Palya's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Palya's Declared Tips to reflect 16% to 20% of Defendants' sales.

**ANSWER:** Defendants deny the allegations of this paragraph.

145. The amount of "Cash Tips" on Palya's Paystubs was used to calculate Palya's annual income on her W-2s.

**ANSWER:** Defendants admit that the tips that Palya received constitute a portion of her annual income reflected on her W-2s but deny the remaining allegations in this paragraph.

### FACTS RELEVANT TO PLAINTIFF NOELLE HOFFMAN

146. From approximately May 2008 until July 2009, Hoffman was a server at a Four Corners bar known as "Kirkwood Bar & Grill" ("Kirkwood"). From approximately July 2017 until October 2017, Hoffman was a server at a Four Corners bar known as "Porter Kitchen & Deck" ("Porter").

**ANSWER:** Defendants admit the allegations of this paragraph.

147.     When she worked at Kirkwood and Porter, Hoffman was compensated at an hourly rate of pay, and through Bestowed Tips.

**ANSWER:** Defendants admit that Hoffman received tips and hourly pay.

148.     To record the number of hours that she worked, Hoffman would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

**ANSWER:** Defendants admit that Hoffman logged in and out of the POS system but deny the remaining allegations in this paragraph.

149.     When she worked at Kirkwood and Porter, Hoffman participated in a "tip pool" with other Servers and Support Staff Employees.

**ANSWER:** Defendants admit that Hoffman pooled her tips with other employees.

150.     At the end of each shift, before she left work, Hoffman would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool." In general, Hoffman accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

151.     After contributing the requisite portion of her Bestowed Tips to the "tip pool," Hoffman accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Hoffman would log out of Defendants' POS system to record that her shift had ended.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

152.    Hoffman was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

153.    Although Hoffman attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Hoffman did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Hoffman was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

154.    However, Hoffman did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

155.    Hoffman usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

**ANSWER:** Defendants admit that amounts were withheld from her paycheck for tax purposes but deny the remaining allegations in this paragraph.

156.    Hoffman's Paystubs routinely stated that Hoffman's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above,

Defendants would alter the amount of Hoffman's Declared Tips to reflect 16% to 20% of Defendants' sales.

**ANSWER:** Defendants deny the allegations of this paragraph.

157.    The amount of "Cash Tips" on Hoffman's Paystubs was used to calculate Hoffman's annual income on her W-2s.

**ANSWER:** Defendants admit that the tips that Hoffman received constitute a portion of her annual income reflected on her W-2s but deny the remaining allegations in this paragraph.

### FACTS RELEVANT TO PLAINTIFF ANNIE CALLANTA

158.    From approximately August 2010 until April 5, 2015, and from approximately September 2016 until May 2017, Callanta was a waitress and bartender at Benchmark.

**ANSWER:** Defendants admit the allegations of this paragraph.

159.    When she worked at Benchmark, Callanta was compensated at an hourly rate of pay, and through Bestowed Tips.

**ANSWER:** Defendants admit that Callanta received tips and hourly pay.

160.    To record the number of hours that she worked, Callanta would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

**ANSWER:** Defendants admit that Callanta logged in and out of the point of sale system but deny the remaining allegations.

161.    When she worked at Benchmark, Callanta participated in a "tip pool" with other Servers and Support Staff Employees.

**ANSWER:** Defendants admit the Callanta pooled tips with other employees.

162.    At the end of each shift, before she left work, Callanta would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount

that was required to be contributed to the "tip pool." In general, Callanta accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

163.    After contributing the requisite portion of her Bestowed Tips to the "tip pool," Callanta accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Callanta would log out of Defendants' POS system to record that her shift had ended.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

164.    Callanta was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

165.    Although Callanta attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Callanta did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Callanta was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

166.    However, Callanta did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

167.    Callanta usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

**ANSWER:** Defendants admit that certain amount were withheld from Callanta's paycheck for tax purposes but deny the remaining allegations.

168.    Callanta's Paystubs routinely stated that Callanta's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Callanta's Declared Tips to reflect 16% to 20% of Defendants' sales.

**ANSWER:** Defendants deny the allegations of this paragraph.

169.    The amount of "Cash Tips" on Callanta's Paystubs was used to calculate Callanta's annual income on her W-2s.

**ANSWER:** Defendants admit that the tips that Callanta received constitute a portion of her annual income reflected on her W-2s but deny the remaining allegations in this paragraph.

**FACTS RELEVANT TO PLAINTIFF RACHEL FOLEY**

170.    From approximately September 2014 until July 2015, Foley was a waitress at Benchmark.

**ANSWER:** Defendants admit the allegations of this paragraph.

171.    When she worked at Benchmark, Foley was compensated at an hourly rate of pay, and through Bestowed Tips.

**ANSWER:** Defendants admit that Foley received tips and hourly pay.

172.    To record the number of hours that she worked, Foley would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

**ANSWER:** Defendants admit that Foley logged in and out of the point of sale system but deny the remaining allegations.

173.    When she worked at Benchmark, Foley participated in a "tip pool" with other Servers and Support Staff Employees.

**ANSWER:** Defendants admit that Foley pooled her tips with other employees.

174.    At the end of each shift, before she left work, Foley would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool." In general, Foley accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

175.    After contributing the requisite portion of her Bestowed Tips to the "tip pool," Foley accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Foley would log out of Defendants' POS system to record that her shift had ended.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

176.    Foley was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

60

177.     Although Foley attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Foley did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Foley was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

178.     However, Foley did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

179.     Foley usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

**ANSWER:** Defendants admit that certain amount were withheld from her paycheck for tax purposes but deny the remaining allegations.

180.     Foley's Paystubs routinely stated that Foley's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Foley's Declared Tips to reflect 16% to 20% of Defendants' sales.

**ANSWER:** Defendants deny the allegations of this paragraph.

181.     The amount of "Cash Tips" on Foley's Paystubs was used to calculate Foley's annual income on her W-2s.

**ANSWER:** Defendants admit that the tips that Foley received constitute a portion of her annual income reflected on her W-2s but deny the remaining allegations in this paragraph.

## FACTS RELEVANT TO PLAINTIFF KATHLEEN CAHILL

182.    From approximately August 2010 until November 2013, Cahill was a bartender at Benchmark.

**ANSWER:** Defendants admit the allegations of this paragraph.

183.    When she worked at Benchmark, Cahill was compensated at an hourly rate of pay, and through Bestowed Tips.

**ANSWER:** Defendants admit that Cahill received tips and hourly pay.

184.    To record the number of hours that she worked, Cahill would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

**ANSWER:** Defendants admit that Cahill logged in and out of the point of sale system and deny the remaining allegations.

185.    When she worked at Benchmark, Cahill participated in a "tip pool" with other Servers and Support Staff Employees.

**ANSWER:** Defendants admit that Cahill pooled her tips with other employees.

186.    At the end of each shift, before she left work, Cahill would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool." In general, Cahill accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

187.     After contributing the requisite portion of her Bestowed Tips to the "tip pool," Cahill accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Cahill would log out of Defendants' POS system to record that her shift had ended.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

188.     Cahill was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

189.     Although Cahill attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Cahill did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Cahill was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

190.     However, Cahill did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

191.     Cahill usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

**ANSWER:** Defendants admit that certain amounts were withheld from Cahill's paycheck for tax purposes but deny the remaining allegations.

192.     Cahill's Paystubs routinely stated that Cahill's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Cahill's Declared Tips to reflect 16% to 20% of Defendants' sales.

**ANSWER:** Defendants deny the allegations of this paragraph.

193.     The amount of "Cash Tips" on Cahill's Paystubs was used to calculate Cahill's annual income on her W-2s.

**ANSWER:** Defendants admit that the tips that Cahill received constitute a portion of her annual income reflected on her W-2s but deny the remaining allegations in this paragraph.

## FACTS RELEVANT TO PLAINTIFF ERIN ROTTENBERG

194.     From approximately May 2016 until June 2016, Rottenberg was a bartender at a Four Corners bar known as Federales ("Federales"). From approximately September 2016 until March 2017, Rottenberg was a waitress at a Four Corners bar known as Westend Bar & Grill ("Westend").

**ANSWER:** Defendants admit the allegations of this paragraph.

195.     When she worked at Federales and Westend, Rottenberg was compensated at an hourly rate of pay, and through Bestowed Tips.

**ANSWER:** Defendants admit that Rottenberg received tips and hourly pay.

196.      To record the number of hours that she worked, Rottenberg would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

**ANSWER:** Defendants admit that Rottenberg logged in and out of the point of sale system and deny the remaining allegations.

197.     When she worked at Federales and Westend, Rottenberg participated in a "tip pool" with other Servers and Support Staff Employees.

**ANSWER:** Defendants admit that Rottenberg pooled tips with other employees.

198.     At the end of each shift, before she left work, Rottenberg would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool." In general, Rottenberg accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

199.     After contributing the requisite portion of her Bestowed Tips to the "tip pool," Rottenberg accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Rottenberg would log out of Defendants' POS system to record that her shift had ended.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

200.     Rottenberg was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

201.    Although Rottenberg attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Rottenberg did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Rottenberg was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

202.    However, Rottenberg did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

203.    Rottenberg usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

**ANSWER:** Defendants admit that certain amounts were withheld from Rottenberg's paycheck for tax purposes but deny the remaining allegations.

204.    Rottenberg's Paystubs routinely stated that Rottenberg's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Rottenberg's Declared Tips to reflect 16% to 20% of Defendants' sales.

**ANSWER:** Defendants deny the allegations of this paragraph.

205.    The amount of "Cash Tips" on Rottenberg's Paystubs was used to calculate Rottenberg's annual income on her W-2s.

**ANSWER:** Defendants admit that the tips that Rottenberg received constitute a portion of her annual income reflected on her W-2s but deny the remaining allegations in this paragraph.

## FACTS RELEVANT TO PLAINTIFF MELISSA MOSHER

206.    From approximately March 2016 until May 2016, Mosher was a waitress at Benchmark. From approximately May 2016 until November 2016, Mosher was a waitress at Federales.

**ANSWER:** Defendants admit the allegations of this paragraph.

207.    When she worked at Federales and Benchmark, Mosher was compensated at an hourly rate of pay, and through Bestowed Tips.

**ANSWER:** Defendants admit that Mosher received tips and hourly pay.

208.    To record the number of hours that she worked, Mosher would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

**ANSWER:** Defendants admit that Mosher logged in and out of the point of sale system and deny the remaining allegations.

209.    When she worked at Federales and Benchmark, Mosher participated in a "tip pool" with other Servers and Support Staff Employees.

**ANSWER:** Defendants admit that Mosher pooled tips with other employees.

210.     At the end of each shift, before she left work, Mosher would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool." In general, Mosher accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

211.    After contributing the requisite portion of her Bestowed Tips to the "tip pool," Mosher accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Mosher would log out of Defendants' POS system to record that her shift had ended.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

212.    Mosher was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

213.    Although Mosher attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Mosher did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Mosher was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

214.    However, Mosher did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

215.    Mosher usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

**ANSWER:** Defendants admit that certain amounts were withheld from Mosher's paycheck for tax purposes but deny the remaining allegations.

216.     Mosher's Paystubs routinely stated that Mosher's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Mosher's Declared Tips to reflect 16% to 20% of Defendants' sales.

**ANSWER:** Defendants deny the allegations of this paragraph.

217.     The amount of "Cash Tips" on Mosher's Paystubs was used to calculate Mosher's annual income on her W-2s.

**ANSWER:** Defendants admit that the tips that Mosher received constitute a portion of her annual income reflected on her W-2s but deny the remaining allegations in this paragraph.

## FACTS RELEVANT TO PLAINTIFF JENNIFER STRAIT

218.     From approximately October 2017 until March 2018, Strait was a waitress at Benchmark.

**ANSWER:** Defendants admit the allegations of this paragraph.

219.     When she worked at Benchmark, Strait was compensated at an hourly rate of pay, and through Bestowed Tips.

**ANSWER:** Defendants admit that Strait received tips and hourly pay.

220.     To record the number of hours that she worked, Strait would log in and out of Defendants' POS system at the beginning and ends of each of her shifts.

**ANSWER:** Defendants admit that Strait logged in and out of the point of sale system but deny the remaining allegations.

221.    When she worked at Benchmark, Strait participated in a "tip pool" with other Servers and Support Staff Employees.

**ANSWER:** Defendants admit that Strait pooled tips with other employees.

222.     At the end of each shift, before she left work, Strait would calculate what she believed to be the accurate total amount of her Bestowed Tips, and the portion of that amount that was required to be contributed to the "tip pool." In general, Strait accurately calculated the amount of her Bestowed Tips, and accounted for all her Bestowed Tips (*e.g.*, cash and credit).

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

223.    After contributing the requisite portion of her Bestowed Tips to the "tip pool," Strait accurately logged and declared the remaining amount of her Bestowed Tips in Defendants' POS system. At the same time, Strait would log out of Defendants' POS system to record that her shift had ended.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

224.     Strait was given Take Home Cash in an amount equal to the total amount of her Declared Tips, and was allowed to keep that Take Home Cash.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

225.    Although Strait attempted to accurately calculate the amount of her Bestowed Tips and believed that her calculations were accurate, there were occasions where Strait did not precisely calculate the amount of Bestowed Tips to which she was entitled. As a result, Strait

was entitled to additional amounts in Bestowed Tips over and above what she declared in Defendants' POS system as Declared Tips and received in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

226.    However, Strait did not receive any additional payments in connection with her Bestowed Tips other than the Take Home Cash she received.

**ANSWER:** Defendants lack sufficient information to admit or deny the allegations in this paragraph and therefore deny such allegations.

227.    Strait usually would not receive a paycheck at the end of each pay period because the entirety of her hourly compensation (and only that amount) was usually withheld for tax purposes.

**ANSWER:** Defendants admit that certain amounts were withheld from Strait's paycheck for tax purposes any deny the remaining allegations.

228.    Strait's Paystubs routinely stated that Strait's "Cash Tips" were greater than the amount of Take Home Cash that she was given (and allowed to keep) and the total amount of her Declared Tips. This was because, pursuant to the policy articulated above, Defendants would alter the amount of Strait's Declared Tips to reflect 16% to 20% of Defendants' sales.

**ANSWER:** Defendants deny the allegations of this paragraph.

229.    The amount of "Cash Tips" on Strait's Paystubs was used to calculate Strait's annual income on her W-2s.

**ANSWER:** Defendants admit that the tips that Strait received constitute a portion of her annual income reflected on her W-2s but deny the remaining allegations in this paragraph.

## COLLECTIVE ACTION ALLEGATIONS

230.    Plaintiffs bring their FLSA claims as a Collective Action on behalf of themselves and the Collective Group of similarly situation employees, pursuant to 29 U.S.C. § 216(b).

**ANSWER:** Defendants deny that any class or collective action or certification is appropriate in this case.

231.    **Tip Credit Collective Group Definition:** Plaintiffs pursue their FLSA claims on behalf of the following "Tip Credit Collective Group:"

> All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute of limitations period, (2) were compensated at an hourly rate of pay, irrespective of tips, that was less than $7.25 per hour, and (3) were entitled to a greater portion of Bestowed Tips from Defendants' customers than what they received in Take Home Cash.

**ANSWER:** Defendants deny such a collective group exists.

232.    Plaintiffs are members of the Tip Credit Collective Group because they were employed by Defendants during the time period relevant to this action, were compensated at an hourly rate of pay that was less than $7.25 per hour, and received Paystubs which stated that they were given a greater amount in "Cash Tips" than they actually received in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

233.    Plaintiffs' FLSA Collective Action consent forms are attached hereto as Exhibit 3.

**ANSWER:** Defendants admit that the forms are attached as Exhibit 3.

234.    **Altered Hours Collective Group Definition:** In addition to the Tip Credit Collective Group defined above, Luna pursues additional FLSA claims on behalf of the following "Altered Hours Collective Group:"

> All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute of limitations period, and (2) had the number of hours they worked, as stored in Defendants' POS system, reduced by Defendants.

**ANSWER:** Defendants deny such a collective group exists.

235.    Luna is a member of the Altered Hours Collective Group because he was employed by Defendants during the time period relevant to this action, and had the number of hours he worked, as stored in Defendants' POS system, reduced by Defendants.

**ANSWER:** Defendants deny the allegations of this paragraph.

236.    Although Plaintiffs and the Tip Credit Collective Group members may have had different job titles and/or worked in different locations throughout the time period relevant to this action, this action may be properly maintained as a Collective Action because:

> a.    Plaintiffs and Tip Credit Collective Group members performed substantially similar job duties as Servers;

> b.    Plaintiffs and Tip Credit Collective Group members were compensated at an hourly rate of pay that was less than $7.25 per hour;

> c.    Plaintiffs and Tip Credit Collective Group members calculated what they believed to be the accurate amount of their Declared Tips and Take Home Cash, and accurately logged and declared that calculated amount in Defendants' POS system;

d. Plaintiffs and Tip Credit Collective Group members were given Take Home Cash in an amount equal to their Declared Tips;

e. Other than their Take Home Cash, Plaintiffs and Tip Credit Collective Group members were not given any additional amounts to account for the amount of Bestowed Tips to which they were entitled but had not received;

f. Plaintiffs and Tip Credit Collective Group members were not given and allowed to keep *all* of the Bestowed Tips to which they were entitled; and

g. Defendants uniformly retained the additional amounts in tips bestowed upon Plaintiffs and Tip Credit Collective Group members by Defendants' customers over and above what Plaintiffs and Tip Credit Collective Group members were given in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

237. Although Luna and the Altered Hours Collective Group members may have had different job titles and/or worked in different locations throughout the time period relevant to this action, this action may be properly maintained as a Collective Action because:

a. Luna and Altered Hours Collective Group members performed substantially similar job duties as Servers;

b. Luna and Altered Hours Collective Group members recorded the time they began working and the time they left work in Defendants' POS system in the same way; and

c. The number of hours that Luna and Altered Hours Collective Group members worked, as stored in Defendants' POS system, was altered by Defendants.

**ANSWER:** Defendants deny the allegations of this paragraph.

238.    Defendants encouraged, required, and permitted Plaintiffs and members of the Collective Groups to work without being properly compensated.

**ANSWER:** Defendants deny the allegations of this paragraph.

239.    Defendants knew that Plaintiffs and members of the Collective Groups performed work that required them to be paid at a rate not less than the minimum wage established by the FLSA. Nonetheless, Defendants operated under a uniform scheme to deprive Plaintiffs and members of the Collective Groups the compensation to which they were entitled.

**ANSWER:** Defendants deny the allegations of this paragraph.

240.    Defendants' conduct, as alleged herein, was willful and has caused significant damage to Plaintiffs and members of the Collective Groups, as they were compensated at a rate that was less than the minimum wage established by the FLSA.

**ANSWER:** Defendants deny the allegations of this paragraph.

241.    Defendants are liable under the FLSA for failing to properly compensate Plaintiffs and members of the Collective Groups at an hourly rate that satisfied the FLSA's minimum wage provisions, and/or retaining a portion of the tips that were bestowed upon Plaintiffs and members of the Collective Groups by Defendants' customers. Plaintiffs request that the Court authorize notice to the members of the Collective Groups to inform them of the pendency of this action and their right to opt-in to this lawsuit—pursuant to 29 U.S.C. § 216(b)—for the purpose of seeking unpaid compensation and liquidated damages under the FLSA, and the other relief requested herein.

**ANSWER:** Defendants deny the allegations of this paragraph.

242.    Plaintiffs estimate that the Collective Groups, including both current and former employees over the time period relevant to this action, will include hundreds of members. This is

based on the fact that Defendants operated approximately twenty (20) bars and restaurants during the time period applicable to this action, and each bar and restaurant employed about fifty (50) Servers at any given time. The precise number of members in each Collective Group should be readily available from Defendants' personnel, scheduling, time, and payroll records maintained in accordance with 29 U.S.C. § 211(c). Given the composition and size of the Collective Groups, their members may be informed of the pendency of this action directly via U.S. mail, e-mail, and by posting notice in Defendants' bars and restaurants.

**ANSWER:** Defendants deny the collective groups defined in the complaint exist.

## CLASS ACTION ALLEGATIONS

243.    Plaintiffs bring their IMWL, Chicago Ordinance, and IWPCA claims as a Class Action on behalf of themselves and the Wage and Hour Classes of similarly situated employees, pursuant to Fed. R. Civ. P. 23, as defined below.

**ANSWER:** Defendants deny that this matter qualifies for class action under Fed. R. Civ. P. 23.

244.    **Tip Credit Class Definition:** Plaintiffs pursue their IMWL, Chicago Ordinance, and IWPCA claims on behalf of the following "Tip Credit Class:"

All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute of limitations period, (2) were compensated at an hourly rate of pay, irrespective of tips, that was less than $7.25 per hour, and (3) were entitled to a greater portion of Bestowed Tips from Defendants' customers than what they received in Take Home Cash.

Excluded from the Tip Credit Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Tip Credit Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person. Plaintiffs hereby reserve the right to amend the above class definition based on discovery and the proofs at trial.

**ANSWER:** Defendants deny such a class exists.

245. **Altered Hours Class Definition:** In addition to the Tip Credit Class defined above, Luna pursues his IMWL, Chicago Ordinance, and IWPCA claims the requested relief on behalf of the following "Altered Hours Class:"

> All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute of limitations period, and (2) had the number of hours they worked, as stored in Defendants' POS system, reduced by Defendants.

Excluded from the Altered Hours Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Altered Hours Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5)

the legal representatives, successors and assigns of any such excluded person. Plaintiffs hereby reserve the right to amend the above class definition based on discovery and the proofs at trial.

**ANSWER:** Defendants deny such a class exists.

246. *Numerosity*. The Wage and Hour Classes are so numerous that joinder of all members is impracticable. Plaintiffs estimate that the Wage and Hour Classes, including both current and former employees over the time period relevant to this action, will include hundreds of members. This is based on the fact that Defendants operated approximately twenty (20) bars and restaurants during the time period applicable to this action, and each bar and restaurant employed about fifty (50) Servers at any given time. The precise number of members of the Wage and Hour Classes should be readily available from Defendants' personnel, scheduling, time, and payroll records maintained in accordance with 29 U.S.C. § 211(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

247. *Commonality and Predominance*. There are questions of fact or law common to the Wage and Hour Classes, which predominate over any questions affecting only individual members including, *inter alia*, the following:

    a. Whether Plaintiffs and members of the Tip Credit Class received additional amounts in Bestowed Tips over and above what they received in Take Home Cash;

    b. Whether Defendants remitted any additional amounts in Bestowed Tips over and above what Plaintiffs and members of the Tip Credit Class received in Take Home Cash;

    c. Whether Defendants retained the additional amounts in tips that Defendants' customers bestowed upon Plaintiffs and Tip Credit Class members over and

above what Plaintiffs and Tip Credit Class members were given in Take Home Cash;

d. Whether Defendants were entitled to avail themselves of a tip credit relative to the hourly rate of compensation paid to Plaintiffs and Tip Credit Class members;

e. Whether Plaintiffs and Tip Credit Class members were compensated at an hourly rate of pay that was less than the minimum rate of established by applicable law;

f. Whether Defendants modified the number of hours, as stored in Defendants' POS system, that Luna and Altered Hours Class members worked;

g. Whether Luna and Altered Hours Class members were compensated for all of the hours that they worked;

h. Whether Plaintiffs and the members of the Wage and Hour Classes have sustained damages and, if so, what is the proper measure of their damages; and

i. Whether Plaintiffs and the members of the Wage and Hour Classes are entitled to the relief sought, including attorney's fees.

**ANSWER:** Defendants deny the allegations of this paragraph.

248. *Adequacy*. Plaintiffs will fairly and adequately protect the interests of the Wage and Hour Classes. Plaintiffs have retained the undersigned class counsel, who are competent and experienced in the prosecution of complex and class action litigation. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the Wage and Hour Classes.

**ANSWER:** Defendants deny the allegations of this paragraph.

249. *Typicality and Superiority*. A class action is an appropriate method for the fair and efficient adjudication of this controversy. The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Wage and Hour

Classes. Plaintiffs' claims, factual settings, and legal theories are typical of the Wage and Hour Classes. Also, the likelihood that individual members of the Wage and Hour Classes will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially in view of the relatively modest amount of monetary relief at issue for individual members of the Wage and Hour Classes.

**ANSWER:** Defendants deny the allegations of this paragraph.

250.    In addition to the Wage and Hour Classes, Plaintiffs bring their Income Tax Claims as a Class Action on behalf of themselves and the Tax Fraud Class of similarly situated employees, pursuant to Fed. R. Civ. P. 23, as defined below.

**ANSWER:** Defendants deny that this matter qualifies for class action under Rule 23.

251.    **Tax Fraud Class Definition:** Plaintiffs pursue their Income Tax Claims on behalf of the following "Tax Fraud Class:"

> All individuals who (1) currently work, or have worked, for Defendants as Servers, or any other position with similar job duties, during the applicable statute of limitations period, and (2) received a W-2 from at least one Defendant which (a) stated that they received a greater amount in wage income from Defendants and tips bestowed upon them by Defendants' customers than they actually received in hourly compensation and Take Home Cash, and (b) was filed by said Defendant with the United States government on or after June 13, 2013.

Excluded from the Tax Fraud Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who

executes and files a timely request for exclusion from the Tax Fraud Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person. Plaintiffs hereby reserve the right to amend the above class definition based on discovery and the proofs at trial.

**ANSWER:** Defendants deny such as class exists.

252.   *Numerosity.* The Tax Fraud Class is so numerous that joinder of all members is impracticable. Plaintiffs estimate that the Tax Fraud Class, including both current and former employees over the time period relevant to this action, will include hundreds of members. This is based on the fact that Defendants operated approximately twenty (20) bars and restaurants during the time period applicable to this action, and each bar and restaurant employed about fifty (50) Servers at any given time. The precise number of members of the Tax Fraud Class should be readily available from Defendants' personnel, scheduling, time, and payroll records maintained in accordance with 29 U.S.C. § 211(c).

**ANSWER:** Defendants deny the allegations of this paragraph.

253.   *Commonality and Predominance.* There are questions of fact or law common to the Tax Fraud Class, which predominate over any questions affecting only individual members including, *inter alia*, the following:

a.   Whether Plaintiffs' and Tax Fraud Class members' Paystubs and W-2s accurately reflected the amount of Take Home Cash that Plaintiffs and Tax Fraud Class members were given by Defendants in connection with the tips that Defendants' customers bestowed upon Plaintiffs and Tax Fraud Class members;

b.  Whether Defendants engaged in fraud by overstating the amount of compensation Defendants paid to Plaintiffs and Tax Fraud Class members on Plaintiffs' and Tax Fraud Class members' Paystubs and W-2s;

c.  Whether Defendants willfully filed fraudulent W-2s with the United States government that overstated the amount of compensation Defendants paid to Plaintiffs and Tax Fraud Class members;

d.  Whether Plaintiffs and the members of the Tax Fraud Class have sustained damages and, if so, what is the proper measure of their damages; and

e.  Whether Plaintiffs and the members of the Tax Fraud Class are entitled to the relief sought, including attorney's fees.

**ANSWER:** Defendants deny the allegations of this paragraph.

254.  *Adequacy*. Plaintiffs will fairly and adequately protect the interests of the Tax Fraud Class. Plaintiffs have retained the undersigned class counsel, who are competent and experienced in the prosecution of complex and class action litigation. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the Tax Fraud Class.

**ANSWER:** Defendants deny the allegations of this paragraph.

255.  *Typicality and Superiority*. A class action is an appropriate method for the fair and efficient adjudication of this controversy. The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Tax Fraud Class. Plaintiffs' claims, factual settings, and legal theories are typical of the Tax Fraud Class. Also, the likelihood that individual members of the Tax Fraud Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation,

especially in view of the relatively modest amount of monetary relief at issue for individual members of the Tax Fraud Class.

**ANSWER:** Defendants deny the allegations of this paragraph.

## COUNT I
### Violation of the Fair Labor Standards Act
### (29 U.S.C. §§ 201, *et seq.*)
### (On Behalf of Plaintiffs and the Collective Groups)

256.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein.

**ANSWER:** Defendants reassert their answers to paragraphs 1-255 here.

257.    Plaintiffs' and members of the Collective Groups' work activities were for the direct and substantial benefit of Defendants, and engaged them individually in "commerce," as defined by 29 U.S.C. § 203(b).

**ANSWER:** Defendants deny the allegations of this paragraph.

258.    At all times relevant, Plaintiffs' and Tip Credit Collective Group members' hourly rate of pay, taken alone, was less than the minimum $7.25 per hour rate established by the FLSA. 29 U.S.C. § 206(a)(1)(C).

**ANSWER:** Defendants deny the allegations of this paragraph.

259.    The Take Home Cash that was given to Plaintiffs and Tip Credit Collective Group members was less than the amount of Bestowed Tips to which Plaintiffs and Tip Credit Collective Group members were entitled.

**ANSWER:** Defendants deny the allegations of this paragraph.

260.    Plaintiffs and Tip Credit Collective Group members did not receive any additional payments in connection with the tips that were bestowed upon them by Defendants' customers other than the Take Home Cash they were given by Defendants.

**ANSWER:** Defendants deny the allegations of this paragraph.

261.    Plaintiffs and Tip Credit Collective Group members were not given and allowed to keep *all* of the tips that were bestowed upon them by Defendants' customers. Instead, Defendants uniformly retained the additional amounts in tips that were bestowed upon Plaintiffs and Tip Credit Collective Group members by Defendants' customers over and above what Plaintiffs and Tip Credit Collective Group members were given in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

262.    As such, Defendants cannot claim a tip credit with respect to Plaintiffs and Tip Credit Collective Group members (29 U.S.C. § 203(m)(2)), and Plaintiffs and Tip Credit Collective Group members were compensated at a rate less than the minimum wage established by the FLSA (29 U.S.C. § 206(a)(1)(C)).

**ANSWER:** Defendants deny the allegations of this paragraph.

263.    Moreover, Defendants unlawfully retained a portion of the tips that were bestowed upon Plaintiffs and Tip Credit Collective Group members by Defendants' customers. 29 U.S.C. § 203(m)(2)(B).

**ANSWER:** Defendants deny the allegations of this paragraph.

264.    Plaintiffs and Tip Credit Collective Group members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the FLSA, as well as the full amount of tips bestowed upon them by Defendants' customers.

**ANSWER:** Defendants deny the allegations of this paragraph.

265.    Luna and Altered Hours Collective Group members recorded the time they began working and the time they left work in Defendants' POS system.

**ANSWER:** Defendants deny the allegations of this paragraph.

266.     Defendants altered and diminished the number of hours that Luna and Altered Hours Collective Group members recorded in Defendants' POS system.

**ANSWER:** Defendants deny the allegations of this paragraph.

267.     As a result, Luna and Altered Hours Collective Group members were not compensated for all of the hours that they worked.

**ANSWER:** Defendants deny the allegations of this paragraph.

268.     Luna and Altered Hours Collective Group members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the FLSA.

**ANSWER:** Defendants deny the allegations of this paragraph.

269.     Defendants knew of the FLSA requirements described herein.

**ANSWER:** Defendants deny the allegations of this paragraph.

270.     Defendants' violations of the FLSA requirements described herein were willful.

**ANSWER:** Defendants deny the allegations of this paragraph.

271.     Pursuant to 29 U.S.C. § 216(b), Plaintiffs and members of the Collective Groups are entitled to: (1) compensation for all of the hours for which they were undercompensated; and (2) liquidated damages in an amount equal to all such unpaid compensation.

**ANSWER:** Defendants deny the allegations of this paragraph.

272.     Plaintiffs and members of the Collective Groups are also entitled to reasonable attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

**ANSWER:** Defendants deny the allegations of this paragraph.

WHEREFORE, Plaintiffs, individually, and on behalf of the Collective Groups, pray for an Order as follows:

      a.  Finding that this action satisfies the prerequisites for maintenance as a Collective Action, as set forth by 29 U.S.C. § 216(b), and certifying the Collective Groups defined herein;

      b.  B. Designating Plaintiffs as representatives of the Collective Groups and their undersigned counsel as Collective Group Counsel;

      c.  Entering judgment in favor of Plaintiffs and the Collective Groups and against Defendants;

      d.  Awarding Plaintiffs and the Collective Groups all unpaid compensation to which they are entitled;

      e.  Awarding Plaintiffs and the Collective Groups liquidated damages in an amount equal to the amount of the unpaid compensation to which they are entitled;

      f.  Awarding Plaintiffs and the Collective Groups reasonable attorneys' fees and costs; and

      g.  Granting all such further and other relief as the Court deems just and appropriate.

**ANSWER:** Defendants deny Plaintiffs are entitled to such relief.

**COUNT II**
**Violation of the Illinois Minimum Wage Law**
**(820 ILCS 105/1, *et seq*.)**
**(On Behalf of Plaintiffs and the Wage and Hour Classes)**

273.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein

**ANSWER:** Defendants reassert their answers to paragraphs 1-255 here.

274.     Plaintiffs' and members of the Wage and Hour Classes' work activities were for the direct and substantial benefit of Defendants, and entitled them to wages, as defined by 820 ILCS 105/3(b).

**ANSWER:** Defendants deny the allegations of this paragraph.

275.     At all times relevant, Plaintiffs' and Tip Credit Class members' hourly rate of pay, taken alone, was less than the minimum $8.25 per hour rate established by the IMWL. 820 ILCS 105/4(a)(1).

**ANSWER:** Defendants deny the allegations of this paragraph.

276.     The Take Home Cash that was given to Plaintiffs and Tip Credit Class members was less than the amount of Bestowed Tips to which Plaintiffs and Tip Credit Class members were entitled.

**ANSWER:** Defendants deny the allegations of this paragraph.

277.     Plaintiffs and Tip Credit Class members did not receive any additional payments in connection with the tips that were bestowed upon them by Defendants' customers other than the Take Home Cash they were given by Defendants.

**ANSWER:** Defendants deny the allegations of this paragraph.

278.     Plaintiffs and Tip Credit Class members were not given and allowed to keep *all* of the tips that were bestowed upon them by Defendants' customers. Instead, Defendants uniformly retained the additional amounts in tips that were bestowed upon Plaintiffs and Tip Credit Class members by Defendants' customers over and above what Plaintiffs and Tip Credit Class members were given in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

279.    As such, Defendants cannot claim a tip credit with respect to Plaintiffs and Tip Credit Class members (820 ILCS 105/4(c)), and Plaintiffs and Tip Credit Class members were compensated at a rate less than the minimum wage established by the IMWL (820 ILCS 105/4(a)(1)).

**ANSWER:** Defendants deny the allegations of this paragraph.

280.    Moreover, Defendants unlawfully retained a portion of the tips that were bestowed upon Plaintiffs and Tip Credit Class members. 820 ILCS 105/3(b).

**ANSWER:** Defendants deny the allegations of this paragraph.

281.    Plaintiffs and Tip Credit Class members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the IMWL, as well as the full amount of tips bestowed upon them by Defendants' customers.

**ANSWER:** Defendants deny the allegations of this paragraph.

282.    Luna and Altered Hours Class members recorded the time they began working and the time they left work in Defendants' POS system.

**ANSWER:** Defendants deny the allegations of this paragraph.

283.    Defendants altered and diminished the number of hours that Luna and Altered Hours Class members recorded in Defendants' POS system.

**ANSWER:** Defendants deny the allegations of this paragraph.

284.    As a result, Luna and Altered Hours Class members were not compensated for all of the hours that they worked.

**ANSWER:** Defendants deny the allegations of this paragraph.

285.     Luna and Altered Hours Class members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the IMWL.

**ANSWER:** Defendants deny the allegations of this paragraph.

286.     Defendants knew of the IMWL requirements described herein.

**ANSWER:** Defendants deny the allegations of this paragraph.

287.     Defendants' violations of the IMWL requirements described herein were willful.

**ANSWER:** Defendants deny the allegations of this paragraph.

288.     Pursuant to 820 ILCS 105/12(a), Plaintiffs and members of the Wage and Hour Classes are entitled to: (1) compensation for all of the hours for which they were undercompensated; and (2) damages in an amount equal to 2% of the amount of all such unpaid compensation for each month following the date of payment during which such underpayments remain unpaid.

**ANSWER:** Defendants deny the allegations of this paragraph.

289.     Plaintiffs and members of the Wage and Hour Classes are also entitled to reasonable attorneys' fees and costs, pursuant to 820 ILCS 105/12(a).

**ANSWER:** Defendants deny the allegations of this paragraph.

WHEREFORE, Plaintiffs, individually, and on behalf of the Wage and Hour Classes, pray for an Order as follows:

        a.  Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Wage and Hour Classes defined herein;

b.  Designating Plaintiffs as representatives of the Wage and Hour Classes and their undersigned counsel as Class Counsel;

c.  Entering judgment in favor of Plaintiffs and the Wage and Hour Classes and against Defendants;

d.  Awarding Plaintiffs and the Wage and Hour Classes all unpaid compensation to which they are entitled;

e.  Awarding Plaintiffs and the Wage and Hour Classes damages in an amount equal to 2% of the amount of all unpaid compensation for each month following the date of payment during which such underpayments remain unpaid;

f.  Awarding Plaintiffs and the Wage and Hour Classes reasonable attorneys' fees and costs; and

g.  Granting all such further and other relief as the Court deems just and appropriate.

**ANSWER:** Defendants deny Plaintiffs are entitled to such relief.

**COUNT III**
**Violation of the Chicago Minimum Wage Ordinance**
**(Chi. Mun. Code §§ 1-24-010, *et seq*.)**
**(On Behalf of Plaintiffs and the Wage and Hour Classes)**

290.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-255 with the same force and effect as though fully set forth herein.

**ANSWER:** Defendants reassert their answers to paragraphs 1-255 here.

291.    Plaintiffs' and members of the Wage and Hours Classes' work activities were for the direct and substantial benefit of Defendants, and were performed while physically present within the geographic boundaries of the City of Chicago, Illinois. As such, Plaintiffs and

members of the Wage and Hours Classes are "Covered Employees" as defined by Chi. Mun. Code § 1-24-010.

**ANSWER:** Defendants deny the allegations of this paragraph.

292.    At all times relevant, Plaintiffs' and Tip Credit Class members' hourly rate of pay, taken alone, was less than the prevailing minimum per hour rate established by the Chicago Ordinance relative to employees who do not receive tips. Chi. Mun. Code § 1-24-020.

**ANSWER:** Defendants deny the allegations of this paragraph.

293.    The Take Home Cash that was given to Plaintiffs and Tip Credit Class members was less than the amount of Bestowed Tips to which Plaintiffs and Tip Credit Class members were entitled.

**ANSWER:** Defendants deny the allegations of this paragraph.

294.    Plaintiffs and Tip Credit Class members did not receive any additional payments in connection with the tips that were bestowed upon them by Defendants' customers other than the Take Home Cash they were given by Defendants.

**ANSWER:** Defendants deny the allegations of this paragraph.

295.    Plaintiffs and Tip Credit Class members were not given and allowed to keep *all* of the tips that were bestowed upon them by Defendants' customers. Instead, Defendants uniformly retained the additional amounts in tips that were bestowed upon Plaintiffs and Tip Credit Class members by Defendants' customers over and above what Plaintiffs and Tip Credit Class members were given in Take Home Cash.

**ANSWER:** Defendants deny the allegations of this paragraph.

296.    As such, Defendants cannot avail themselves of the lesser minimum wage for tipped employees under the Chicago Ordinance relative to the hourly rate of compensation paid

to Plaintiffs and Tip Credit Class members (Chi. Mun. Code § 1-24-030), and Plaintiffs and Tip

Credit Class members were compensated at a rate less than the applicable minimum wage

established by the Chicago Ordinance (Chi. Mun. Code § 1-24-020).

**ANSWER:** Defendants deny the allegations of this paragraph.

297.    Moreover, Defendants unlawfully retained a portion of the tips that Defendants'

customers bestowed upon Plaintiffs and Tip Credit Class members. Chi. Mun. Code § 1-24-010.

**ANSWER:** Defendants deny the allegations of this paragraph.

298.    Plaintiffs and Tip Credit Class members have been harmed as a direct and

proximate result of Defendants' unlawful conduct because they have been deprived of

compensation at a rate not less the minimum wage established by the Chicago Ordinance, as well

as the full amount of tips bestowed upon them by Defendants' customers.

**ANSWER:** Defendants deny the allegations of this paragraph.

299.    Luna and Altered Hours Class members recorded the time they began working

and the time they left work in Defendants' POS system.

**ANSWER:** Defendants deny the allegations of this paragraph.

300.    Defendants altered and diminished the number of hours that Luna and Altered

Hours Class members recorded in Defendants' POS system.

**ANSWER:** Defendants deny the allegations of this paragraph.

301.    As a result, Luna and Altered Hours Class members were not compensated for all

of the hours that they worked.

**ANSWER:** Defendants deny the allegations of this paragraph.

302.    Luna and Altered Hours Class members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of compensation at a rate not less the minimum wage established by the Chicago Ordinance.

**ANSWER:** Defendants deny the allegations of this paragraph.

303.    Defendants knew of the Chicago Ordinance requirements described herein.

**ANSWER:** Defendants deny the allegations of this paragraph.

304.    Defendants' violations of the Chicago Ordinance requirements described herein were willful.

**ANSWER:** Defendants deny the allegations of this paragraph.

305.    Pursuant to Chi. Mun. Code § 1-24-110, Plaintiffs and members of the Wage and Hour Classes are entitled to recover three times the amount of compensation owed to them under the Chicago Ordinance.

**ANSWER:** Defendants deny the allegations of this paragraph.

306.    Plaintiffs and members of the Wage and Hour Classes are also entitled to reasonable attorneys' fees and costs, pursuant to Chi. Mun. Code § 1-24-110.

**ANSWER:** Defendants deny the allegations of this paragraph.

WHEREFORE, Plaintiffs, individually, and on behalf of the Wage and Hour Classes, pray for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Wage and Hour Classes defined herein;

b.    Designating Plaintiffs as representatives of the Wage and Hour Classes and their undersigned counsel as Class Counsel;

c.  Entering judgment in favor of Plaintiffs and the Wage and Hour Classes and against Defendants;

d.  Awarding Plaintiffs and the Wage and Hour Classes an amount equal to three times the amount of all unpaid compensation to which they are entitled;

e.  Awarding Plaintiffs and the Wage and Hour Classes reasonable attorneys' fees and costs; and

f.  Granting all such further and other relief as the Court deems just and appropriate.

**ANSWER:** Defendants deny Plaintiffs are entitled to such relief.

## COUNTS IV through VII

**ANSWER:** Counts IV through VII are subject to pending motion to dismiss.  Dkt. 68.

## **AFFIRMATIVE DEFENSES**

1.     Plaintiffs claims are barred in whole or in part because the Plaintiffs themselves caused the harm they now complain of by intentionally underreporting their cash tips and intentionally logging in to the POS system well before they actually started working and logging out of the POS system well after they stopped working.

2.     Plaintiffs fail, in whole or in part, to state a claim upon which relief can be granted.

3.     Defendants make no allegations whatsoever regarding 32 of the 37 Defendants and therefore have not stated a claim against any of those Defendants.

4.     Plaintiffs' claims are barred in whole or in part because Defendants actions relative to Plaintiffs' wages and tips were expressly authorized by applicable statutes and regulations.

5.     Plaintiffs claims are barred in whole or in part because Plaintiffs at all times had full knowledge of and acquiesced in Defendants' conduct and waived any claims based thereon.

6.     Plaintiffs claims are barred in whole or in part by the doctrines of waiver, laches and estoppel.

7.     Defendants are not liable for the acts of their employees or agents who were acting outside the scope of their employment or agency.

8.     Defendants expressly disclaim any knowledge, actual or constructive, of the unlawful conduct of any employee or agent, including any such acts alleged herein.

9.     Plaintiffs claims are barred to the extent they seek remedies beyond those allowable under the applicable law.

10.     Any amount due Plaintiffs should be setoff by amounts of tips that Plaintiffs failed to report and amounts of wages paid to Plaintiffs when they were logged into the POS system but did not actually work.

11.     Plaintiff's claims are barred by the affirmative defenses of estoppel, unclean hands, and/or latches.

12.     To the extent Plaintiffs demand a jury, Defendants object to their jury demand as Plaintiffs claims cannot properly be submitted to a jury.

13.     Defendants acted in good faith and had reasonable grounds for believing they acted lawfully in its pay practices with respect to Plaintiffs and, therefore, Plaintiffs may not be awarded liquidated damages.

14.     Plaintiffs' claims are barred to the extent that they are outside the applicable statute of limitations.

15.     Plaintiffs' claims are barred, in whole or in part, by statutory exclusions, exceptions, setoffs, or credits under the FLSA and Illinois law.

16.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs acted in bad faith.

17.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs actions were unlawful and in violation of any federal or state laws, rules or regulations relating to declaring tip income.

18.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs engaged in fraudulent conduct with respect to declaring tip income for tax purposes and to the extent Plaintiffs misrepresented their tip income.

19.     Plaintiffs claims are barred because the alleged damages, if any, were actually or proximately caused, in whole or in part, by independent, unforeseeable, superseding, and/or intervening cause.

20.     Plaintiffs' Northwest's claims are barred because their alleged damages, if any, were caused solely, partially, or proximately by the actions, omissions, representations, misrepresentations, negligence, or breach of duty of other persons, firms, or corporations that Defendants did not and do not control and for whom Defendants are not responsible or liable.

21.     Plaintiffs failed to mitigate their damages by, among other things, failing to consult with their supervisors about any amounts they felt they were owed.

22.     Defendants have failed to plead the alleged claims with requisite specificity.

Defendants reserve the right to assert and rely on such other defenses as may become available or apparent during the course of discovery and to amend their answer to assert such additional defenses.

WHEREFORE, Defendants respectfully request that this Court dismiss the First Amended Collective and Class Action Complaint with prejudice and award Defendants their costs and attorneys' fees.

Date: August 8, 2019

Respectfully submitted,

4C Kinzie Investor LLC, *et al.*,

By: /s/ Daniel W. Tarpey
    One of their attorneys

By: /s/ Noah A. Finkel
    One of their attorneys

Daniel W. Tarpey
David G. Wix
Matthew M. Showel
TARPEY WIX LLC
225 West Wacker Drive, Suite 1515
Chicago, IL 60606
(312) 948-9090
dtarpey@tarpeywix.com
dwix@tarpeywix.com
mshowel@tarpeywix.com

Noah A. Finkel
Cheryl A. Luce
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
(312) 460-5000
nfinkel@seyfarth.com
cluce@seyfarth.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on August 8, 2019 I electronically filed the

Defendants' Answer and Affirmative Defenses to the Amended Complaint with the Clerk of the

Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of

record.

/s/ Matthew M. Showel
Daniel W. Tarpey
Tarpey Wix LLC
225 W. Wacker Drive, Suite 1515
Chicago, IL 60606
(312) 948-9090
dtarpey@tarpeywix.com
*Attorney for Defendants*